**BUCHALTER**
J. Rick Taché (CA Bar No. 195100)
(rtache@buchalter.com)
Joanne N. Davies (CA Bar No. 204100)
(jdavies@buchalter.com)
Benjamin C. Deming (CA Bar No. 233687)
(bdeming@buchalter.com)
18400 Von Karman Avenue, Suite 800
Irvine, California 92612
Telephone: (949) 760-1121
Facsimile:  (949) 720-0182

Attorneys for Plaintiff
Wave Neuroscience, Inc.

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| WAVE NEUROSCIENCE, INC., a Delaware corporation,<br><br>        Plaintiff,<br><br>vs.<br><br>PEAKLOGIC, INC., a Delaware corporation; and KEVIN T. MURPHY, M.D., a Professional Corporation, doing business as MINDSET,<br><br>        Defendant. | Case No. 3:21-cv-01330-CAB-AGS<br>Assigned to Hon. Cathy Ann Bencivengo<br><br>**PLAINTIFF'S OPENING CLAIM CONSTRUCTION BRIEF** |

# TABLE OF CONTENTS

I.  **INTRODUCTION** ....................................................................... 1

   A.  Background ......................................................................... 1

II.  **THE TECHNOLOGY AND LEVEL OF ORDINARY SKILL** ................ 2

   A.  U.S. Patent No. 8,475,354 (the "'354 Patent") ................................ 2

   B.  U.S. Patent No. 8,480,554 (the "'554 Patent") ................................ 2

   C.  U.S. Patent No. 9,446,259 (the "'259 Patent") ................................ 3

   D.  Level of Ordinary Skill in the Art ............................................... 3

III.  **LEGAL STANDARD FOR CLAIM CONSTRUCTION** ......................... 4

IV.  **COMPROMISE REACHED BY THE PARTIES** .................................. 7

V.  **CLAIM TERMS IN DISPUTE** ..................................................... 8

   A.  "Pre-Selected [Intrinsic Frequency / Q-factor / EEG Phase / Frequency]" .... 9

   B.  "Improves" ........................................................................ 14

   C.  "Adjusting output of a magnetic field based on the subject's intrinsic frequency" .................................................................. 24

BUCHALTER
A PROFESSIONAL CORPORATION
LOS ANGELES

i

1

# TABLE OF AUTHORITIES

2

**Cases**

3

*Biosig Instruments, Inc. v. Nautilus, Inc.*, 783 F.3d 1374 (Fed. Cir. 2015) ..............6

4

*Brown v. 3M*, 265 F.3d 1349 (Fed. Cir. 2001) ........................................11

5

*Datamize LLC v. Plumtree Software, Inc.*, 417 F.3d 1342 (Fed. Cir. 2005)..........5, 6

6

*Finjan, Inc., v. Proofpoint, Inc.*, No. 13-CV-05808-HSG, 2015 WL 7770208

7

    (N.D. Cal. Dec. 3, 2015)................................................................11

8

*Haemonetics Corp. v. Baxter Healthcare Corp.*, 607 F.3d 776 (Fed. Cir. 2010)....10

9

*i2 Techs., Inc. v. Oracle Corp.*, No. 6:09-cv-194, 2011 WL 209692 (E.D. Tex.

10

    Jan. 21, 2011) ..............................................................................4

11

*In re Katz Interactive Call Processing Patent Litig.*, 639 F.3d 1303 (Fed. Cir. 2011)

12

    ...................................................................................14, 25

13

*Intertrust Techs. Corp v. Microsoft Corp.*, 275 F. Supp. 2d 1031 (N.D. Cal. 2003)18

14

*Interval Licensing LLC v. AOL, Inc.*, 766 F.3d 1364 (Fed. Cir. 2014) .....................6

15

*Kara Tech., Inc. v. Stamps.com, Inc.*, 582 F.3d 1341 (Fed. Cir. 2009) ...................5

16

*Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898 (Fed. Cir. 2004)...............5, 13

17

*Lundbeck A/S v. Apotex Inc.*, No. 1:18-cv-00088-LPS, 2019 U.S. Dist. LEXIS

18

    117990 [2019 WL 3206016] (D. Del. July 16, 2019)...........................................16

19

*Nature Simulation Sys. v. Autodesk, Inc.*, 23 F.4th 1334 (Fed. Cir. 2022) ..............22

20

*Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898 (2014) .........................5, 17

21

*Nevro Corp. v. Bos. Sci. Corp.*, 955 F.3d 35 (Fed. Cir. 2020) ......................6, 17, 18

22

*Niazi Licensing Corp. v. St. Jude Med. S.C., Inc.*, 30 F.4th 1339 (Fed. Cir. 2022) ..6,

23

    22

24

*One-E-Way, Inc. v. Int'l Trade Comm'n*, 859 F.3d 1059 (Fed. Cir. 2017)...............6

25

*Orthokinetics, Inc. v. Safety Travel Chairs, Inc.*, 806 F.2d 1565 (Fed. Cir. 1986)....6

26

*Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005)........................................4

27

*Pitney Bowes, Inc. v. Hewlett-Packard Co.*, 182 F.3d 1298, 1304 (Fed. Cir.

28

1999)..................................................................................................4

*Procter & Gamble Co. v. Team Techs., Inc.*, 46 F. Supp. 3d 764 (S.D. Ohio 2014)
..........................................................................................................22

*Provisur Techs., Inc. v. Weber, Inc.*, No. 19-CV-6021-SRB, 2021 U.S. Dist. LEXIS
151597 [2021 WL 3578189] (Aug. 12, 2021 W.D. Mo.)....................................7

*Salix Pharms., Ltd. v. Norwich Pharms., Inc.*, No. 20-430-RGA, 2022 U.S. Dist.
LEXIS 142335 [2022 WL 3225381] (Aug. 10, 2022 D. Del.) ............................16

*SmithKline Beecham Corp. v. Apotex Corp.*, 403 F.3d 1331 (Fed. Cir. 2005)........18

*Sonix Tech. Co. v. Publ'ns Int'l, Ltd.*, 844 F.3d 1370 (Fed. Cir. 2017) .......10, 15, 22

*Star Scientific, Inc. v. R.J. Reynolds Tobacco Co.*, 655 F.3d 1364 (Fed. Cir. 2011) .6

*Starhome GmbH v. AT & T Mobility LLC*, 743 F.3d 849 (Fed. Cir. 2014)..............11

*U.S. Silica Co. v. Amberger Kaolinwerke Eduard Kick GmbH*, No. 2:20-CV-00298-
JRG (E.D. Tex. Nov. 19, 2021)..........................................................................16

*Vitronics  Corp.  v. Conceptronic, Inc.*, 90 F.3d 1576 (Fed. Cir. 1996)....................5

*Websidestory, Inc. v. Netratings, Inc.*, No. 06-CV-408 WHQ (AJB), 2007 U.S.
Dist.  LEXIS  50186  (S.D. Cal. July 2007).........................................................11

