1  **CHARLES A. BLAZER, II** (CSBN 282,495)
2  cblazer@blazerlegal.com
   5282 Gaylord Place
3  San Diego, CA 92117
4  Telephone: (757) 560-7298

5  **ALLEN M. SOKAL** (*pro hac vice*)
6  asokal@dcpatent.com
   Ditthavong, Steiner, & Mlotkowski
7  201 N. Union Street, Suite 110
8  Alexandria, VA 22314
   Telephone (202) 297-2479
9
10 *Attorneys for Defendants and Counter-Plaintiffs*,
    PEAKLOGIC, INC., and KEVIN T. MURPHY,
11  M.D., a Professional Corporation, doing business
    as MINDSET
12

13              **UNITED STATES DISTRICT COURT**
14            **SOUTHERN DISTRICT OF CALIFORNIA**
15

16 | WAVE NEUROSCIENCE, INC., | CASE NO.:  3:21-cv-01330-CAB-AGS |
17 | *Plaintiff and Counter-Defendant*, | **DEFENDANTS' OPENING CLAIM CONSTRUCTION BRIEF** |
18 | v. | |
19 | PEAKLOGIC, INC., and KEVIN T. MURPHY, M.D., a Professional Corporation, doing business as MINDSET | Hearing Date:  November 10, 2022 |
20 | | Time: 10:00 a.m. |
21 | | District Judge Cathy Ann Bencivengo |
22 | *Defendants and Counter-Plaintiffs* | |
23
24
25
26
27
28

i

**TABLE OF CONTENTS**

I.      BACKGROUND ............................................................................................1

    A.      The Parties ........................................................................................1

    B.      Repetitive Transcranial Magnetic Stimulation (rTMS) ...................2

        1.      Intrinsic Frequency .................................................................2

        2.      Q-Factor ..................................................................................3

        3.      Therapeutic Benefits ..............................................................4

    C.      The Asserted Patents .........................................................................5

        1.      Asserted Claim of the '354 Patent .........................................5

        2.      Asserted Claims of the '554 Patent ........................................6

        3.      Asserted Claim of the '259 Patent .........................................7

II.     LEGAL STANDARD ..................................................................................7

    A.      Claim Construction ...........................................................................7

    B.      Indefiniteness.....................................................................................9

III.    DISPUTED TERMS ..................................................................................10

    A.      "pre-selected" [intrinsic frequency] ...............................................10

    B.      "pre-selected" [Q-factor of the intrinsic frequency] .....................14

    C.      "pre-selected" [EEG phase of the specified EEG frequency].......15

    D.      "adjusting output of a magnetic field based on the subject's intrinsic
        frequency" .......................................................................................16

    E.      "pre-selected frequency" .................................................................18

IV.     UNDISPUTED TERMS .............................................................................19

    A.      "processor moves (a) an intrinsic frequency of the brain of the subject within
        the specified (EEG) band to a pre-selected intrinsic frequency".................19

B.      "moves/moving [Q-factor/EEG phase] toward the preselected [Q-factor/EEG phase]".............................................................19

V.      CONCLUSION..........................................................................................20

# TABLE OF AUTHORITIES

**Cases**

*Applied Med. Res. Corp. v. U.S. Surgical Corp.*,
   448 F.3d 1324 (Fed. Cir. 2006) ................................................................. 18

*CAE Screenplates Inc. v. Heinrich Fiedler GmbH & Co. KG*,
   224 F.3d 1308 (Fed. Cir. 2000) ................................................................. 18

*Elekta Instrument S.A. v. O.U.R. Scientific Int'l, Inc.*,
   214 F.3d 1302 (Fed. Cir. 2000) ......................................................... 10, 17

*GPNE Corp. v. Apple Inc.*,
   830 F.3d 1365 (Fed. Cir. 2016) ................................................................... 8

*ICU Med., Inc. v. Alaris Med. Sys., Inc.*,
   558 F.3d 1368 (Fed. Cir. 2009) ................................................................... 8

*In re Berg*,
   140 F.3d 1428 (Fed. Cir. 1998) ................................................................... 5

*In re Rambus Inc.*,
   694 F.3d 42 (Fed. Cir. 2012) ....................................................................... 8

*Kara Tech. Inc. v. Stamps.com Inc.*,
   582 F.3d 1341 (Fed. Cir. 2009) ................................................................... 8

*Liebel-Flarsheim Co. v. Medrad, Inc.*,
   358 F.3d 898 (Fed. Cir. 2004) ................................................................... 10

*Markman v. Westview Instruments, Inc.*,
   517 U.S. 370 (1996) .............................................................................. 7, 9

*MicroStrategy Inc. v. Business Objects Americas*,
   238 F. App'x 605 (Fed. Cir. 2007) ........................................................... 18

*Modine Mfg. Co. v. U.S. Int'l Trade Comm'n*,
   75 F.3d 1545 (Fed. Cir. 1996) ................................................................... 9

*Omega Eng'g, Inc. v. Raytek Corp.*,
    334 F.3d 1314 (Fed. Cir. 2003)....................................................................8

*Osram GmbH v. Int'l Trade Comm'n*,
    505 F.3d 1351 (Fed. Cir. 2007)....................................................................9

*Phillips v. AWH Corp.*,
    415 F.3d 1303 (Fed. Cir. 2005) (*en banc*) ....................................7, 8, 9, 10

*Pitney Bowes, Inc. v. Hewlett-Packard Co.*,
    182 F.3d 1298 (Fed. Cir. 1999)....................................................................9

*Renishaw PLC v. Marposs Societa' per Azioni*,
    158 F.3d 1243 (Fed. Cir. 1998)................................................................7, 9

