# EXHIBIT D

**Excerpts from the Prosecution History of U.S. Patent No. 8,475,354**

*Electronically Filed on March 12, 2012*

Attorney Docket No. 35784-701.201
PATENT

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

| | |
|---|---|
| Inventor: James William Phillips et al. | Group Art Unit: 3735 |
| Serial Number: 12/237,319 | Examiner: Lannu, Joshua Daryl Deanon |
| Filing Date: September 24, 2008 | Confirmation No: 9568 |
| Title: SYSTEMS AND METHODS FOR DEPRESSION TREATMENT USING NEURO-EEG SYNCHRONIZATION THERAPY | Customer No. 021971 |

### AMENDMENT IN RESPONSE TO OFFICE ACTION

MAIL STOP AMENDMENT
Commissioner for Patents
P.O. Box 1450
Alexandria VA 22313-1450

Madam:

In response to Examiner's Office Action mailed October 14, 2011, Applicants respectfully request reconsideration of the above-referenced application in view of the following amendments and remarks. A Petition for Extension of Time is requested for a reply within the second month and the fee set forth under 37 C.F.R. §1.17(a)(2) is electronically submitted herewith.

*Amendments to the Claims* begin on page 2 of this paper.

*Remarks* begin on page 12 of this paper

*Conclusion* begins on page 19 of this paper

## AMENDMENTS TO THE CLAIMS

This listing of claims will replace all prior versions, and listings of claims in this application. Applicant reserves the right to pursue any subject matter of any canceled claims in this or any other appropriate patent application. Support for these claims is provided in the remarks following the listing of claims.

1.  (Currently Amended)  A method of treating a subject having an intrinsic frequency in a specified EEG band, comprising:

    (a) adjusting output of a magnetic field based on the subject's intrinsic frequency for influencing an the intrinsic frequency of a specified EEG band of the subject toward a pre-selected intrinsic frequency of the specified EEG band; and

    (b) applying said magnetic field close to a head of the subject.

2.  (Original)  A method of treating a subject, comprising:

    (a) adjusting output of a magnetic field for influencing a Q-factor of an intrinsic frequency within a specified EEG band of the subject toward a pre-selected Q-factor; and

    (b) applying said magnetic field close to a head of the subject.

3.  (Currently Amended)  A method of treating a subject having intrinsic frequencies among multiple sites in a brain of the subject within a specified EEG band comprising:
    (a) providing a pre-selected coherence value,
    (b) determining a coherence value of the intrinsic frequencies among multiple sites in a brain of the subject within a specified EEG band,
    (c) adjusting output of one or more a magnetic fields for influencing the a coherence value of intrinsic frequencies among multiple sites in a brain of the subject within a specified EEG band toward a the pre-selected coherence value; and
    (d) (b) applying said one or more magnetic fields close to a head of the subject, wherein if the coherence value is higher than the pre-selected coherence value, the adjusting and applying steps comprises lowering the coherence value of the subject by applying at least

<div align="right">Attorney Docket No. 35784-701.201</div>

<u>two asynchronous magnetic fields close to the head of the subject, and wherein if the coherence value is lower than the pre-selected coherence value, the adjusting and applying steps comprises raising the coherence value of the subject by applying at least one synchronized magnetic field close to a head of the subject.</u>

4.  (Currently Amended)  A method for treating a subject <u>having an EEG phase between a first site and a second site in a brain of the subject of a specified EEG frequency</u>, comprising:

   (a)  <u>providing a pre-selected EEG phase of the specified EEG frequency</u>

   (b)  adjusting output of <u>one or more</u> ~~a~~ magnetic field<u>s</u> for influencing <u>the</u> ~~an~~ EEG phase ~~between two sites in the brain of a subject of a specified EEG frequency~~ toward <u>the</u> ~~a~~ pre-selected EEG phase ~~of the specified EEG frequency~~; and

   <u>(c)</u>  applying said <u>one or more</u> magnetic field<u>s</u> close to a head of the subject<u>, wherein the one or more magnetic fields are of the same frequency and are in-phase with each other, out of phase with each other, or a combination thereof</u>.