**Statutes**

35 U.S.C. § 112....................................................................................10, 15

35 U.S.C. § 282....................................................................................10, 15

BUCHALTER
A PROFESSIONAL CORPORATION
LOS ANGELES

iii

BN 72838888

Case No. 21cv1330

## INDEX OF EXHIBITS
### (Attached to Deming Decl.)

**Ex. 1**      U.S. Patent 8,475,354

**Ex. 2**      U.S. Patent 8,480,554

**Ex. 3**      U.S. Patent 9,446,259

**Ex. 4**      '259 Patent File History, Jan. 15, 2015 Office Action

**Ex. 5**      '259 Patent File History, July 30, 2015 Office Action

**Ex. 6**      '259 Patent File History, Nov. 19, 2015 Office Action

**Ex. 7**      '259 Patent File History, March 24, 2016 Office Action

**Ex. 8**      Cook I.A., Wilson A.C., Corlier J., Leuchter A.F. 2019. Brain Activity and Clinical Outcomes in Adults With Depression Treated With Synchronized Transcranial Magnetic Stimulation: An Exploratory Study. Neuromodulation 2019; 22: 894–897

**Ex. 9**      Claim Construction Order in *U.S. Silica*

**Ex. 10**    Screenshots from www.prtms.com

BUCHALTER
A PROFESSIONAL CORPORATION
LOS ANGELES

iv

BN 72838888

Case No. 21cv1330

# I.   INTRODUCTION

## A.   Background

Wave Neuroscience, Inc. ("Wave") is a recognized global-leader in developing personalized, non-invasive technology aimed at addressing neurological disorders and enhancing cognitive brain function through Transcranial Magnetic Stimulation ("TMS").  Wave's technological advancements in the areas of testing and treatment of neurological disorders and in enhancing cognitive brain function using TMS are evidenced by its extensive patent and trademark portfolio and its collection of proprietary historical data of patient electroencephalogram ("EEG") results and associated medical conditions.

Wave's patented technology involves analyzing a patient's EEG results to derive insight into each patient's brain health.  Wave combines its proprietary algorithms with years of proprietary historical data to create an actionable cognitive treatment report.  Doctors and clinics use Wave's patented equipment and treatment protocols to treat patients to achieve long-lasting cognitive health.

Wave's predecessor, NeoSync, Inc. ("NeoSync"), was founded in 2008 as a clinical stage company.  NeoSync helped pioneer personalized TMS for the treatment of major depressive disorder and other diseases of the central nervous system.  Medical professionals acknowledged that synchronized transcranial magnetic stimulation using EEG was a "new neuromodulation technique", and confirmed the findings using NeoSync's EEG Synchronized TMS ("N.E.S.T.") device. (Ex. 8.)[1]  On February 13, 2020, Wave acquired certain assets from NeoSync, including the patents at issue in this case, which enhanced Wave's patent portfolio and its collection of proprietary historical data of patient EEG results and associated medical conditions.

Wave's patented technology is being used by or in connection with numerous

---

[1] The terms "Exhibit __" and "Ex. __" refer to the exhibits attached to the Declaration of Benjamin Deming, filed concurrently.

BUCHALTER
A PROFESSIONAL CORPORATION
LOS ANGELES

strategic partners, including the U.S. Department of Defense, Department of Veterans Affairs, Special Operations Care – Fund (SOC-F), Tomahawk Charitable Solutions, Texas A&M Institute for Bioscience and Technology, Ohio State University – Physical Medicine and Rehabilitation, Kerlan-Jobe Orthopedic Sports Medicine, Cedar-Sinai, University of Southern California Center for Neurorestoration, Enterhealth Ranch – Substance Abuse Treatment Center, and Warriors Heart – Addiction, Chemical Dependency & PTSD Treatment Center for Active Military, Veterans, and First Responders.  Wave's products, services, and successful treatments have been featured on over 50 podcasts including The Broken Brain, Finding Center, The Joe Rogan Experience, Bulletproof Veteran, Military Veteran Dad, Vets First, and many more.

## II.   THE TECHNOLOGY AND LEVEL OF ORDINARY SKILL

Wave alleges that Defendants infringe claim 39 of U.S. Patent No. 8,475,354 (Ex. 1), claims 1, 4, 7, 8, and 11 of U.S. Patent No. 8,480,554[2] (Ex. 2), and claim 1 of U.S. Patent No. 9,446,259 (Ex. 3).

### A.   U.S. Patent No. 8,475,354 (the "'354 Patent")

The '354 Patent, entitled "SYSTEMS AND METHODS FOR NEURO-EEG SYNCHRONIZATION THERAPY" issued on July 2, 2013.  The '354 Patent provides a method and system for a novel, inexpensive, and easy to use therapy for a number of mental disorders that gently tunes the brain and affect mood, focus, and cognition of a subject, by using a magnetic field to influence an intrinsic frequency of a specified EEG band of the subject toward a pre-selected or target intrinsic frequency of the specified EEG band.

### B.   U.S. Patent No. 8,480,554 (the "'554 Patent")

The '354 Patent, entitled "SYSTEMS AND METHODS FOR DEPRESSION TREATMENT USING NEURO-EEG SYNCHRONIZATION THERAPY" issued

---

[2] Asserted claims 7, 8, and 11 are directly or indirectly dependent on non-asserted claims 2, 5, and or 10.

on July 9, 2013.  The '554 Patent is a continuation of and is directed to the same

technology as that disclosed in the'354 Patent.

## C.     U.S. Patent No. 9,446,259 (the "'259 Patent")

The '259 Patent, entitled "Systems and methods for neuro-EEG

synchronization therapy" issued on September 20, 2016.  The '259 Patent provides

methods, devices, and systems for a novel, inexpensive, easy to use therapy for a

number of disorders with no medication, using alternating magnetic fields to gently

"tune" the brain and affect mood, focus, and cognition of subjects.

## D.     Level of Ordinary Skill in the Art

A POSITA for the Asserted Patents would be someone having knowledge

and familiarity with electrophysiology and signal processing.  Sufficient familiarity

and experience with the subject matter of the asserted patents could be obtained by:

(i) successfully completing a Bachelor's degree in Electrical Engineering or

Biomedical Engineering or similar discipline with classes or experience directed to

electrophysiology and signal processing and TMS; (ii) a medical degree focusing

on treatment of patients with brain disorders and experience with EEG and

application of electrical or magnetic energy such as TMS; or (iii) at least three (3)

years of experience in a job working with patients having brain disorders using

treatment protocols involving TMS and EEG/electrophysiology.

At the time of the invention in 2007, TMS was still a developing technology.

Accordingly, there were not yet any regulatory approvals in place for the use of

TMS in treating depression, nor was TMS in wide use in medical settings.

Therefore, experience at that time would have consisted largely of concentrated

research efforts into specific clinical conditions using predominant theories of TMS

action at the time, which were the activation or inactivation of brain tissue given

high or low frequency applications of TMS.  (Declaration of Marom Bikson

("Bikson Decl."), ¶ 15.)

Defendants have argued in a separate proceeding that "[a] person of ordinary

BUCHALTER
A PROFESSIONAL CORPORATION
LOS ANGELES

skill in the art would have a medical degree plus at least two years of academic and/or industry experience in the field of TMS. Additional professional and/or technical experience could substitute for education, and vice versa."[3]  However in 2007, it would have been uncommon for anyone with a medical degree to have experience in the field of TMS.  (Bikson Decl., ¶¶ 14-16); *Phillips v. AWH Corp.*, 415 F.3d 1303, 1316 (Fed.Cir. 2005) (words of a claim are given "the ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question *at the time of the invention*.") (emphasis added).  Thus, although a medical degree focusing on the relevant practice area might have been one possible avenue for gaining ordinary skill in the art in 2007, it was not the only avenue.  A medical degree is neither necessary nor sufficient to acquire the necessary skills to be a POSITA.  (Bikson Decl., ¶¶ 14-16).