*Rhine v. Casio, Inc.*,
    183 F.3d 1342 (Fed. Cir. 1999)....................................................................9

*Teva Pharm. USA, Inc. v. Sandoz, Inc.*,
    135 S. Ct. 831 (2015) ................................................................................7, 9

*Thorner v. Sony Computer Entm't Am. LLC*,
    669 F.3d 1362 (Fed. Cir. 2012)....................................................................9

*Trustees of Columbia Univ. v. Symantec Corp.*,
    811 F.3d 1359 (Fed. Cir. 2016)....................................................................9

*VirnetX, Inc. v. Cisco Sys., Inc.*,
    767 F.3d 1308 (Fed. Cir. 2014)....................................................................8

*Vitronics Corp. v. Conceptronic, Inc.*,
    90 F.3d 1576 (Fed. Cir. 1996)..................................................................8, 9

**Statutes**

35 U.S.C. § 101 .............................................................................................14

35 U.S.C. § 112 ......................................................................10, 14, 16, 17

v

**Other Authorities**

Klimesch et al., *Enhancing Cognitive Performance with Repetitive Transcranial Magnetic Stimulation at Human Individual Alpha Frequency*, 17 European Journal of Neuroscience 1129 (2003) ........................................................................................ 4, 17

U.S. Pat. No. 6,488,617 ("Katz") ........................................................................... 3, 4, 13

Yi Jin et al., *Therapeutic Effects of Individualized Alpha Frequency Transcranial Magnetic Stimulation on the Negative Symptoms of Schizophrenia*, 32 Schizophrenia Bulletin 556 (October 27, 2005) .......................................................................... 3, 4, 12

Pursuant to Patent Local Rule 4.4(a) and the Case Management Order (Doc. 40) in this case, Defendants respectfully submit this Opening Claim Construction Brief.

# I.  BACKGROUND

## A.  The Parties

The parties in this case are direct competitors in the medical practice of prescribing repetitive transcranial magnetic stimulation (rTMS or TMS) to treat neurological and behavioral disorders. Defendant Dr. Murphy is a medical doctor with over twenty years of specialized experience treating the human brain. His medical research focuses on prescribing a personalized form of TMS to treat and diagnose patients suffering from a variety of brain maladies, including brain tumors, post-traumatic stress disorder (PTSD), autism spectrum disorder, addiction behaviors, cerebral palsy, and more. The brain's response to magnetic stimulation is a natural phenomenon, and the medical potential of TMS to treat a variety of brain conditions has been known and studied for over thirty years. Since Dr. Murphy first started studying TMS, he has personally treated more than 3,000 patients and been involved in the planning and delivery of treatment recommendations for more than 7,000 patients. Dr. Murphy did not invent TMS (neither did Plaintiff), but his vast firsthand experience, clinical research, and proprietary data accumulated over thousands of treatments make him a leader in the field. His treatments reduce symptoms, dramatically improve quality of life, and, in some cases, save lives.

Defendant PeakLogic, Inc. is Dr. Murphy's business, through which he provides treatment recommendations to physicians who use TMS to treat patients. PeakLogic provides a simple software tool for physicians to securely submit patient data to Dr. Murphy for him to review. The software then allows Dr. Murphy to reply with his recommended course of treatment. In short, PeakLogic provides a convenient, HIPAA-secure, doctor-to-doctor communication portal that allows Dr. Murphy to offer his TMS expertise and experience virtually anywhere. The treating physician, however, ultimately decides whether to adopt, modify, or apply Dr. Murphy's recommendations.

Plaintiff Wave Neuroscience, Inc. is a recently founded competitor that also uses TMS to treat patients with brain disorders. Since its inception, Wave acquired the assets of its predecessor, Newport Brain Research Laboratory (NBRL), and the patents of another company, NeoSync, and has begun an aggressive campaign to preempt the entire field of prescribing and using TMS to treat patients with brain disorders, even though the practice is over thirty years old already. Among the patents acquired from NeoSync are the three patents asserted in this case: U.S. Patent Nos. 8,475,354 ("the '354 Patent"), 8,480,554 ("the '554 Patent"), and 9,446,259 ("the '259 Patent").

### B.    Repetitive Transcranial Magnetic Stimulation (rTMS)

#### 1.    Intrinsic Frequency

The Asserted Patents all relate to applying rTMS to the human brain to elicit the brain's natural response to magnetic stimulation. Different regions of the brain naturally produce electrical signals across a spectrum of frequencies. An electroencephalogram (EEG) is a well-known prior art tool for observing and measuring the frequency spectrum of brain activity. Of particular interest are signals in the "alpha" frequency band, between about 8 and 13 Hz. A person's "intrinsic frequency" is



'354 Patent, Fig. 5 (in part) (depicting a peak in the alpha band at 9.12 Hz).

the peak frequency in that alpha band, as measured by an EEG.

As described in the '354 Patent, when the brain is exposed to a repetitive magnetic field at a frequency in the alpha band that is lower than the patient's intrinsic frequency, the brain naturally resonates with that applied frequency, and the patient's intrinsic frequency "shift[s] down" toward the applied frequency. Exhibit A ('354 Patent) at col. 34, ll. 56-67. Conversely, when the brain is exposed to a repetitive magnetic field at a frequency in the alpha band that is higher than the patient's intrinsic frequency, the brain naturally resonates with that applied frequency, and the patient's intrinsic frequency "shift[s] up" toward the applied frequency. *Id.* at col. 34, l. 67 – col. 35, l. 5. The

2

patentees did not invent this property of the human brain; it is the brain's natural response to magnetic stimulation. *See generally* Exhibit G (Yi Jin et al., *Therapeutic Effects of Individualized Alpha Frequency Transcranial Magnetic Stimulation on the Negative Symptoms of Schizophrenia*, 32 Schizophrenia Bulletin 557 (October 27, 2005) ("Jin")) at 557, 559 (prior art study observing that TMS stimulation in the alpha band will "alter the alpha EEG based on the physics of resonance … as long as the stimulation rates are close enough to the intrinsic frequency of the alpha rhythm"); Exhibit I (U.S. Pat. No. 6,488,617 ("Katz")) at col. 2, l. 66 – col. 3, l. 5 (prior art patent in the field of TMS, filed on Oct. 13, 2000, observing the previously known state of the art: "The ability to produce a localized magnetic field, which in turn triggers localized electrical activity in the brain, has enabled TMS to be successful in the treatment of depression."); Exhibit D (Prosecution History of the '354 Patent) at WNI000626 (discussing how the applications of TMS in Katz "***move the brain waves*** from one band to another") (emphasis added).