5.  (Original)  The method of claim 1, comprising:,

   (a)  determining the intrinsic frequency of the subject within the specified EEG band;

   (b)  comparing the intrinsic frequency from step (a) to an average intrinsic frequency of a healthy population database;

   (c)  if the intrinsic frequency from step (a) is higher than the average intrinsic frequency of the healthy population database, shifting down the intrinsic frequency of the subject by applying a specific magnetic field close to a head of the subject, wherein said specific magnetic field has a frequency lower than the intrinsic frequency of the subject; and

   (d)  if the intrinsic frequency from step (a) is lower than the average intrinsic frequency of the healthy population database, shifting up the intrinsic frequency of the subject by applying a specific magnetic field close to a head of the subject, wherein said specific magnetic field has a frequency higher than the intrinsic frequency of the subject.

Attorney Docket No. 35784-701.201

6. (Original) The method of claim 2, comprising:

(a) determining the Q-factor of the intrinsic frequency within the specified EEG band of the subject;

(b) comparing the Q-factor of the intrinsic frequency from step (a) to an average Q-factor of the intrinsic frequency of a healthy population database;

(c) if the Q-factor of the intrinsic frequency from step (a) is higher than the average Q-factor of the intrinsic frequency of the healthy population database, tuning down the Q-factor of the intrinsic frequency of the subject by applying a magnetic field with a plurality of frequencies or with a single pre-selected frequency close to a head of the subject; and

(d) if the Q-factor of the intrinsic frequency from step (a) is lower than the average Q-factor of the intrinsic frequency of the healthy population database, tuning up the Q-factor of the intrinsic frequency of the subject by applying a magnetic field with a plurality of frequencies or with a pre-selected frequency to a head of the subject.

7. (Original) The method of claim 3, comprising:

(a) determining the coherence value of the intrinsic frequencies among multiple locations throughout a scalp of the subject;

(b) comparing the coherence value from step (a) to an average coherence value of a healthy population database;

(c) if the coherence value from step (a) is higher than the average coherence value of the healthy population database, lowering the coherence value of the subject by applying at least two asynchronous magnetic fields close to a head of the subject;

(d) if the coherence value from step (a) is lower than the average coherence value of the healthy population database, raising the coherence value of the subject by applying at least one synchronized magnetic field close to a head of the subject.

Attorney Docket No. 35784-701.201

8. (Original)  The method of claim 4, comprising:

(a) determining the EEG phase the between at least two locations measured on the head of the subject;

(b) comparing the EEG phase from step (a) to an average EEG phase of a healthy population; and

(c) applying a magnetic field close to a head of the subject

wherein applying the magnetic field influences the determined EEG phase toward the average EEG phase of a healthy population.

9. (Currently Amended)  A method of using a Transcranial Magnetic Stimulation (TMS) device ~~for influencing an intrinsic frequency of a subject within a specified EEG band~~, comprising:

(a) adjusting output of said TMS device;

(b) <u>repetitively firing a magnetic field using said TMS device at settings chosen in order to</u> ~~changing~~ <u>change an intrinsic frequency of a subject within a specified EEG band</u> ~~EEG frequency~~, <u>change a Q-factor of the intrinsic frequency</u>, or <u>change a</u> coherence <u>value of intrinsic frequencies among multiple sites in a brain of the subject within the specified EEG band</u> ~~by repetitive firing of a magnetic field using said TMS device~~; and

(c) applying said magnetic field close to a head of the subject,

<u>wherein when a coherence value is being changed, if the coherence value is higher than the pre-selected coherence value, the settings comprise applying at least two asynchronous magnetic fields close to the head of the subject in order to lower the coherence value of the subject, and wherein if the coherence value is lower than the pre-selected coherence value, the settings comprise applying at least one synchronized magnetic field close to a head of the subject in order to raise the coherence value of the subject.</u>

10. (Currently Amended)  The method of any <u>one</u> of claims 1-4, further comprising the step of measuring EEG data of the subject after the applying step.

Attorney Docket No. 35784-701.201

11. (Currently Amended) The method of any <u>one</u> of claims 1-4, further comprising the steps of: adjusting frequency of said magnetic field based on the EEG data of the subject; and repeating the applying step with an adjusted frequency.

12. (Currently Amended) The method of any <u>one</u> of claims 1-4, wherein the applying of the magnetic field applies the magnetic field to a diffuse area in a brain of the subject.