## III.   LEGAL STANDARD FOR CLAIM CONSTRUCTION

It is a "bedrock principle" of patent law that the claims in a patent define the invention to which the patentee is entitled protective rights. *Phillips v. AWH Corp.*, 415 F.3d at 1312.  The purpose of claim construction is for the court to define the proper scope of the invention and to discern the meaning of the claim language the jury might otherwise misunderstand in the context of the patent and file history.  *See, e.g., i2 Techs., Inc. v. Oracle Corp.*, No. 6:09-cv-194, 2011 WL 209692, *4 (E.D. Tex. Jan. 21, 2011); *Pitney Bowes, Inc. v. Hewlett-Packard Co.*, 182 F.3d 1298, 1304 (Fed. Cir. 1999).   In making this determination, the Court must first look to the intrinsic evidence: (1) the patent claims; (2) the patent specification; and (3) the prosecution history. *Markman*, 52 F.3d at 979; *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996).

The patent specification is the primary basis for construing the claims.

---

[3] Petitions for Inter Partes Review (IPR2022-01526, IPR2022-0157, IPR2022-01550), filed by Defendants in September 2022.  The IPR petitions are publicly available via www.uspto.gov, and will be provided to the Court upon request.

The specification is appropriately resorted to "for the purpose of better understanding the meaning of the claim," as the specification provides context for claim language. *Phillips*, 415 F.3d at 1315-16. However, the claims, *not* specification embodiments, define the scope of patent protection and the *patentee is entitled to the full scope of his claims*, without being limited to only the embodiments in the specification. *Kara Tech., Inc. v. Stamps.com, Inc.*, 582 F.3d 1341, 1348 (Fed. Cir. 2009). Unless there is a clear intention by the Applicant, the court "will not at any time import limitations from the specification into the claims," even if only a single embodiment is described. *CollegeNet, Inc. v. ApplyYourself, Inc.*, 418 F.3d 1225, 1231 (Fed. Cir. 2005); *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 906 (Fed. Cir. 2004).

A patent's prosecution history consists of the complete record of the proceedings before the United States Patent and Trademark Office (the "PTO"), including the prior art cited during examination of the patent. Like the patent's specification, "the prosecution history provides evidence of how the PTO and the inventor understood the patent." *Phillips*, 415 F.3d at 1317. In many patent infringement lawsuits, "an analysis of the intrinsic evidence alone will resolve any ambiguity in a disputed claim term. In such circumstances, it is improper to rely on extrinsic evidence." *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1583 (Fed. Cir. 1996).

A patent is only invalid for indefiniteness "if its claims, read in light of the specification delineating the patent, and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 901 (2014) (emphasis added). A classic example of indefiniteness is the term "aesthetically pleasing," which the Federal Circuit in *Datamize LLC v. Plumtree Software, Inc.*, 417 F.3d 1342, 1345 (Fed. Cir. 2005), found was "purely subjective," rendering claims drawn to the "look and feel" of an interface screen invalid. While purely subjective

BUCHALTER
A PROFESSIONAL CORPORATION
LOS ANGELES

terms are indefinite, "[t]erms of degree are not 'inherently indefinite,' and 'absolute or mathematical precision is not required.'"  *One-E-Way, Inc. v. Int'l Trade Comm'n*, 859 F.3d 1059, 1068 (Fed. Cir. 2017) (quoting *Interval Licensing LLC v. AOL, Inc.*, 766 F.3d 1364, 1370 (Fed. Cir. 2014)).  Further, just because a term is susceptible to more than one meaning does not render it indefinite:  "Such a test would render nearly every claim term indefinite so long as a party could manufacture a plausible construction." *Nevro Corp. v. Bos. Sci. Corp.*, 955 F.3d 35, 41 (Fed. Cir. 2020).

To a POSITA,[4]  reasonable certainty in claim scope may allow for both a subjective and objective determination.  See *Datamize*, 417 F.3d at 1350; *Orthokinetics, Inc. v. Safety Travel Chairs, Inc.*, 806 F.2d 1565, 1576 (Fed. Cir. 1986); *Intertrust Techs. Corp. v. Microsoft Corp.*, 275 F. Supp. 2d 1031, 1046 (N.D. Cal. 2003) ("[T]he fact that 'secure' [device] is subjective, in contrast to the clearly objective variable of length, . . . does not mean that a person of ordinary skill in the art cannot determine whether or not something is secure within the context that the term is used.").  "[T]he degree of precision necessary for adequate claims is a function of the nature of the subject matter." *Biosig Instruments, Inc. v. Nautilus, Inc.*, 783 F.3d 1374, 1382 (Fed. Cir. 2015); *Star Scientific, Inc. v. R.J. Reynolds Tobacco Co.*, 655 F.3d 1364, 1373-74 (Fed. Cir. 2011) (finding term "controlled environment" was not indefinite despite the lack of specific numerical parameters for measuring humidity, temperature, and airflow because "a person of skill in the art of tobacco curing would possess adequate understanding to manipulate these variables to create a controlled environment" based on industry standards).  "A claim is not indefinite just because it is broad." *Niazi Licensing Corp. v. St. Jude Med. S.C., Inc.*, 30 F.4th 1339, 1347 (Fed. Cir. 2022); *Provisur*

---

[4] "Person of Ordinary Skill in the Art." A POSITA is a "hypothetical person who is presumed to be aware of all of the pertinent prior art." *Custom Accessories, Inc. v. Saffrey Allan Indus. Inc.*, 807 F.2d 955, 962 (Fed. Cir. 1986).

*Techs., Inc. v. Weber, Inc.*, No. 19-CV-6021-SRB, 2021 U.S. Dist. LEXIS 151597, *41 [2021 WL 3578189] (Aug. 12, 2021 W.D. Mo.) ("Given the explanation in the specifications for how precision can be improved and achieved within the context of the '005 Patent, the terms 'precise' and 'exact' are not boundless, nor does the breadth of the terms inherently render the claims indefinite.").

## IV.   COMPROMISE REACHED BY THE PARTIES

The parties have reached agreement as to the proposed construction for the following disputed claim terms at issue in this case:[5]

| CLAIM TERM NUMBER | DISPUTED CLAIM TERM | AGREED CLAIM CONSTRUCTION |
|---|---|---|
| 5. | **"processor moves (a) an intrinsic frequency of the brain of the subject within the specified (EEG) band to a pre-selected intrinsic frequency"** <br> *'354 Patent, claim 39* | Shifts or alters an intrinsic frequency to be substantially the same as the preselected intrinsic frequency |
| 7. | **"moves/moving [Q-factor/EEG phase] toward the preselected [Q-factor/EEG phase]"** <br> *'354 Patent claim 39* <br> *'554 Patent, claims 2 and 4* | Shifting or altering the [Q-factor/EEG phase] to be closer to the preselected [Q-factor/EEG phase] |
| 8. | **"move the [Q-factor/intrinsic frequency]… toward the preselected [Q-factor/intrinsic frequency]"** <br> *'259 Patent, claim 1* | Shifting or altering the [Q-factor/intrinsic frequency] to be closer to the preselected [Q-factor/ intrinsic frequency] |

Accordingly, the parties respectfully request that the Court adopt the parties' agreed upon construction for the three above-referenced claim terms.