## 2. Q-Factor

The "tightness" or shape of the peak in the patient's alpha frequency band is measured by a mathematical relationship called "Q-factor." "The Q-factor is defined as the ratio of $f_0/\Delta f$…. [W]hen $\Delta f$ decreases for a given $f_0$, the Q-factor will increase. This can occur when the peak energy $E_{max}$ of the signal increases or when the bandwidth of the EEG signal decreases." '354 Patent at Fig. 12



(depicted at right), col. 46, ll. 56-60. By this relationship, a tall, skinny, "tight" peak would have a higher Q-factor than a low, wide, "flat" peak.

When the brain is exposed to a repetitive magnetic field at a frequency in the alpha band at or near the patient's intrinsic frequency, the brain naturally resonates with that applied frequency, and the Q-factor of the peak "tun[es] up." *Id.* at col. 35, ll. 20-35. In other words, the peak becomes taller and narrower relative to its width, as the brain's

electrical signaling at or near the intrinsic frequency increases relative to its signaling at other frequencies. The patentees did not invent this property of the human brain; it is the brain's natural response to magnetic stimulation. *See generally* Exhibit G (Jin) at 559; Katz at col. 2, l. 66 – col. 3, l. 5.

### 3. Therapeutic Benefits

As explained in the prior art and in the Asserted Patents, the natural resonance that occurs in the brain in response to applying rTMS at or near a patient's intrinsic frequency in the alpha band provides therapeutic benefits for patients suffering from many different brain dysfunctions and neurological disorders. In other words, a healthy brain tends to exhibit a tight, narrow peak at the patient's intrinsic frequency in the alpha band, with a correspondingly high Q-factor, and since rTMS heightens Q-factor, it can help transition the brain to a healthier state. Long before the patents were filed, "rTMS has been extensively studied in the treatment of depression and other disorders." Exhibit G (Jin) at 557 (citing George *et al.* (1999)). For example, prior art studies predicted and demonstrated that "the stimulus rate of rTMS set individually at each subject's intrinsic peak alpha frequency would increase frontal alpha activity and, consequently, reduce the clinical symptoms [of schizophrenia]." *Id.*; *see* '354 Patent at col. 19, ll. 22-40 (listing seventeen mental disorders treatable by rTMS), col. 20, ll. 4-16 (listing twenty symptoms treatable by rTMS), col. 20, ll. 30-44 (listing thirty conditions, diseases, and injuries treatable by rTMS); *cf.* Exhibit H (Klimesch et al., *Enhancing Cognitive Performance with Repetitive Transcranial Magnetic Stimulation at Human Individual Alpha Frequency*, 17 European Journal of Neuroscience 1129-33 (2003)) ("Klimesch") at 1129, 1132 (showing rTMS set individually at each subject's intrinsic peak alpha frequency plus 1 Hz increases frontal alpha activity and, consequently, improves cognitive performance). Thirty years ago, this was a phenomenal breakthrough in brain treatment, because it is a method that involves no medication. Since then, thousands of hospitals and treatment centers across the country now offer rTMS treatment.

### C.     The Asserted Patents

All three patents are substantially identical. Specifically, the '354 and '554 Patents both claim priority to the same Provisional Patent Applications, and their specifications are almost entirely the same, *verbatim*. The '259 Patent claims a different priority date, but much of its specification is likewise the same as the other Asserted Patents, *verbatim*. The claims of all three patents are so substantially similar in scope that the U.S. Patent and Trademark Office (USPTO) rejected the later-filed claims of the '259 Patent in view of the earlier-filed claims of the '354 and '554 Patents based on nonstatutory double patenting (*i.e.*, "not patentably distinct" from the earlier-filed claims), thereby requiring the patentee to disclaim any additional patent term that would have been accorded to the '259 Patent. Exhibit F (Prosecution History of the '259 Patent) at WNI004827-4829 (Double Patenting Rejections) (citing *e.g.*, *In re Berg*, 140 F.3d 1428 (Fed. Cir. 1998)), WNI004850 (Terminal Disclaimer with respect to the '354 Patent), WNI004856 (Terminal Disclaimer with respect to the '554 Patent).

Plaintiff asserts claim 39 of the '354 Patent against both Defendants; claims 1, 4, 7, 8, and 11 of the '554 Patent against only PeakLogic; and claim 1 of the '259 Patent against only PeakLogic. All of these claims are subject to currently pending Petitions for *Inter Partes* Review at the USPTO, but the Patent Trial and Appeal Board has not yet instituted review. *See PeakLogic, Inc. v. Wave Neuroscience, Inc.*, IPR2022-01526, 01527, Paper 1 (PTAB Sep. 9, 2022), IPR2022-01550, Paper 1 (PTAB Sep. 15, 2022).