13. (Currently Amended) The method of any <u>one</u> of claims 1-4, wherein the magnetic field is generated by movement of at least one permanent magnet.

14. (Original) The method of claim 13, wherein said movement comprises at least one of rotational motion, linear motion, and swing motion.

15. (Currently Amended) The method of any of claims 1-4, <u>or</u> ~~and~~ 9, wherein a frequency of the magnetic field with the specified EEG band is from about 0.5 Hz to about 100 Hz.

16. (Original) The method of claim 13, wherein the strength of the at least one permanent magnet is from about 10 Gauss to about 4 Tesla.

17. (Original) The method of claim 13, wherein the distance between the at least one permanent magnet and the subject is from about 1/32 in to about 12 in.

18. (Currently Amended) The method of any <u>one</u> of claims 1-4, wherein the step of applying the magnetic field is for about 5 minutes to about two hours.

19. (Currently Amended) The method of any <u>one</u> of claims 1-4, further comprising repeating the applying step after an interval about 6 hours to about 14 days.

20. (Currently Amended) The method of any <u>one</u> of claims 1-4, further comprising: (a) locating a first electrode operable to detect electrical brain activity on the subject in at least one of an area of low electrical resistivity on a subject, and an area with substantially no electrical impulse interference on a subject; (b) locating a second electrode operable to detect a reference signal on the subject; and (c) determining the intrinsic frequency from the electrical

brain activity detected by the first electrode and the reference signal detected by the second electrode.

21. (Currently Amended) The method of any of claims 1-4, ~~and~~ or 9 wherein the method improves an indication selected from the group consisting of replacement for meditation, quick nap, stress release, attention span, comprehension, memory, lowered blood pressure, increased libido, sports performance, academic performance, and any combination thereof.

22. (Currently Amended) The method of any of claims 1-4, ~~and~~ or 9 wherein the method improves a disorder selected from the group consisting of depression, bipolar, anxiety, obsessive-compulsive, seizure, Parkinson's disease, ADHD, autism, substance abuse, head injury, Alzheimer's disease, eating disorder, sleep disorder, tinnitus, fibromyalgia, and any combination thereof.

23. (Currently Amended) The method of any of claims 1-4, ~~and~~ or 9 wherein the method improves a characteristic selected from the group consisting of peripheral visual response, attention span, immediate reaction time (IRT), movement time (MT), simple perceptual reaction time (SPR), conflict perceptual reaction time (CPR), and any combination thereof.

24. (Original) The method of one of claims 4 or 9, wherein the magnetic field results from a first magnetic source and a second magnetic source.

25. (Original) The method of claim 24, wherein the first magnetic source and the second magnetic source are out of phase relative to each other.

26. (Currently Amended) A device comprising:

   a) at least one permanent magnet; and

   b) a subunit coupled to the magnet;

   wherein the subunit enables movement of at least one said magnet at a frequency between about 0.5 Hz and about 100 Hz based on at least one of: an intrinsic frequency of

<u>the brain of a subject within a specified EEG band; and a Q-factor of the intrinsic frequency of the brain of the subject within the specified EEG band.</u>

27.  (Original)  The device of claim 26, wherein the device is operable to at least one of: influence an intrinsic frequency of the brain of a subject within a specified EEG band; influence a Q-factor of the intrinsic frequency; influence a coherence of intrinsic frequencies among multiple sites in the brain of a subject within a specified EEG band; and influence an EEG phase between two sites in the brain of a subject of a specified EEG frequency.

28.  (Original)  The device of claim 26, wherein a magnetic field is generated by movement of at least the permanent magnet.

29.  (Original)  The device of claim 28, wherein said movement comprises at least one of rotational motion, linear motion, and swing motion.

30.  (Original)  The device of claim 26, further comprising logic that controls the frequency in increments of about 0.1 Hz.

31.  (Original)  The device of claim 26, further comprising logic that automatically changes the frequency in response to EEG readings of a subject during treatment.

32.  (Original)  The device of claim 26, further comprising logic that calculates information from EEG data collected from the subject within a specified EEG band, wherein said information comprises at least one of items listed below: (a) at least one intrinsic frequency; (b) Q-factor of the at least one intrinsic frequency; (c) a coherence value of intrinsic frequencies; (d) an EEG phase; and (e) any combination thereof.