---

[5] In addition, while the parties were unable to reach agreement as to the remaining seven claim terms, the parties have filed a Supplemental Joint Claim Construction Disclosures containing revised constructions as to several terms. (Dkt. No. 51)

## V.    CLAIM TERMS IN DISPUTE

There are seven remaining claim terms in dispute, falling into three general categories (Dkt. 51 at pp. 2-3).  Defendants assert that six of these seven remaining claim terms are indefinite, while at the same time providing proposed alternative constructions for only five of the seven claim terms.

The first category of disputed claim terms (terms 1-4, and 10) revolves around the term "pre-selected," associated with various attributes of a patient's EEG profile, such as intrinsic frequency or Q-factor.  Defendants propose that each of these terms is indefinite – a position that is belied by their ability to construe these terms when they appear in the agreed-upon terms described immediately above.  Defendants have also proposed an alternate construction for each.  The parties appear to agree that "pre-selected [attribute]" must mean that the targeted attribute is chosen before treatment begins, although Defendants insist on importing numerous limitations that are not found anywhere in the patents to support their extremely narrow interpretation.

The second category in dispute is occupied by the term "improves" (term 6), which appears only in claim 1 of the '259 Patent.  In context, the claim recites that application of the magnetic field "improves" certain maladies experienced by the patient.  Defendants allege only that the term is indefinite and do not propose a construction for the term.

The third category of disputed claim terms is for the term "adjusting output of a magnetic field…" (term 9).  Again, the parties seem to agree in general terms that "adjusting output" means to change settings on a magnetic field generator.  Although the specification describes several different types of settings that might be adjusted, Defendants read in limitations in proposing that the term be construed to allow only one particular type of adjustment.

Defendants' thinly veiled attempt to derive creative meanings for common terms for the sole purpose of benefitting their case should not be abided,

BUCHALTER
A PROFESSIONAL CORPORATION
LOS ANGELES

particularly when such proposed meanings directly conflict with both their own proposed constructions and intrinsic and extrinsic evidence.

A.      **"Pre-Selected [Intrinsic Frequency / Q-factor / EEG Phase / Frequency]"**

The claim term: "*pre-selected*" appears in the Asserted Patents, coupled with various attributes of the EEG, as follows:

   (i)      **"pre-selected intrinsic frequency"**
            ['354 Patent, claim 39; '554 Patent, claim 1; '259 Patent, claim 1];

   (ii)     **"pre-selected Q-factor of the intrinsic frequency"**
            ['354 Patent, claim 39; '554 Patent, claim 2; '259 Patent, claim 1];

   (iii)    **"pre-selected EEG phase of the specified EEG frequency"**
            ['554 Patent, claim 4]; and

   (iv)     **"pre-selected frequency"**
            ['554 Patent, claim 5 [6]].

Defendants inexplicably attempt to convince the Court that the first three instances in which the term "*pre-selected*" is used are indefinite, whereas the uses of the same terms in the claim term 10 ("pre-selected frequency") and in the agreed-upon constructions for disputed claim terms 5, 7, and 8 is ***not indefinite***. But Defendants fail to proffer any explanation for why the first three uses must be treated differently than the last and those in the agreed upon constructions.  Such an illogical position further exposes Defendants' contrived proposed constructions of each of the first three "indefinite" uses of the term "pre-selected."

Specifically, Defendants argue that the claim term "*pre-selected*," when coupled with various attributes of an EEG (i.e., "intrinsic frequency,"[7] "Q-factor of an intrinsic frequency,"[8] and "EEG phase"[9]) is indefinite, while at the same time

---

[6] Asserted claims 7, 8, and 11 are dependent on non-asserted claim 5.
[7] '354 Patent, cl. 39; '554 Patent, cl. 1; '259 Patent, cl.1. [Dkt. 51 at pp. 6-25.]
[8] '354 Patent, cl. 39; '554 Patent, cl. 2; '259 Patent, cl.1. [Dkt. 51 at pp. 25-44.]
[9] '554 Patent, cl. 4. [Dkt. 51 at pp. 44-46.]

acknowledging that "*pre-selected*" when coupled with another attribute – i.e., "pre-selected frequency"[10] – is ***not indefinite***.  Moreover, the parties agreed upon the proposed construction for disputed claim terms 5, 7, and 8, as noted above.  The agreed upon construction for these three disputed claim terms includes the following:  "within the specified (EEG) band to a ***pre-selected intrinsic frequency***" (disputed claim term 5); "toward the ***preselected [Q-factor/EEG phase***]" (disputed claim term 7); and "toward the ***preselected [Q-factor/intrinsic frequency***]" (disputed claim term 8).  Defendants take no issue with the inclusion of this language within disputed claim terms 5, 7, and 8.  Unwittingly, Defendants have conceded, at least with respect to disputed claim terms 5, 7, 8, and 10, that the use of the claim term "*pre-selected*" coupled with "intrinsic frequency," "Q-factor," "EEG phase," and "frequency" is ***not indefinite***.  Accordingly, Defendants' attempt to assert that disputed claim terms 1 - 4 are indefinite – despite containing the identical language as agreed to claim terms 5, 7, and 8 – is logically inconsistent and unsupportable.

To prevail Defendants must meet the exacting "clear and convincing evidence" standard required to invalidate the three asserted patents that were duly issued.  *See* 35 U.S.C. §§ 112, 282 (patents are presumed valid and definite); *Sonix Tech. Co. v. Publ'ns Int'l, Ltd.*, 844 F.3d 1370, 1377 (Fed. Cir. 2017) ("Indefiniteness must be proven by clear and convincing evidence."); *Haemonetics Corp. v. Baxter Healthcare Corp.*, 607 F.3d 776, 783 (Fed. Cir. 2010) ("Because claim construction frequently poses difficult questions over which reasonable minds may disagree, proof of indefiniteness must meet 'an exacting standard.'").  Defendants' indefiniteness challenges run contrary to the intrinsic evidence.  The challenged claim terms are commonly used and understood, not only by those skilled in the art, lay people, and Defendants themselves, as evidenced by their

---

[10] '554 Patent, cl. 5 of the '554 Patent. [Dkt. 51 at pp. 69-75.]

BUCHALTER
A PROFESSIONAL CORPORATION
LOS ANGELES

agreement on the construction of disputed claim terms 5, 7, and 8, and their failure argue that disputed claim term 10 ("pre-selected frequency") is indefinite.

None of the disputed claim terms, including claim terms 1 - 4, requires construction. Each uses their plain meaning and provides adequate notice of the scope of the invention. (Bikson Decl., ¶¶ 22-28.) The words of a claim are presumed to use their plain and ordinary meaning, which "provides an objective baseline from which to begin claim interpretation." *Phillips,* 415 F.3d. at 1312-13 ("A fundamental maxim is that the words in a claim should be given their ordinary meaning"). The ordinary meaning is that which "the term would have to a PHOSITA at the time of the invention." *Id.* at 1303. Where the plain and ordinary meaning of a claim term is understandable and consistent with the specification, the term requires no construction. *See, e.g., i2 Techs., Inc.*, 2011 WL 209692, at *4; *Finjan, Inc., v. Proofpoint, Inc.*, No. 13-CV-05808-HSG, 2015 WL 7770208, at *13 (N.D. Cal. Dec. 3, 2015); *Websidestory, Inc. v. Netratings, Inc.*, No. 06-CV-408 WHQ (AJB), 2007 U.S. Dist. LEXIS 50186, *31 (S.D. Cal. July 2007). If a claim term is non-technical and derives no special meaning from the patent and its prosecution history, the Court should not function as a thesaurus. *See Brown v. 3M*, 265 F.3d 1349, 1352 (Fed. Cir. 2001).