### 1.  Asserted Claim of the '354 Patent

Claim 39 is directed to a TMS device that controls an electromagnet to generate a repetitive magnetic field at a frequency "based on" either a subject's intrinsic frequency or the Q-factor of their intrinsic frequency. The claim recites that, in response to the magnetic field, either: (a) the subject's intrinsic frequency moves to a pre-selected intrinsic frequency; (b) the Q-factor of the intrinsic frequency moves toward a pre-selected Q-factor; (c) a coherence value of intrinsic frequencies moves to a lower or higher coherence value; (d) an EEG phase between two sites in the brain moves; or (e) a

5

combination thereof. All of those responses are natural responses of the brain to the claimed magnetic field.

### 2. Asserted Claims of the '554 Patent

Claim 1 is directed to using TMS to treat depression. The claimed method comprises: "(a) adjusting output of a magnetic field based on the subject's intrinsic frequency; (b) applying said magnetic field close to a head of the subject; and (c) moving the intrinsic frequency toward a pre-selected intrinsic frequency within the specified EEG band." As discussed above, the claimed movement of the intrinsic frequency is the brain's natural response to applying a magnetic field.

Claim 2 is not asserted, but asserted claims 7, 8, and 11 depend from it. Claim 2 is substantially similar to claim 1, except that it recites applying the magnetic field to move a Q-factor of the intrinsic frequency toward a pre-selected Q-factor, instead of claiming movement of the intrinsic frequency.

Claim 4 is substantially similar to claim 1, except that it recites applying the magnetic field to move "an EEG phase between a first site and a second site in a brain of the subject of a specified EEG frequency" toward a "pre-selected EEG phase," instead of claiming movement of the intrinsic frequency or Q-factor.

Claim 5 is not asserted, but asserted claims 7, 8, and 11 depend from it. Claim 5 is directed to applying the magnetic field to "tun[e] down the Q-factor" of the intrinsic frequency.

Claim 7 depends from claims 2 or 5 (in the alternative) and adds the step of "measuring EEG data of the subject" after applying the magnetic field.

Claim 8 depends from claims 2 or 5 (in the alternative) and adds the steps of "adjusting frequency of said magnetic field based on the EEG data of the subject; and repeating the applying step with an adjusted frequency."

Claim 10 is not asserted, but asserted claim 11 depends from it. Claim 10 depends from claims 2 or 5 (in the alternative) and adds the limitation that the magnetic field is generated by a permanent magnet.

Claim 11 depends from claim 10 and adds the limitation that the strength of the permanent magnet is from "about 10 Gauss to about 4 Tesla."

### 3.   Asserted Claim of the '259 Patent

Claim 1 is directed to using TMS to treat brain conditions. It claims generating a magnetic field "based on" a subject's intrinsic frequency, Q-factor, or both. The step of "generating" comprises any one of five possible steps or any combination thereof. The generated magnetic field is then applied to a subject's head, and the claim then recites that this improves any one of four different brain conditions. These many alternative limitations give rise to at least seventy-two different combinations of limitations – three times six times four – not counting the factorial combinations that arise from the recitation of "or a combination thereof." Moreover, the claimed effects are merely the brain's natural responses to magnetic stimulation.

## II.   LEGAL STANDARD

### A.   Claim Construction

Claim construction is ultimately a question of law. *See Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 135 S. Ct. 831, 837 (2015) (citing *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 388-91 (1996)). "It is a bedrock principle of patent law that the claims of a patent define the invention to which the patentee is entitled the right to exclude." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (*en banc*) (internal quotation marks omitted). "[T]he claim construction inquiry, therefore, begins and ends in all cases with the actual words of the claim," and "the resulting claim interpretation must, in the end, accord with the words chosen by the patentee to stake out the boundary of the claimed property." *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1248 (Fed. Cir. 1998).

Generally, "there is no magic formula or catechism for conducting claim construction." *Phillips*, F.3d at 1324. Instead, Courts are free to attach the appropriate weight to appropriate sources "in light of the statutes and policies that inform patent law." *Id*.

1    When construing claims, "the intrinsic evidence and particularly the claim
2    language are the primary resources." *Kara Tech. Inc. v. Stamps.com Inc.*, 582 F.3d 1341,
3    1348 (Fed. Cir. 2009). Intrinsic evidence is the evidence in the public record of the
4    patent, and includes the claims, specification and, if in evidence, the prosecution history.
5    *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996). "[T]he claims
6    themselves provide substantial guidance as to the meaning of particular claim terms."
7    *Phillips*, 415 F.3d at 1314. The context of the surrounding words of the claims must also
8    be considered. *Id.* "[T]he context in which a term is used in the asserted claim can be
9    highly instructive," and "[o]ther claims of the patent in question, both asserted and
10   unasserted, can also be valuable sources of enlightenment ... [b]ecause claim terms are
11   normally used consistently throughout the patent." *Id.* (internal citation omitted). And
12   "the presence of a dependent claim that adds a particular limitation gives rise to a
13   presumption that the limitation in question is not present in the independent claim." *Id.* at
14   1314-15. "[U]nless otherwise compelled … the same claim term in the same patent or
15   related patents carries the same construed meaning." *In re Rambus Inc.*, 694 F.3d 42, 48
16   (Fed. Cir. 2012) (quoting *Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1334 (Fed.
17   Cir. 2003)). Therefore, all intrinsic and extrinsic evidence relevant to the construction of
18   a term recited in any asserted claim of one of the Asserted Patents is relevant to the
19   construction of that same term in the other Asserted Patents.