33.  (Currently Amended)  The device of claim 26, further comprising: (a) a first electrode operable to detect electrical brain activity; and (b) a second electrode operable to detect a reference signal; wherein the first electrode is <u>adapted to be</u> located on the subject in at least one of: an area of low electrical resistivity on a subject, and an area with substantially no electrical impulse interference on a subject, and wherein the second electrode is<u> adapted to be</u> located on the subject.

Attorney Docket No. 35784-701.201

34. (Original)  The device of claim 26, wherein the device improves an indication selected from the group consisting of replacement for meditation, quick nap, stress release, attention span, comprehension, memory, lowered blood pressure, increased libido, sports performance, academic performance, and any combination thereof.

35. (Original)  The device of claim 26, wherein the device improves a disorder selected from the group consisting of depression, bipolar, anxiety, obsessive-compulsive, seizure, Parkinson's disease, ADHD, autism, substance abuse, head injury, Alzheimer's disease, eating disorder, sleep disorder, tinnitus, fibromyalgia, and any combination thereof.

36. (Original)  The device of claim 26, wherein the device improves a characteristic selected from the group consisting of peripheral visual response, attention span, immediate reaction time (IRT), movement time (MT), simple perceptual reaction time (SPR), conflict perceptual reaction time (CPR), and any combination thereof.

37. (Original)  The device of claim 26, wherein said subunit comprises a rotating mechanism comprising:

   (a) a motor;

   (b) a power source capable of powering the motor; and

   (c) a rotating element coupled to the motor and coupled to the magnet.

38. (Original)  The device of claim 26, comprising a second permanent magnet, wherein the subunit is coupled to the second magnet, and wherein the subunit enables movement of the second magnet at a frequency between about 0.5 Hz and about 100 Hz.

39. (Original)  The device of claim 38, wherein the first permanent magnet has a first rotational orientation relative to a treatment surface of the device and the second permanent magnet has a second rotational orientation relative to the treatment surface of the device.

40. (Original)  The device of claim 39, wherein the device is operable to move the first permanent magnet at the same frequency as the second permanent magnet.

41.  (Original) The device of claim 39, wherein the first rotational orientation relative to a first portion of a treatment surface of the device is between at least about 0 degrees and about 360 degrees different from the second rotational orientation relative to a second portion of the treatment surface of the device.

42.  (Original) The device of claim 41, wherein the first portion of the treatment surface is the portion of the treatment surface approximately closest to the first permanent magnet, and wherein the second portion of the treatment surface is the portion of the treatment surface approximately closest to the second permanent magnet.

43.  (Original) The device of claim 41, wherein the difference between the first rotational orientation and the second rotational orientation results in a magnetic phase when the first permanent magnet is moved at the same frequency as the second permanent magnet.

44.  (Original) The device of claim 43, wherein the magnetic phase of the device is operable to influence an EEG phase between a first site and a second site in the brain of a subject of a specified EEG frequency.

45.  (Original) The device of claim 44, wherein the first site generally aligns with the first permanent magnet, and the second site generally aligns with the second permanent magnet of the device.

46.  (Currently Amended) A device for use in treating a subject, comprising: a means for applying a magnetic field to a head of a subject; whereby the means for applying the magnetic field is ~~capable of influencing~~ <ins>configured to influence</ins> (a) an intrinsic frequency of a brain of the subject within a specified EEG band; (b) a Q-factor of an intrinsic frequency of ~~a~~ <ins>the</ins> brain of the subject within a specified EEG band; (c) a coherence <ins>value</ins> of intrinsic frequencies among multiple sites in ~~a~~ <ins>the</ins> brain of the subject within a specified EEG band <ins>wherein if the coherence value is higher than a pre-selected coherence value, configuring the device to lower the coherence value by applying at least two asynchronous magnetic fields close to the head of the subject, and wherein if the coherence value is lower than the pre-selected coherence value, raising the coherence value by applying at least one synchronized magnetic field close to a head of the subject</ins>; (d) an EEG phase <ins>between two sites in the brain</ins>

of ~~a~~ the subject of a specified EEG frequency wherein the magnetic field comprises a first magnetic field that is in-phase with a second magnetic field or a first magnetic field that is out of phase with a second magnetic field; or (e) a combination thereof.