The specification can only alter the ordinary meaning of claim language if it is plain that the Applicant intended a different definition of claim terms. *Phillips,* 415 F.3d. at 1316 ("[T]he specification may reveal a special definition given to a claim term by the patentee that differs from the meaning it would otherwise possess. In such cases, the inventor's lexicography governs."). To determine whether a claim term is consistent with the ordinary meaning, a court may rely upon dictionaries so long as the dictionary does not contradict any definition ascertained by a reading of the patent. *Starhome GmbH v. AT & T Mobility LLC*, 743 F.3d 849, 856 (Fed. Cir. 2014).

Here, "*pre-selected*" is a term whose ordinary meaning is well understood in

BUCHALTER
A PROFESSIONAL CORPORATION
LOS ANGELES

everyday language and is consistent with Applicant's intended meaning within the Asserted Patents. Applicant did not ascribe any special meaning to the disputed claim terms. As such, there is no need for the Court to rely on dictionaries to confirm the meaning of the term or otherwise engage in a meaningless intellectual exercise of determining synonymous words when the terms specifically chosen by the Applicant for the claims are the best and most clear indication of the Applicant's own inventions.

Notably, even with respect to the first three proposed constructions,[11] Defendants agree with the core of Plaintiff's proposed construction of the disputed "*pre-selected*" claim terms. Defendants agree with the Plaintiff's proposed construction of "a targeted [intrinsic frequency / Q-factor of an intrinsic frequency] chosen before initiating treatment," but then append extraneous limitations to each construction: "...and used consistently throughout a treatment regimen that is either the [subject's intrinsic frequency / Q-factor of the subject's intrinsic frequency] or the [average intrinsic frequency / average Q-factor of the intrinsic frequency] of a population, such as an average intrinsic frequency of a healthy population database." (Dkt# 51 at pp. 77-94.) Such superfluous language runs directly counter to the express disclosure contained within the specifications of the Asserted Patents and should be rejected. *CollegeNet*, 418 F.3d at 1231 (Absent a clear intention by the Applicant, courts "will not at any time import limitations from the specification into the claims.")

Throughout the drawings and their corresponding descriptions in the specification in each of the three Asserted Patents, the Applicant intentionally discloses alternatives to intrinsic frequency and Q-factor of the intrinsic frequency and averages thereof. (Bikson Decl., ¶¶ 26-27.) Notably, the patents teach that the pre-selected intrinsic frequency may be a harmonic of the peak intrinsic frequency (Ex. 1 at 11:9-11; Ex. 3 at 63:49-51), it may be simply a "target frequency" of the

---

[11] Defendants fail to provide a proposed construction for the fourth disputed term.

BUCHALTER
A PROFESSIONAL CORPORATION
LOS ANGELES

alpha band (Ex. 1 at 42:35-37; Ex. 3 at 72:19-20), or it may be an average

frequency of a group of at least two people without regard to a "healthy population"

(Ex. 1 at 42:37-39; Ex. 3 at 72:21-23).

Importantly, the use of an average frequency of a health population is

mentioned as only one possible solution:  "The pre-selected frequency **may be** an

average intrinsic frequency of a healthy population database."  (Ex. 1 at 3:28-30;

Bikson Decl., ¶ 27.)  But the law is clear that it is improper to import limitations

from the specification into the claims, absent an express intention to do so.

*CollegeNet*, 418 F.3d at 1231.  This is true even when the specification describes

only a single embodiment.  *Liebel-Flarsheim,* 358 F.3d at 906.  The prohibition on

importing limitations applies with greater force when the specification describes

multiple alternatives, as in the Asserted Patents.

In addition, Defendants' proposed construction adds a second limitation:

"and used consistently throughout a treatment regimen."  Such language is not

found anywhere in the Asserted Patents or their associated file histories and runs

directly contrary to both the express disclosure contained within the subject patents

and a POSITA's understanding.  (Bikson Decl., ¶¶ 24-25.)  As used throughout the

patents, the term "pre-selected" means that the targeted attribute or setting is chosen

before a session begins, rather than during application of the device.  It specifically

contemplates that the "pre-selected" attribute is likely to change throughout a series

of treatments based on feedback received in each session.  (*See, e.g.,* Ex. 1 ('354

Pat.) at 4:61-67 (treatment is adjusted and reapplied with new parameters); 7:35-38

("[T]he devices further comprise logic that automatically changes the frequency in

response to EEG readings of a subject before and/or during treatment"); 54:14-15

("[D]evice may adjust the treatment automatically by a biofeedback system."); Ex.

3 ('259 Pat.) at 2:65-3:3 (treatment is adjusted and reapplied with new parameters).)

As set forth in the specification and as understood by a POSITA, prior to

each individual treatment session the most-current EEG report is reviewed to

determine the targeted attribute(s)[12] for the patient's treatment session.  (Ex. 1 at 45:14-23; Bikson Decl. ¶ 25.)   Nowhere in the intrinsic evidence is there a requirement that the pre-selected [intrinsic frequency / Q-factor / EEG phase] must be used "consistently throughout a treatment regimen."  To the contrary, such a limitation flies in the face of the acceptable treatment protocol that allows the patient's EEG to be reviewed prior to each treatment to determine the desired target [intrinsic frequency / Q-factor / EEG phase] to be used for the upcoming treatment session.  The goal is to continue to maximize the benefit of each treatment session. To require the pre-selected [intrinsic frequency / Q-factor / EEG phase] to be "used consistently throughout a treatment regimen," by definition limits the potential benefits of the patented technology.

Given that Defendants' proposed construction of these disputed claim terms is not only logically inconsistent and unsupported by the intrinsic and extrinsic evidence, the proper construction of each of these claim terms is "a targeted [intrinsic frequency/Q-factor of the intrinsic frequency/EEG phase of the specified EEG frequency/frequency] chosen before initiating treatment" consistent with the Applicant's clear intention for these terms.  Any further narrowed construction, particularly one that excludes an embodiment actually disclosed by the Applicant, runs afoul of applicable law and should not be adopted.  See *In re Katz Interactive Call Processing Patent Litig.*, 639 F.3d 1303, 1324 (Fed. Cir. 2011).

**B.    "Improves"**

The claim term "*improves*" appears in claim 1 of the '259 Patent. Defendants incorrectly assert that this claim term is indefinite and do not propose any construction.  As set forth below, the claim term "*improves*" as used in the context of the '259 Patent is clearly understood by a POSITA and is not indefinite.

"*Improves*" is a readily understood word.  Accordingly, no construction is

---

[12] I.e., the "intrinsic frequency," "Q-factor of the intrinsic frequency," "EEG phase of the specified EEG frequency," or "frequency" as recited in the various claims.