20   The specification "is always highly relevant to the claim construction analysis."
21   *Phillips*, 415 F.3d at 1315. "Usually, it is dispositive; it is the single best guide to the
22   meaning of a disputed term." *Vitronics Corp.*, 90 F.3d at 1582. And when "a patent
23   'repeatedly and consistently' characterizes a claim term in a particular way, it is proper to
24   construe the claim term in accordance with that characterization." *GPNE Corp. v. Apple
25   Inc.*, 830 F.3d 1365, 1370 (Fed. Cir. 2016) (citing *VirnetX, Inc. v. Cisco Sys., Inc.*, 767
26   F.3d 1308, 1318 (Fed. Cir. 2014); *ICU Med., Inc. v. Alaris Med. Sys., Inc.*, 558 F.3d
27   1368, 1374-75 (Fed. Cir. 2009)). Importantly, "the only meaning that matters in a claim
28   construction is the meaning in the context of the patent." *GPNE Corp.*, 830 F.3d at 1370

(citing *Trustees of Columbia Univ. v. Symantec Corp.*, 811 F.3d 1359, 1363 (Fed. Cir. 2016)).

In some cases, "the district court will need to look beyond the patent's intrinsic evidence and to consult extrinsic evidence in order to understand, for example, the background science or the meaning of a term in the relevant art during the relevant time period." *Teva Pharm.*, 135 S.Ct. at 841. Extrinsic evidence "consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises." *Markman*, 52 F.3d at 980. But courts must not lose sight of the fact that "expert reports and testimony [are] generated at the time of and for the purpose of litigation and thus can suffer from bias that is not present in intrinsic evidence." *Phillips*, F.3d at 1318. Overall, while extrinsic evidence "may be useful" to the court, it is "less reliable" than intrinsic evidence, and its consideration "is unlikely to result in a reliable interpretation of patent claim scope unless considered in the context of the intrinsic evidence." *Id*. at 1318-19. Where the intrinsic record unambiguously describes the scope of the patented invention, reliance on any extrinsic evidence is improper. *See Pitney Bowes, Inc. v. Hewlett-Packard Co.*, 182 F.3d 1298, 1308 (Fed. Cir. 1999) (citing *Vitronics*, 90 F.3d at 1583).

Finally, "[t]he construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction." *Renishaw*, 158 F.3d at 1250. It follows that "a claim interpretation that would exclude the inventor's device is rarely the correct interpretation." *Osram GmbH v. Int'l Trade Comm'n*, 505 F.3d 1351, 1358 (Fed. Cir. 2007) (quoting *Modine Mfg. Co. v. U.S. Int'l Trade Comm'n*, 75 F.3d 1545, 1550 (Fed. Cir. 1996)). Ultimately, "[i]t is the claims that define the metes and bounds of the patentee's invention." *Thorner v. Sony Computer Entm't Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012).

## B.   Indefiniteness

Generally, patent claims are "construed, if possible, as to sustain their validity." *Rhine v. Casio, Inc.*, 183 F.3d 1342, 1345 (Fed. Cir. 1999). However, in cases where "the

court concludes, after applying all the available tools of claim construction, that the claim is still ambiguous," then a claim may be found invalid during claim construction for failure to meet the definiteness requirement of 35 U.S.C. § 112. *Phillips*, 415 F.3d at 1327 (quoting *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 911 (Fed. Cir. 2004)); *Elekta Instrument S.A. v. O.U.R. Scientific Int'l, Inc.*, 214 F.3d 1302, 1309 (Fed. Cir. 2000) ("having concluded that the amended claim is susceptible of only one reasonable construction, we cannot construe the claim differently from its plain meaning in order to preserve its validity").

## III.    DISPUTED TERMS

Following a meet and confer to reduce the number of terms in dispute, the parties submitted a Supplemental Joint Claim Construction Hearing Statement under Patent Local Rule 4.2(a) on September 27, 2022. Doc. 51. That Statement and its attached Supplemental Joint Claim Construction Chart under Patent Local Rule 4.2(b) replace the previously filed Statement (Doc. 47) and provide an overview of the parties' proposed constructions and the claims in which they appear.

### A.    "pre-selected" [intrinsic frequency]

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| Plain and ordinary meaning, namely: "A targeted intrinsic frequency chosen before initiating treatment." | Indefinite. Alternatively, if construed: "A fixed target intrinsic frequency, chosen before treatment, and used consistently throughout a treatment regimen that is either the subject's intrinsic frequency or the average intrinsic frequency of a population, such as an average intrinsic frequency of a healthy population database." |

This term appears in the '354 Patent, claim 39; '554 Patent, claim 1; and '259 Patent, claim 1.

A person of ordinary skill in the art at the time of the invention would understand the plain and ordinary meaning of "an **intrinsic frequency** of a specified EEG band of a subject" in the context of the claims and specification. *See supra* Sec. I(B)(1). Therefore, there is no dispute about the construction of "intrinsic frequency."

However, the term "**pre-selected**" is ambiguous in the context of the claims. The specifications also do not provide an express definition of the term. If the term "pre-selected [intrinsic frequency]" is to be construed, it should be construed consistent with the specifications and prosecution histories to mean "a fixed target intrinsic frequency, chosen before treatment, and used consistently throughout a treatment regimen that is either the subject's intrinsic frequency or the average intrinsic frequency of a population, such as an average intrinsic frequency of a healthy population database."

This construction is drawn from the definitions provided in the shared specification of all three Asserted Patents, in connection with various embodiments: "In some embodiments of at least one aspect described above, the pre-selected or target frequency is an average intrinsic frequency of a healthy population database within a specified EEG band. In some embodiments of at least one aspect described above, the preselected or target frequency is an intrinsic frequency of a brain of the subject within a specified EEG band." '354 Patent at col. 4, ll. 54-60; '554 Patent at col. 4, ll. 54-60; '259 Patent at col. 17, ll. 22-29.[1]

The specifications further provide a relevant embodiment labeled "Example 14":

> FIGS. 31 and 32 show the results of a clinical trial utilizing the NEST device and methods for the treatment of depression as provided herein.... EEG readings were taken before treatment began.... The intrinsic frequency in the alpha band (7-11 Hz) was determined using the

---

[1] Since the relevant portions of the written descriptions of the Asserted Patents are identical, *verbatim*, citation to the '354 Patent specification alone suffices for purposes of this discussion.