47. (Cancelled)

48. (Currently Amended)  A device for use in treating a subject, comprising: a Transcranial Magnetic Stimulation (TMS) device; whereby the TMS device is configured to influence ~~capable of influencing~~ (a) an intrinsic frequency of a brain of the subject within a specified Electroencephalography (EEG) band; (b) a Q-factor of an intrinsic frequency of ~~a~~ the brain of the subject within a specified EEG band; (c) a coherence value of intrinsic frequencies among multiple sites in ~~a~~ the brain of the subject within a specified EEG band wherein if the coherence value is higher than a pre-selected coherence value, configuring the device to lower the coherence value by applying at least two asynchronous magnetic fields close to the head of the subject, and wherein if the coherence value is lower than the pre-selected coherence value, raising the coherence value by applying at least one synchronized magnetic field close to a head of the subject; (d) an EEG phase between two sites in the brain of ~~a~~ the subject of a specified EEG frequency wherein the magnetic field comprises a first magnetic field that is in-phase with a second magnetic field or a first magnetic field that is out of phase with a second magnetic field, or (e) a combination thereof.

49. (Previously Presented) The device of claim 48, further comprising an Electroencephalography (EEG) device.

50.  (Previously Presented) The device of claim 49, wherein the EEG device is used to relay information to the TMS device in order to achieve at least one of (a), (b), (c), (d), and (e).

51. (Previously Presented) The device of claim 49, wherein the TMS device is used to receive information from the EEG device in order to achieve at least one of (a), (b), (c), (d), and (e).

WNI 000624

<div style="text-align: right">Attorney Docket No. 35784-701.201</div>

## REMARKS

The following remarks are in response to the Examiner's Office Action mailed on October 14, 2011. Claims 1, 3, 4, 9-13, 15, 18-23, 26, 33, 46, and 48 are amended. Support for claim amendments can be found in the application as filed. Support for amendments to Claim 1 and 26 can be found throughout the specification as filed, for example paragraphs [0350], at least. Support for amendments to Claims 3, 9, 26, 46, and 48 can be found in paragraphs [0166] to [0167], [0271], and [0327] at least. Support for amendments to Claim 4, 26, 46, and 48 can be found in paragraphs [0255] to [0259], at least. Claims 1-46, 48-51 are pending. Reconsideration is respectfully requested in light of the following remarks.

### Claim Objections

Claims 15, 21, 22, and 23 were objected to under 37 CFR 1.75(c) as being in improper form. These claims have been amended to be presented in proper alternative form. Applicants respectfully submit these claims are in condition of allowance, and that the objection is obviated.

### Provisional Double Patenting

Claims 1-4 were provisionally rejected under the judicially created doctrine of obviousness-type double patenting as allegedly being unpatentable over claims 1-4 of co-pending U.S. Application No. 12/237,328. Claims 1-4, 10-13, 16, and 18-20 were provisionally rejected as being upatentable over claims 1, 3-7 and 9-10 of co-pending U.S. Application No. 12/850,547. While Applicants do not necessarily agree with the position taken by the Examiner, Applicants request that such provisional rejection be held in abeyance and Applicants will consider submitting a terminal disclaimer or additional arguments at the appropriate time.

### Claim Rejections - 35 USC § 101

Claim 33 was rejected under 35 U.S.C. 101 as being directed to non-statutory subject matter. Applicants thank the examiner for the suggestion regarding the amendment that would be appropriate to overcome this rejection. Applicants have amended Claim 33 in accordance with this suggestion.

## **_Claim Rejections – 35 USC § 102_**

Claims 1-4, 9, 10-12, 15, 24, 25, 46 and 48-51 were rejected under 35 U.S.C. 102(b) as being anticipated by USPN 6,488,617 (Katz). Applicants traverse, for at least the reasons stated below.

Katz fails to anticipate the elements of Claims 1-4, 9, 46, and 48, at least. Katz describes **_a feedback system_**, which **_in real time_**, tries to move a subject **_from a current brain state into a desired brain state_** via magnetic stimulation. Brain states targeted in Katz are categorized based on the level of alertness of the subject. (Col. 1, line 14 to 34). These states include sleep states associated with brain wave frequencies in the delta and theta ranges of 1.5 to 3.5 Hz and 3.5 to 7 Hz, respectively, a relaxed state associated with brain wave frequencies in the alpha range of 7.5 to 12.5 Hz, and an excited state associated with brain wave frequencies in the beta range of 12.5 to 20 Hz  (_Id., See also_, Col. 6, lines 16-35). Thus, each state of Katz is within a different EEG band, and Katz tries to move the subject from one state (in one band) to another state (in another band). At least the following distinctions can be made from the present claims.