BUCHALTER
A PROFESSIONAL CORPORATION
LOS ANGELES

required.  If construction is deemed necessary, then a POSITA would understand this term to mean "**reduces symptoms associated with**" [at least one of neuropathic pain in the subject, a neurological disorder in the subject, a symptom of brain damage, and brain dysfunction in the subject], especially when read in the context of the intrinsic evidence.  Defendants, on the other hand, have not offered a construction of this term, contending instead that it renders the claims indefinite. To prevail in this argument, Defendants must meet the "clear and convincing evidence" standard required to invalidate a duly issued patent such as the '259 Patent.  *See* 35 U.S.C. §§ 112, 282 (patents are presumed valid and definite); *Sonix Tech.*, 844 F.3d at 1377 ("Indefiniteness must be proven by clear and convincing evidence."); *Haemonetics Corp.*, 607 F.3d at 783 ("Because claim construction frequently poses difficult questions over which reasonable minds may disagree, proof of indefiniteness must meet 'an exacting standard.").  Moreover, Defendants' indefiniteness challenge is contrary to the intrinsic and extrinsic evidence, as detailed below, and is particularly unavailing here, where the term is commonly used and understood, not only by those skilled in the art, but even by lay people.

Claim 1 of the '259 Patent describes a method comprising "generating output of a magnetic field" with specific criteria based on the individual subject being treated, and "applying the output of the magnetic field to a head of the subject, wherein application of the output of the magnetic field ***improves*** at least one of neuropathic pain in the subject, a neurological disorder in the subject, a symptom of brain damage, and brain dysfunction in the subject."  Neuropathic pain, neurological disorders, brain damage, and brain dysfunction are associated with a number of clinical symptoms.  The claim uses the term "*improves*" to describe the clinical purpose of reducing the symptoms associated with these disorders, and clinicians know how to evaluate patient symptoms and whether they have been reduced.  (Bikson Decl., ¶¶ 31-34.)

Courts have construed and held definite terms of comparison like

"*improves*," including in the clinical context where individuals, with their individual characteristics, are being treated so as to alleviate symptoms.  *See, e.g.*, *Salix Pharms., Ltd. v. Norwich Pharms., Inc.*, No. 20-430-RGA, 2022 U.S. Dist. LEXIS 142335, *66-67 [2022 WL 3225381] (Aug. 10, 2022 D. Del.) (Andrews, J.) (trial opinion) (holding term definite and crediting expert testimony that "'*adequate relief' of symptoms* is used to determine IBS-D treatment success in the field," even as to "a collection of symptoms [where] there is no biomarker to determine a successful overall treatment"); *Lundbeck A/S v. Apotex Inc.*, No. 1:18-cv-00088-LPS, 2019 U.S. Dist. LEXIS 117990, *18 [2019 WL 3206016] (D. Del. July 16, 2019) (holding "*plain and ordinary meaning of 'alleviates' in the medical context is reducing the severity of symptoms*."); *Invitrogen Corp. v. Biocrest Mfg., L.P.*, 327 F.3d 1364, 1369 (Fed. Cir. 2003) (affirming construction of term "*improved* competence" as "generally increased" without any specific numerical limitation); *U.S. Silica Co. v. Amberger Kaolinwerke Eduard Kick GmbH*, No. 2:20-CV-00298-JRG, p. 22 (E.D. Tex. Nov. 19, 2021) (Gilstrap, J.)[13] ("*improves* adherence" not indefinite as "a skilled artisan would understand that improvement to be relative to the adherence of the particles to the asphalt layer without any treatment").

In *Lundbeck*, the court rejected an indefiniteness challenge and held that the "plain and ordinary meaning of 'alleviates' in the medical context is reducing the severity of symptoms."  *Lundbeck*, 2019 U.S. Dist. LEXIS 117990, *18.  There, the disputed term "alleviates" appeared in context as follows: "[a] method of alleviating a symptom or complication of depression or major depressive disorder . . . wherein said method *alleviates* a symptom or complication of depression or major depressive disorder."  *Id., emphasis added.*  In holding the claim definite, the court explained, "[t]his plain and ordinary meaning is used in the specification, which describes 'alleviating' as 'partially arrest[ing] the clinical manifestations' of MDD

---

[13] The Claim Construction Order in *U.S. Silica* is attached as Exhibit 9.

BUCHALTER
A PROFESSIONAL CORPORATION
LOS ANGELES

[Major Depressive Disorder] and 'reliev[ing]' a symptom of MDD." *Id.* Turning to extrinsic evidence, the court found, "[d]ictionaries also clearly define the term as ***reducing symptoms***, not requiring eliminating them entirely." *Id.* What is more, the court followed *Nautilus*'s command that "absolute precision" is not required. *Id.* Thus, even where "there are several diagnostic scales that list differing symptoms for MDD," the claim was not indefinite because the "record shows that '[c]linicians understand [MDD] symptoms and know how to evaluate whether the severity of one or more symptoms has been reduced in their patients.'" *Id.* at *18-19 (citing to expert declaration). While the defendant argued that "quantitative measurements, temporal limitations, or specific methods" were required, the court held otherwise, citing *Nautilus* for the principle that "absolute precision" is not required. *Id.*

The Federal Circuit has squarely rejected invalidating claims on the grounds they require individual clinical assessments for each patient. For example, in *Nevro Corp.,* 955 F.3d 35, the invention was a spinal cord modulation system to reduce or eliminate pain, including a "means for generating a paresthesia-free therapy signal." *Id.* at 38. "Paresthesia" was found to mean a tingling or numbness and may vary from patient to patient. *Id.* at 39. In denying the accused infringer's indefiniteness challenge to "paresthesia-free therapy signal," the Federal Circuit held that the test for indefiniteness is *not* whether infringement of the claim must be determined on a case-by-case basis—indeed, it would have to be for each patient's sensation of paresthesia had to be individually determined. Rather, the test is simply whether a claim "inform[s] those skilled in the art about the scope of the invention with reasonable certainty." *Id.* (quoting *Nautilus*, 572 U.S. at 910). The *Nevro* defendant also argued that the claims were indefinite because infringement could be determined only after use of the device or method. The Circuit rejected that argument, too: "We do not agree. Definiteness does not require that a potential infringer be able to determine ex ante if a particular act infringes the claims." *Id.* at

40 (emphasis in original, citations omitted); *see also Intertrust Techs. Corp v. Microsoft Corp.*, 275 F. Supp. 2d 1031, 1045 (N.D. Cal. 2003) ("Nor are the claims at issue indefinite because they use a term that requires an evaluation of the context in which it is used or describes a range of circumstances.").  Moreover, a claim is not indefinite merely because it is difficult to determine if one's product infringes. *SmithKline Beecham Corp. v. Apotex Corp.*, 403 F.3d 1331, 1340-41 (Fed. Cir. 2005) ("The test for indefiniteness does not depend on a potential infringer's ability to ascertain the nature of its own accused product to determine infringement, but instead on whether the claim delineates to a skilled artisan the bounds of the invention.").