> initial EEG reading. Patients were placed in one of three groups: constant frequency, random frequency, or sham, with equal probability for each group. Patients received treatment every weekday for 30 days…. If the patient was in the "constant frequency" group, the NEST was set to rotate the magnets **at the intrinsic frequency**.

'354 Patent at col. 55, ll. 48-65 (emphasis added); *accord* Exhibit G (Jin) at 557 (disclosing setting the stimulus rate of rTMS near each individual subject's "intrinsic peak alpha frequency"). "Example 15" in the specification discloses substantially the same process as Example 14, except to treat anxiety rather than depression. '354 Patent at col. 56, ll. 41-56. Thus, the specification discloses fixing (*i.e.*, "pre-selecting") the intrinsic frequency, based on EEG readings, to be the same as the patient's intrinsic frequency, and maintaining that treatment every weekday for 30 days. A person of ordinary skill in the art at the time of the invention would understand that this has the effect of driving any variations in the subject's peak frequency in the alpha band toward the subject's intrinsic frequency in that band. *See* Exhibit G (Jin) at 559 (in response to 10 days of rTMS at the nearest integer frequency to the individual subject's intrinsic peak alpha frequency, observing "a marked increase (34% +/- 0.3) in power of the alpha EEG activity").

In an alternate embodiment, the specification of the Asserted Patents further discloses:

> In another aspect are methods of altering an intrinsic frequency of a brain of a subject within a specified EEG band, comprising: (a) determining the intrinsic frequency of the subject within the specified EEG band; (b) comparing the intrinsic frequency from step (a) to **an average intrinsic frequency of a healthy population database**; (c) if the intrinsic frequency from step (a) is higher than the average intrinsic frequency of the healthy population database, shifting down the intrinsic frequency of the subject by applying a specific magnetic field close to a head of the subject, wherein said specific magnetic field has a frequency lower than the intrinsic frequency of the subject; and (d) if the intrinsic frequency from step (a) is lower than the average intrinsic frequency of the healthy population database, shifting up the intrinsic frequency of the subject by applying a specific magnetic field close to a head of the

subject, wherein said specific magnetic field has a frequency higher than the intrinsic frequency of the subject.

'354 Patent at col. 34, l. 56 – col. 35, l. 5; col. 41, ll. 36-49 (emphasis added). Thus, this alternate embodiment fixes (*i.e.*, "pre-selects") the intrinsic frequency at the "average intrinsic frequency of a healthy population database."

During prosecution of the '354 and '554 Patents, the applicants distinguished a prior art TMS system with a frequency that adjusts during treatment and does not "pre-select" a fixed frequency for use throughout the treatment protocol. Specifically, the Applicants argued that prior art U.S. Patent No. 6,488,617 to Katz "is a feedback system that adjusts based on a subject's reaction to a particular field," as opposed to the "particular method and field arrangement" of the invention. Exhibit D (Prosecution History of the '354 Patent) at WNI000626, 000629 (Mar. 12, 2012, Response to Office Action, pp. 13, 16) (distinguishing Katz in part because "Katz describes ***a feedback system***") (bold, italics, and underlining in original), WNI001387 (Jan. 18, 2013, Response to Final Office Action, p. 15) (repeating the same argument, *verbatim*); *accord* Exhibit E (Prosecution History of the '554 Patent) at WNI002199 (Mar. 12, 2012, Response to Office Action, p. 7) (filed on the same day and repeating the same argument, *verbatim*); Exhibit F (Prosecution History of the '259 Patent) at WNI003265-66 (Oct. 10, 2013 Preliminary Amendment, pp. 4-5) (amending claim limitations of "~~adjusting~~ output of a magnetic field" to "applying output of a magnetic field").

Plaintiff's proposed construction is problematically vague, because it amounts to little more than a rephrasing of "pre-selected," leaving open the question whether *any* frequency in the alpha band meets the definition of a "targeted intrinsic frequency." Such a construction would be inconsistent with: 1) the specification, which teaches that the pre-selected intrinsic frequency is either the patient's intrinsic frequency or the intrinsic frequency of a population, as discussed above; and 2) the claim's validity in view of the prior art, which already showed using TMS to move the patient's intrinsic frequency toward arbitrary fixed frequencies. Specifically, during prosecution of the '259 Patent,

the applicants distinguished a prior art TMS system that used arbitrary fixed frequencies that are not based on the subject's intrinsic frequency. Exhibit F (Prosecution History of the '259 Patent) at WNI004779 (Sep. 30, 2015, Response to Final Office Action, p. 9) (distinguishing prior art TMS system of Becker because it teaches applying "frequencies of about 7.83, 14.1, 20.3, 26.4, 31.32, 39 and 45 Hz" which are not "based on an intrinsic frequency of a specified EEG band of a subject"). Moreover, if the term "pre-selected [intrinsic frequency]" were construed to include any frequency in the alpha band conjured from the mind of a medical doctor based on that doctor's medical experience, such a construction would likely send the claim afoul of 35 U.S.C. §§ 101 and 112.

Therefore, to the extent that the ambiguous term "pre-selected [intrinsic frequency]" is amenable to a construction, that term should be construed to mean "a fixed target intrinsic frequency, chosen before treatment, and used consistently throughout a treatment regimen that is either the subject's intrinsic frequency or the average intrinsic frequency of a population, such as an average intrinsic frequency of a healthy population database."