With respect to Claim 1, Katz fails to teach or suggest "adjusting output of a magnetic field based on the subject's intrinsic frequency for influencing the intrinsic frequency toward a pre-selected intrinsic frequency of the specified EEG band."

In contrast, Katz targets a desired brain **_state_**, which encompasses **a range** of frequencies in multiple bands. Claim 1 of the present invention targets a pre-selected intrinsic **frequency**, not a state encompassing a range of frequencies.  The Office Action tacitly acknowledges this difference by referring to the desired state of Katz and frequenc**ies** in each state, as opposed to a particular pre-selected frequenc**y** as is claimed.

Further, Claim 1 of the present invention recites adjusting output of a magnetic field to influence the subject's intrinsic frequency in a specified EEG band toward a pre-selected intrinsic frequency of **_the same_** EEG band.  On the other hand, Katz's only intention and goal is to move a subject **_from a current brain state into a desired brain state_**.  Since the brain states correlate to separate EEG bands in Katz (i.e. from relaxed in the alpha band to sleep in the delta or theta band), **_Katz' methods and devices move the brain waves from one band to another_**.

Likewise, regarding Claim 2, since Katz is concerned with moving the current brain state to another brain state, Katz fails to teach or suggest "adjusting output of a magnetic field for

influencing a Q-factor of an intrinsic frequency within a specified EEG band of the subject toward a pre-selected Q-factor." As described and shown in the instant specification (for example at paragraphs [0300], [0326] and in Figure 12, at least), a Q-factor is a measure of the distribution around the frequenc**y** within a single EEG band.

The Office Action points to Katz Column 6 lines 16-61 and states "Katz states that a higher magnitude magnetic field increases the focus of a mean frequency, which is the equivalent of modifying the bandwidth of an intrinsic frequency to a preselected bandwidth." On the contrary, Katz's reference to focus refers to the focal area of the brain, and not a focus of a mean frequency. Katz actually says that "a key component [of the magnetic field] is field strength. Greater magnitude [of field strength] implies more influence on the intended [focal area of the brain], although the size of that [focal area] will also increase as the magnitude [of field strength] increases" in Column 6 lines 16-61. This makes sense, since Katz uses multiple magnets having unique and varying frequencies, magnitudes, positions and durations applied to the subject's head. Thus, Katz recognizes that field strength is one parameter (of several) that may be used in order to achieve its goal of moving a subject from a state in one EEG band to a state in another EEG band; however, Katz neither discloses nor suggests "adjusting output of a magnetic field for influencing a Q-factor of an intrinsic frequency within a specified EEG band of the subject toward a pre-selected Q-factor."

With respect to Claim 3, as amended, Katz fails to teach or suggest "providing a pre-selected coherence value, [] determining a coherence value of the intrinsic frequencies among multiple sites in a brain of the subject within a specified EEG band, [] adjusting output of one or more magnetic fields for influencing the coherence value toward the pre-selected coherence value; and [] applying said one or more magnetic fields close to a head of the subject, wherein if the coherence value is higher than the pre-selected coherence value, the adjusting and applying steps comprises lowering the coherence value of the subject by applying at least two asynchronous magnetic fields close to the head of the subject, and wherein if the coherence value is lower than the pre-selected coherence value, the adjusting and applying steps comprises raising the coherence value of the subject by applying at least one synchronized magnetic field close to a head of the subject."