A POSITA would understand that the claimed invention is directed to treating mental disorders, and that "*improves*" is used in its plain and ordinary sense of "reduces symptoms associated" with the mental disorders.  (Bikson Decl., ¶¶ 36-38.)  Claim terms are to be understood in context, and, here, the specification repeatedly teaches "*improves*" in the context of ***treating*** patients who are suffering from clinically assessed mental disorders, so as to ***reduce symptoms*** associated with their disorders.  Just a few of these teachings are recited here (with emphasis added):

> "Described are **methods** and devices **to treat** disorders that involves no medication." (Ex. 3 at Abstract);

> "Mental disorders generate serious problems for the affected people, their families, and society. Currently, **psychiatrists and neurophysiologists treat these disorders** with a variety of medications, many of which have significant negative side effects." (Ex. 3 at 1:15-19);

> "Repetitive Transcranial Magnetic Stimulation (rTMS) . . . can **reduce the negative symptoms** of Schizophrenia and depression under certain circumstances." (Ex. 3 at 1:20-25);

> "**Described are methods** and systems for novel, inexpensive, easy to use therapy for a number of mental disorders.  Described are methods and devices **to treat mental disorders** that involve no medication. Methods and devices described herein gently 'tune' the brain and affect mood, focus, and cognition of subjects." (Ex. 3 at 1:30-39);

BUCHALTER
A PROFESSIONAL CORPORATION
LOS ANGELES

"Certain types of **neuropathic pain may also be treated with** the devices and methods provided herein. This may include, for nonlimiting example occipital neuralgia (affecting the head), neuritis (inflammation of a nerve), trigeminal neuralgia (affecting the facial areas)....") (Ex. 3 at 34:29-39);

"Likewise, certain types of **neurologic disorders may be treated with** the devices and methods provided herein. Neurological disorders can be categorized according to the primary location affected, the primary type of dysfunction involved, or the primary type of cause...." (Ex. 3 at 34:40-60).

The '259 Patent specification also expressly describes treatment using the patented inventions in terms of improving or reducing the symptoms the patients suffer due to their mental disorders (with emphasis added):

"An effect of use of a modified rTMS device according to the methods and device descriptions provided herein was shown to **reduce the symptoms** of fibromyalgia. . . . The NEST device was used to tune an intrinsic frequency (of the patient's alpha wave). **Following treatment**, the patient reported a **reduction of the symptoms** of fibromyalgia." (Ex. 3 at 84:46-53);

"Some studies have shown that rTMS can **reduce the negative symptoms** of Schizophrenia and depression under certain circumstances." (Ex. 3 at 1:23-25);

"A number of studies have shown this excessive EEG alpha power, which may be a result of neural activity being overly synchronous. By applying a low magnitude alternating magnetic field, activity becomes less synchronous and EEG alpha power decreases. These changes correlate with **improvement in clinical symptoms**." (Ex. 3 at 43:11-14);

"The decrease in Q factor causes the cortex to be higher energy, which causes a **decrease in the symptoms** of MDD [Major Depressive Disorder]." (Ex. 3 at 45:38-40);

"In some embodiments, . . . the desynchronization of alpha activity can play a pathophysiological role in the mental disorders listed above. . . . In some embodiments, the quantifiable change in alpha frequency can be seen clearly following the therapy session, and the patient may have an immediate **reduction in symptoms**. . . . The therapy using methods or systems described does not have to involve any medication whatsoever." (Ex. 3 at 52:50-64);

"Since EEG changes can be direct consequences of treatments using the methods or devices described herein, those EEG changes can be used to **clinically correlate improvement in symptoms** of mental disorders." (Ex. 3 at 70:25-28).

The term "*improves*" does not call for any "purely subjective" inquiry, but

relies on a clinical assessment that provides a baseline against which the treatment's effectiveness in reducing the patient's symptoms for the disorder can be measured after treatment.  (Bikson Decl., ¶ 39.)

Indeed, the specification gives a number of examples of clinical assessments used to establish a baseline from which to measure improvement, including as part of "Example 6," which describes a study where patients suffering from psychosis, depression, and movement disorders were clinically assessed before and after receiving treatment using a pMERT device:

> "Severity of psychosis, depression, and movement disorders are **assessed** with the Hamilton Anxiety Scale (HAMA), the Hamilton Depression Scale (HAMD), PANSS, Montgomery-Asberg Depression Rating Scale (MADRS), Barnes Akathisia Rating Scale (BARS), and Simpson-Angus Scale (SAS), respectively. All rating scales and EEGs are administered at screening, **baseline (immediately prior to first treatment)**, immediately following the fifth and tenth treatments. . . . A priori categorical definition for **clinical** response is >30% **baseline-to-post treatment reduction** at the end of treatment on PANSS negative symptom subscale. . . . **Patients with a baseline and at least 1 additional set of completed assessments** (at least 5 treatment sessions) are included in the analysis of mean treatment effect. Efficacy in **clinical ratings** is evaluated by using analyses of variance (ANOVA) with repeated measure over time….
>
> "[¶] … Change score for each variable before and after pMERT (NEST) treatment is used to correlate with the change score of each **clinical measure** from the same time points…."
> (Ex. 3 at 75:52-76:5 & 76:37-40 (emphases added).)

The specification at "Example 14" and FIGS. 31 and 32 describes another clinical trial, this one to treat depression using a NEST device where the magnetic field was adjusted to influence the Q-factor of an intrinsic frequency within the alpha-band for subjects in the test groups.  (Ex. 3 at 85:52-86:42.)  The subjects were clinically assessed before treatment using the Hamilton Depression Scale (HAMD) to establish the baseline (FIG. 31) against which improvement (FIG. 32) in reduced symptoms was assessed (*id.*).



FIG. 31

FIG. 32

The specification at "Example 15" and FIG. 33 describes another clinical trial, this one using a NEST device to treat anxiety.  86:46-87:3.  Again, the improvement is based on clinical assessments before and after treatment—where the pre-treatment assessment provides the baseline:

"The first data point is the **baseline** HAMA score. The second data point for each line represents the HAMA **score after** one (1) week of **treatment** for each patient. The third data point for each line represents the HAMA **score after** two (2) weeks of **treatment** for each patient. The fourth data point for each line represents the HAMA **score after** four (4) weeks of **treatment** for each patient." (Ex. 3 at 86:63-87:3 (emphases added));

"[T]he method provides an **improvement as measured using a rating scale** selected from the group consisting of HAMA, HAMD, PANSS, MADRS, BARS, SAS, and any combination thereof.  In some embodiments of at least one aspect described above, the method provides an improvement as measured using the Unified Parkinson's Rating Scale."). (Ex. 3 at 18:43-53 (emphases added).)

Thus, a POSITA would understand that the claims of the '259 Patent use the term "*improves*" to describe the clinical purpose of reducing the symptoms associated with the specifically listed disorders, and would know how to evaluate whether symptoms have been reduced after treatment.  (Bikson Decl., ¶¶ 31-40.)

The prosecution history further establishes that the term "*improves*" is

definite, because the Examiner had no difficulty in determining the scope of "*improves*," and was able to understand and apply the term in performing prior art searches and in making rejections from the perspective of what would have been obvious to a POSITA.  *See Sonix Tech.*, 844 F.3d at 1379-81 (reversing indefiniteness ruling and finding compelling that "the USPTO did not express any uncertainty as to the scope of 'visually negligible,' or encounter any apparent difficulty in applying the term to the references"); *Niazi Licensing*, 30 F.4th at 1347 (Federal Circuit reiterating that in *Sonix*, "[w]e also found it highly relevant that the examiner understood this phrase throughout prosecution"); *Nature Simulation Sys. v. Autodesk, Inc.*, 23 F.4th 1334, 1343 (Fed. Cir. 2022) ("[E]xaminers are deemed to be experienced in the relevant technology as well as the statutory requirements for patentability."); *Procter & Gamble Co. v. Team Techs., Inc.*, 46 F. Supp. 3d 764, 771-74 (S.D. Ohio 2014) (Examiner's reaction to and understanding of the claimed invention is further evidence that term is not indefinite.).