### B.    "pre-selected" [Q-factor of the intrinsic frequency]

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
| --- | --- |
| Plain and ordinary meaning, namely: <br><br> "A targeted Q-factor of the intrinsic frequency chosen before initiating treatment." | Indefinite. <br><br> Alternatively, if construed: "A fixed target Q-factor of the intrinsic frequency, chosen before treatment, and used consistently throughout a treatment regimen that is either the Q-factor of the subject's intrinsic frequency or the average Q-factor of the intrinsic frequency of a population, such as an average intrinsic frequency of a healthy population database." |

This term appears in the '354 Patent, claim 39; '554 Patent, claim 2; and '259 Patent, claim 1.

14

A person of ordinary skill in the art at the time of the invention would understand the plain and ordinary meaning of "a **Q-factor** of the intrinsic frequency" in the context of the claims and specification. *See, e.g.*, '354 Patent, Fig. 12; *supra* Sec. I(B)(2).

However, the term "**pre-selected**" is ambiguous in the context of the claim. To the extent that the term "pre-selected [Q-factor]" can be construed, that term should be construed consistently with the term "pre-selected [intrinsic frequency]" discussed above. Therefore, for the reasons provided above with respect to the term "pre-selected [intrinsic frequency]," the term "pre-selected [Q-factor]" should be construed to mean "a fixed target Q-factor of the intrinsic frequency, chosen before treatment, and used consistently throughout a treatment regimen, that is either the Q-factor of the subject's intrinsic frequency or the average Q-factor of the intrinsic frequency of a population, such as an average intrinsic frequency of a healthy population database." This proposed construction simply replaces "intrinsic frequency" with "Q-factor of the intrinsic frequency" in the construction of "pre-selected [intrinsic frequency]" discussed above.

### C.    "pre-selected" [EEG phase of the specified EEG frequency]

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| Plain and ordinary meaning, namely: "A targeted EEG phase of the specified EEG frequency chosen before initiating treatment." | Indefinite. |

This term appears in the '554 Patent, claim 4.

A person of ordinary skill in the art at the time of the invention would understand that the term "a **subject** having an **EEG phase**" is nonsensical on its face and has no plain and ordinary meaning. A brain wave in the human brain may be described as a time domain signal having a phase. *See* '554 Patent, Figs. 5-6 (left graphs depicting time domain signals). An EEG is merely a tool for measuring many brain waves at many different frequencies and converting that information into a frequency domain spectrum for analysis. *See id.* (right graphs depicting frequency domain spectra). To say that a

1   *subject's* brain has an "*EEG* phase," however, would have no meaning to a person of

2   ordinary skill in the art.

3        Even more unclear is exactly how a "pre-selected EEG phase" between sites in a

4   person's brain can be achieved using rTMS. The '554 Patent specification does not

5   explain how. Column 35, line 59 through column 36, line 50 mentions "EEG phase"

6   many times and repeatedly asserts that a magnetic field can influence or adjust said EEG

7   phase, but the patent never explains *how*. The specification never teaches any specific

8   TMS settings that give rise to a "pre-selected EEG phase." Therefore, the ambiguity of

9   this claim term cannot be solved by recourse to the specification, the term is not

10   amenable to any construction, and claim 4 is indefinite and not enabled under 35 U.S.C. §

11   112.

12        To the extent, however, that this claim element includes the term "pre-selected,"

13   that term should be construed consistently with "pre-selected [intrinsic frequency]" and

14   "pre-selected [Q-factor]," discussed above.

15       **D.**    **"adjusting output of a magnetic field based on the subject's intrinsic**

16           **frequency"**

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| Plain and ordinary meaning, namely: "Controlling the settings on the magnetic field generator to treat a subject in response to the naturally occurring wave frequency of a subject's brain measured by an EEG." | Indefinite. Alternatively, if construed: "Adjusting the frequency of a magnetic field to a preselected intrinsic frequency. |

22        This term appears in the '554 Patent, claim 1.

23        As an initial matter, the precise scope of the term "based on" is unclear. In the

24   embodiments of Examples 14 and 15, discussed above in Section I(B)(1), the

25   specification discloses applying rTMS at the subject's intrinsic frequency, which is

26   clearly one example of adjusting the frequency of the magnetic field to a frequency that is

27   "based on" the subject's intrinsic frequency. *See* '554 Patent at col. 55, l. 51 – col. 57, l.

28

3. Ambiguity arises, however, as to whether any other frequency in the alpha band can be considered "based on" the subject's intrinsic frequency, or what degree of relationship is required for the stimulation frequency to be considered "based on" the subject's intrinsic frequency. Furthermore, the prior art shows clinical studies where the stimulation frequency was set to the subject's intrinsic frequency plus one Hertz, which seems like a clear example of a stimulation frequency that is "based on" the subject's intrinsic frequency. Exhibit H (Klimesch) at 1129 (calling the subject's intrinsic alpha frequency "IAF" and stimulating patients at "IAF + 1 Hz"). The claim's patentable distinctiveness over the prior art therefore must rely on a dubious, contorted, and highly limited interpretation of "based on" that is not provided anywhere in the intrinsic record – or else the claim is invalid in view of the prior art. *But see Elekta Instrument*, 214 F.3d at 1309 ("having concluded that the amended claim is susceptible of only one reasonable construction, we cannot construe the claim differently from its plain meaning in order to preserve its validity"). For at least this reason, this element of claim 1 is not amenable to any proper construction, and the claim is invalid under 35 U.S.C. § 112.