The Examiner refers to a definition of "coherence" in the Office Action based on Katz. However, Applicants respectfully disagree with this characterization of the term based on the way the term is used in the claims and specification herein. Coherence, as used in the present application,

refers to how closely matched are the intrinsic frequencies among multiple sites in a brain of the subject within a specified EEG band (*e.g.,* how closely matched is a first intrinsic frequency of a first site in the brain of the subject within a specified EEG band to a second intrinsic frequency of a second site in the brain of the subject within the same EEG band, at least). (See, e.g. para [0010], at least). It is expressed as a coherence value. Thus, if the two or more intrinsic frequencies are matched in frequency, a coherence value shows this matching characteristic. Likewise, if the two or more intrinsic frequencies are not matched, the coherence value expresses this. A coherence value that is higher (more coherent) would indicate that the intrinsic frequencies are more closely matched than the situation in which a coherence value is lower (indicating less coherent). Accordingly, the method is written such that the subject's own coherence value may shifted up or down-- toward a pre-selected coherence value.

      Katz fails to disclose or suggest this method, or a device adapted to achieve this. First, Katz fails to disclose or suggest providing a pre-selected coherence value. Second, Katz also fails to disclose or suggest determining a coherence value of the intrinsic frequencies among multiple sites in a brain of the subject within a specified EEG band. Third, Katz fails to disclose or suggest adjusting output of one or more magnetic fields for influencing the coherence value toward the pre-selected coherence value; and [] applying said one or more magnetic fields close to a head of the subject, wherein if the coherence value is higher than the pre-selected coherence value, the adjusting and applying steps comprises lowering the coherence value of the subject by applying at least two asynchronous magnetic fields close to the head of the subject, and wherein if the coherence value is lower than the pre-selected coherence value, the adjusting and applying steps comprises raising the coherence value of the subject by applying at least one synchronized magnetic field close to a head of the subject. Rather, Katz expresses a goal of achieving **symmetry in magnitude** of the EEG readings starting with asynchronous magnetic fields (0.5Hz, 5Hz). (See, Column 8 line 39-60, at least). Thus, any **secondary** preference toward coherent waves appears to use **asynchronous magnetic fields** to achieve coherent waves. (See, Column 8 line 39-60, at least). This is different with respect to how fields are used in Claim 3 to influence coherence toward the pre-selected coherence value.

      Further, other examples in Katz (e.g. Column 8 lines 60- Column 9 line 16), again refer to the use of the methods and devices of Katz using synchronization "causing the mind to move


[from a relaxed state] to a state of alert readiness." In Katz, this is achieved with "a larger magnet set," however, it is undisclosed in Katz how synchronization is achieved, i.e., what field distribution would achieve this. (Id.) In fact, Katz is a feedback system that adjusts based on a subject's reaction to a particular field, and Katz indicates this "will vary from patient to patient." Thus, Katz again fails to disclose the method of Claim 3, which describes a particular method and field arrangement to use based on the subject's coherence value and the pre-selected coherence value, neither of which Katz discloses or suggests.

For similar reasons as noted with regard to Claim 3, Katz simply fails to disclose or suggest elements of Claim 4, including "providing a pre-selected EEG phase of the specified EEG frequency [] adjusting output of one or more magnetic fields for influencing the EEG phase toward the pre-selected EEG phase; and [] applying said one or more magnetic fields close to a head of the subject, wherein the one or more magnetic fields are of the same frequency and are in-phase with each other, out of phase with each other, or a combination thereof."

Likewise, for similar reasons as noted with regard to Claims 1-4, Katz simply fails to disclose or suggest all of the elements of each of Claims 9, 46, and 48.

Based on the above, at least, Applicants submit the independent Claims 1-4, 9, 46 and 48, as amended, and all claims dependent therefrom, are in condition for allowance and advancement to allowance is earnestly solicited.

Claims 26, 28, 29, 34, 35, 37 and 38 were rejected under 35 U.S.C. 102(b) as being anticipated by USPN 6,001,055 (Souder). On the contrary, Souder fails to disclose or suggest a device comprising "a subunit coupled to the magnet; wherein the subunit enables movement of at least one said magnet at a frequency between about 0.5 Hz and about 100 Hz based on at least one of: an intrinsic frequency of the brain of a subject within a specified EEG band; and a Q-factor of the intrinsic frequency of the brain of the subject within the specified EEG band," as is required in Claim 26, as amended, and thus, required in any claim dependent therefrom.

Based on the above, at least, Applicants submit the independent Claim 26, as amended, and all claims dependent therefrom, are in condition for allowance and advancement to allowance is earnestly solicited.