During the prosecution of the '259 Patent, the Examiner rejected Claim 1 (original Claim 19) as obvious under § 103 in light of the prior art references Becker and Katz.[14]  In so doing, the Examiner not only understood the scope of the "*improves*" term to a POSITA and applied the "*improves*" term in searching the prior art, but also concluded that some prior art did not teach the "*improves*" limitation (Katz), while other prior art did (Becker), and then combined these references specifically to read on the "*improves*" limitation:

> "It would have been ***obvious to one of ordinary skill in the art*** at the time of the invention to modify the method of Katz with **improving** at least one of neuropathic pain in the subject, a neurological disorder in the subject, a symptom of brain damage, and brain dysfunction in the subject as taught by Becker ***in order to effectively reduce symptoms associated with such states*** (Becker (¶ [0055]).

(Ex. 4, Jan. 15, 2015 Office Action ("OA") at pp. 7-8 (emphases added).[15]

---

[14] U.S. 6,488,617 ("Katz"); U.S. 2005/0182287 ("Becker").

[15] Plaintiff will provide full copies of the prosecution histories (approximately 5000 pages in total) to the Court upon request.

Subsequent amendments to Claim 1 left the "*improves*" term intact, showing that the term "*improves*" is **not** indefinite.  (*See* Ex. 5, July 30, 2015 OA at pp. 5-6; Ex. 6, Nov. 19, 2015 OA at pp. 8-10 (discussing prior art application of "applying magnetic fields to the head to improve [symptoms]")"; Ex. 7, March 25, 2016 OA at pp. 7-9; Bikson Decl., ¶ 39.)

The record further shows that the Examiner did not fail to apply the written description requirement before allowing the claims, as evidenced by his indefiniteness rejections as to different limitations, for example, the "moving" step in Claim 1 as preliminarily amended.  (Ex. 4 Jan. 15, 2015 OA at pp. 4; *see also* Ex. 5, July 30, 2015 OA at pp. 3-4 (indefiniteness rejection as to another limitation in another claim).)

Thus, the evidence establishes that the term "*improves*" is definite and used according to its plain and ordinary meaning, i.e., "reduces symptoms associated with."  (*See also* Bikson Decl., ¶ 40.)

Finally, Defendants' use of the disputed claim language is also instructive in determining whether the claim language has a discernible meaning and is therefore definite.  Defendants' website (www.prtms.com) repeatedly use the terms "improve" and "improving" consistent with the plain and ordinary meaning of the term proposed by Wave in this case:

"PeakLogic® is focused on **improving brain health**…." (Ex. 10 (prtms.com) at p. 5);

"Our mission is to… **improve their patients' mental health and human performance**." (Ex. 10 (prtms.com) at p. 5);

"Personalized rTMS… **improved outcome in a patient suffering from concussion, depression, and anxiety** following a surfing accident" (Ex. 10 (prtms.com) at p. 29).

Such references to "*improves*" appearing on Defendants' website today are instructive of the fact that Defendants and researchers, like a POSITA and a lay person, clearly understand the meaning of the term "*improves*" in the context of the

BUCHALTER
A PROFESSIONAL CORPORATION
LOS ANGELES

technology disclosed and claimed in the '259 Patent.  Defendants, given the significant intrinsic and extrinsic evidence to the contrary, will not be able to meet the high bar to establish that the claim term "*improves*" is indefinite.  Because such evidence clearly establishes that the term "*improves*" is definite and used according to its plain and ordinary meaning and because Defendants failed to provide an alternative proposed construction, the Court should construe "*improves*" to mean "reduces symptoms associated with [at least one of neuropathic pain in the subject, a neurological disorder in the subject, a symptom of brain damage, and brain dysfunction in the subject]."

C.     **"Adjusting output of a magnetic field based on the subject's intrinsic frequency"**

The claim term "adjusting output of a magnetic field based on the subject's intrinsic frequency" appears in claim 1 of the '554 Patent.  The dispute as to this claim term is focused on whether there are multiple possible settings (i.e. parameters) that may be adjusted to determine the *output of the magnetic field* (as Plaintiff proposes) or, whether the only parameter capable of being adjusted is the *frequency of the magnetic field* (as Defendants propose).

Contrary to Defendants' proposed construction, the specification makes clear that more than just the "frequency" can be adjusted with respect to the magnetic field: Three parameters of magnetic fields generated by the devices described can be manipulated[16]:  (a) the ***intensity*** of the magnetic field at the treatment site…; (b) the ***frequency*** of the magnetic field…; (c) the ***amplitude*** of the net change in magnetic flux…; and (d) the ***phase*** of the magnetic field between two (or more) magnets.  (Ex. 2 at 25:41-58, emphasis added).

Any attempt to limit the magnetic field output to just "frequency" runs

---

[16] Although this passage refers to "three" parameters that can be manipulated, this portion of the specification actually describes ***four*** such parameters.

1    directly counter to the express disclosure contained within the drawings and written

2    description in the specification.  Absent a clear intention by the Applicant, courts

3    "will not at any time import limitations from the specification into the claims."

4    *CollegeNet, Inc. v. ApplyYourself, Inc.*, 418 F.3d at 1231.

5        Throughout the drawings and their corresponding descriptions in the

6    specification, of the '554 Patent, the Applicant intentionally discloses four discrete

7    parameters of magnetic fields generated by the variety of magnetic field generating

8    devices that may be manipulated to impact the output of the magnetic field.  For

9    example, referencing Figs. 10A-10G, the specification provides a detailed

10   description of the amplitude of the net change in magnetic flux (Ex. 2 at 25:60-

11   26:44).  In addition, the ability to adjust the phase of the magnetic field between

12   two or more magnets is disclosed in Example 2. (*Id*. at 43:20-32.)

13       Thus, a proper construction of this claim term is "controlling the settings on

14   the device in response to the naturally occurring wave frequency of a subject's

15   brain measured by an EEG (i.e. a subject's intrinsic frequency)" consistent with the

16   Applicant's clear intention for the term to identify the various parameters that may

17   be controlled to adjust the output of the magnetic field, based upon the subject's

18   intrinsic frequency.  Any further narrowed construction (such as that proposed by

19   Defendants), particularly one that excludes embodiments actually disclosed by the

20   Applicant, runs afoul of applicable law and should not be adopted.  See *In re Katz*,

21   639 F.3d at 1324.

22       The seven remaining claim terms in dispute should, for the reasons set forth

23   above, be construed as having their plain and ordinary meaning and ascribed the

24   construction proposed by Plaintiff.

25   DATED:  September 30, 2022         BUCHALTER
                                        A Professional Corporation
26

27                                      By:  _____/s/ J. Rick Taché_____

28                                          J. Rick Tache

25



Benjamin C. Deming
Attorneys for Plaintiff,
Wave Neuroscience, Inc.
Attorneys for Plaintiff

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28