Alternatively, if the Court construes this ambiguous term, then Plaintiff's proposed construction only adds more ambiguity. In place of "adjusting output of a magnetic field," Plaintiff's construction substitutes "controlling the settings on the magnetic field generator" – which, at first, looks like a needless rewording of otherwise plain language. But Plaintiff's construction adds ambiguity by adding the question: Controlling *what* settings? The frequency of the magnetic field is the only setting that the specification teaches adjusting "based on" the subject's intrinsic frequency. *See, e.g.*, '354 Patent at col. 55, l. 46 – col. 56, l. 64 (adjusting the magnetic field's frequency to be the same as the patient's intrinsic frequency); *see also id.* at col. 34, l. 56 – col. 35, l. 5; col. 41, ll. 36-49 (adjusting the magnetic field's frequency to be the same as the average intrinsic frequency of a healthy population). The specification *mentions* other parameters (intensity, duration, and site of stimulation) but never teaches how to adjust those parameters "based on" the subject's intrinsic frequency. '554 Patent at col. 40, ll. 25-32.

Thus, the only enabled adjustable setting is the frequency of the magnetic field –
consistent with Defendants' proposed construction.

### E.    "pre-selected frequency"

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| Plain and ordinary meaning, namely:<br><br>"A targeted intrinsic frequency chosen before initiating treatment." | "An average intrinsic frequency of a population, such as an average intrinsic frequency of a healthy population database." |

This term appears in the '554 Patent, claim 5.

In full context, this term appears as the first option in a list of three options recited
in the alternative: "wherein the magnetic field comprises at least one of **(a) a single pre-selected frequency**; (b) a plurality of frequencies within a specified EEG band; and (c)
an intrinsic frequency of the brain of the subject within a specified EEG band." '554
Patent, cl. 5 (emphasis added). This term therefore stands in contrast to the other options
– especially option (c), "an intrinsic frequency of the brain of the subject." In claim
construction, courts assume that a patentee's choice to use different words was
intentional, and therefore "different claim terms are presumed to have different
meanings." *MicroStrategy Inc. v. Business Objects Americas*, 238 F. App'x 605, 609
(Fed. Cir. 2007) (citing *CAE Screenplates Inc. v. Heinrich Fiedler GmbH & Co. KG*, 224
F.3d 1308, 1317 (Fed. Cir. 2000) ("In the absence of any evidence to the contrary, we
must presume that the use of these different terms in the claims connotes different
meanings."); *Applied Med. Res. Corp. v. U.S. Surgical Corp.*, 448 F.3d 1324, 1333 n.3
(Fed. Cir. 2006) ("[T]he use of two terms in a claim requires that they connote different
meanings.")).

The parties appear to agree, at least, that the "single pre-selected frequency" must
be an intrinsic frequency. However, it cannot be just any "targeted intrinsic frequency,"
as proposed by Plaintiff. In the same three-part claim element, an "intrinsic frequency of
the brain of the subject" is recited as an *alternative* to the "single pre-selected frequency."
Therefore the "single pre-selected frequency" is presumed to be different from "an

intrinsic frequency of the brain of the subject." As discussed above in Section III(A), a "pre-selected intrinsic frequency" may be either: (1) the subject's intrinsic frequency; or (2) the average intrinsic frequency of a population, such as an average intrinsic frequency of a healthy population database. In this claim, since the "single pre-selected frequency" cannot be (1) "an intrinsic frequency of the brain of the subject," the only remaining possibility is that it must be (2) "an average intrinsic frequency of a population, such as an average intrinsic frequency of a healthy population database," which is Defendants' proposed construction.

## IV.   UNDISPUTED TERMS

Although initially disputed, the parties reached agreement regarding the proper constructions of the following terms.

### A.   "processor moves (a) an intrinsic frequency of the brain of the subject within the specified (EEG) band to a pre-selected intrinsic frequency"

| Agreed Construction |
| --- |
| "Shifts or alters an intrinsic frequency to cause the intrinsic frequency to be substantially the same as the preselected intrinsic frequency." |

This term appears in the '354 Patent, claim 39.

The parties raised this element for construction because it recites "moves … to," which stands in contrast to other claim elements that recite "moves … toward." The parties agree that "moves … to" means "shifts or alters to cause to be substantially the same as."

### B.   "moves/moving [Q-factor/EEG phase] toward the preselected [Q-factor/EEG phase]"

| Agreed Construction |
| --- |
| "Shifting or altering the [Q-factor/EEG phase] to be closer to the preselected [Q-factor/EEG phase]." |

This term appears in the '354 Patent, claim 39; and '554 Patent, claims 2 and 4.

The parties raised this element for construction because it recites "moving …
toward," which stands in contrast to another claim element that recites "moves … to."
The parties agree that "moving … toward" means "shifting or altering … to be closer to."

**V.   CONCLUSION**

For at least the foregoing reasons, Defendants respectfully request that the Court
adopt their proposed constructions.


Respectfully submitted,

Dated: September 30, 2022          By:   */s/ Charles A. Blazer, II*
Charles A. Blazer, II
Allen M. Sokal
*Attorneys for Defendants*,
PeakLogic, Inc., and Kevin T. Murphy,
M.D.

## CERTIFICATE OF SERVICE

I hereby certify that on September 30, 2022, I caused a copy of the foregoing

**DEFENDANTS' OPENING CLAIM CONSTRUCTION BRIEF**

and any attachments thereto to be served *via* electronic mail to counsel for all parties and

their counsel of record, who are deemed to have consented to electronic service using the

Court's CM/ECF system.

I declare under penalty of perjury that the foregoing is true and correct.

Respectfully submitted,

Dated: September 30, 2022          By:   */s/ Charles A. Blazer, II*
                                         Charles A. Blazer, II
                                         Allen M. Sokal
                                         *Attorneys for Defendants*,
                                         PeakLogic, Inc., and Kevin T. Murphy,
                                         M.D.