### **_Claim Rejections - 35 USC § 103_**

Claims 5-8 were rejected under 35 U.S.C. 103(a) as being unpatentable over USPN 6,488,617 (Katz) as applied to claims 1-4 above, and further in view of US Publication 2005-0070778 (Lackey). Claims 13 and 14 were rejected under 35 U.S.C. 103(a) as being unpatentable over Katz as applied to claims 1-4 above, and further in view of Souder. Claims 16 and 17 were rejected under 35 U.S.C 103(a) as being unpatentable over Katz and Souder as applied to claim 13 above, and further in view of USPN 5,667,469 (Zhang). Claims 18 and 19 were rejected under 35 U.S.C. 103(a) as being unpatentable over Katz as applied to claims 1-4 above, and further in view of USPN 5,788,624 (Lu). Claim 20 was rejected under 35 U.S.C. 103(a) as being unpatentable over Katz as applied to claims 1-4 above, and further in view of USPN 3,821,949 (Hatzell).

To establish a *prima facie* case of obviousness, the cited art itself or "the inferences and creative steps that a person of ordinary skill in the art would [have] employ[ed]" at the time of the invention are to have taught or suggested the claim elements. *KSR Int'l Co. v. Teleflex Inc.*, 127 S. Ct. 1727, 1742 (2007); *See also* MPEP § 2143.03. Thus, the Examiner must make "a searching comparison of the claimed invention – including all its limitations – with the teaching of the prior art." *In re Ochiai*, 71 F.3d 1565, 1572 (Fed. Cir. 1995). As such, "obviousness requires a suggestion of all limitations in a claim." *CFMT, Inc. v. Yieldup Intern. Corp.*, 349 F.3d 1333, 1342 (Fed. Cir. 2003) (citing *In re Royka*, 490 F.2d 981, 985 (CCPA 1974)).

As noted above with regard to Claims 1-4, and 9, Katz fails to disclose or suggest all of the elements in each of the noted independent claims. None of Lackey, Souder, Zhang, Lu, and Hatzell, whether considered alone or in any combination with Katz or any other reference make up for the deficiencies of Katz, as noted above. Thus, Applicants submit that independent Claims 1-4, and 9, and all claims dependent therefrom, are in condition of allowance. Advancement to allowance is earnestly solicited for all of Claims 1 to 25.

Likewise, Claims 27, 30, 31, 32, and 33 were rejected under 35 U.S.C. (103(a) as being unpatentable over Souder as applied to claim 26 above, and further in view of Katz. Claim 36 was rejected under 35 U.S.C. 103(a) as being unpatentable over Souder as applied to claim 26 above, and further in view of US Publication 2005-0124848 (Holzner). Claims 39-43 were rejected under 35 U.S.C. 103(a) as being unpatentable over Souder as applied to claim 38 above, and further in view of

<div align="right">Attorney Docket No. 35784-701.201</div>

WO 96/15829 (Spiegel). Claims 44 and 45 were rejected under 35 U.S.C. 103(a) as being unpatentable over Souder and Spiegel as applied to claim 43 above, and further in view of Katz.

As noted above with regard to Claims 26 above, Souder fails to disclose or suggest all of the elements in each of the noted independent claims. None of Katz, Holzner, and Spiegel, whether considered alone or in any combination with Souder or any other reference make up for the deficiencies of Souder, as noted above. Thus, Applicants submit that independent Claim 26 and all claims dependent therefrom are in condition of allowance. Advancement to allowance is earnestly solicited for all of Claims 26-45.

<div align="right">Attorney Docket No. 35784-701.201</div>

## CONCLUSION

In light of the remarks set forth above, Applicants believe that the pending claims are under condition for allowance. Applicants respectfully solicit the Examiner to expedite the prosecution of this patent application to issuance. Should the Examiner have any questions, the Examiner is encouraged to telephone the undersigned.

The Commissioner is authorized to charge any underpayment or credit any overpayment to Deposit account No. 23-2415 (Attorney Docket No. 32695-701.201).

Respectfully submitted,

Date: March 12, 2012          By:    /Kristin Havranek/
                                     KRISTIN HAVRANEK
                                     Reg. No. 58,789

WILSON SONSINI GOODRICH & ROSATI
650 Page Mill Road
Palo Alto, CA 94304-1050
Direct Line: (858) 350-2215
**Customer No. 021971**