# EXHIBIT F

**Excerpts from the Prosecution History of U.S. Patent No. 9,446,259**

**FILED ELECTRONICALLY ON OCTOBER 10, 2013**

ATTORNEY DOCKET NO.  35784-707.401
PATENT

| | |
|---|---|
| In re the Patent Application of: | Confirmation No.:  Unassigned |
| Applicants:   James William Phillips *et al.* | Group Art Unit:  Unassigned |
| Serial No.:  Unassigned | Examiner:  Unassigned |
| Filed:  Herewith | |
| Title: **SYSTEMS AND METHODS FOR NEURO-EEG SYNCHRONIZATION THERAPY** | |

## PRELIMINARY AMENDMENT

Commissioner for Patents
P.O. Box 1450
Alexandria, VA 22313-1450

Commissioner:

Applicants respectfully request entry of the proposed amendments prior to examination and allowance of the pending claims.

**Amendments to the Specification** begin on page **2**.

**Amendments to the Claims** begin on page **4**.

**Remarks** and **Conclusion** are on page **7** of this paper.

WNI 003262

Attorney Docket No. 35784-707.401

**Amendments to the Specification**:

**Please delete Paragraph [0001] and replace with the following:**

[0001]  This application is a divisional of U.S. Patent Application No. 12/942,922, filed November 9, 2010, which claims the benefit of U.S. Provisional Patent Application No. 61/260,779, filed November 12, 2009, the contents of each of which are incorporated herein by reference in their entirety.

**Please delete Paragraph [00128] and replace with the following:**

[00128]      In some embodiments of at least one aspect described above, the method improves an indication selected from the group consisting of replacement for meditation, quick nap, stress release, attention span, comprehension, memory, lowered blood pressure, increased libido, sports performance, academic performance, and any combination thereof.  In some embodiments of at least one aspect described above, the method improves a mental disorder selected from the group consisting of depression, bipolar, anxiety, obsessive-compulsive, seizure, Parkinson's disease, ADHD, autism, substance abuse, head injury, Alzheimer's disease, eating disorder, sleep disorder, tinnitus, and any combination thereof.  In some embodiments of at least one aspect described above, the method improves symptoms of fibromyalgia.  In some embodiments of at least one aspect described above, the method halts the onset of a seizure.  In some embodiments of at least one aspect described above, the method prevents the onset of a seizure.  In some embodiments of at least one aspect described above, the method improves a characteristic selected from the group consisting of peripheral visual response, attention span, immediate reaction time (IRT), movement time (MT), simple perceptual reaction time (SPR), conflict perceptual reaction time (CPR), and any combination thereof.  In some embodiments of at least one aspect described above, the method provides an improvement as measured using a rating scale selected from the group consisting of HAMA, HAMD, PANSS, MADRS, BARS, SAS, and any combination thereof.  In some embodiments of at least one aspect described above, the method provides an improvement as measured using the Unified Parkinson's Rating Scale. In some embodiments of at least one aspect described above, the method provides an improvement as measured using a modified Unified Parkinson's Rating Scale. In some embodiments of at least one aspect described above, the method uses a Permanent Magneto-

Attorney Docket No. 35784-707.401

EEG Resonant Therapy (pMERT) device (alternatively called a Neuro-EEG Synchronization Therapy (NEST) device).  In some embodiments of at least one aspect described above, the method uses a device as described ~~in any of claims 44-88, and/or as described~~ herein.  In some embodiments of at least one aspect described above, the method does not use a Transcranial Magnetic Stimulation (TMS) device.


**Please delete Paragraph [00152] and replace with the following:**


[00152]        In some embodiments of at least one aspect described above, the device is any device ~~of claims 44-88~~ <u>described herein</u>.  In some embodiments of at least one aspect described above, the user account comprises

(a) user information;

(b) user access information; and

(c) based on each  subject and each therapeutic dosage quota administered to each  subject, fields for storing at least one of

    (1) EEG data of the subject,

    (2) intrinsic frequency within a specified EEG band of the subject,

    (3) Q-factor of the intrinsic frequency of the subject

    (4) an EEG phase of a specified EEG frequency of the subject,

    (5) a coherence value of intrinsic frequencies of the subject,

    (6) treatment information of the subject, and

    (7) device usage information for the subject.


**Please delete Paragraph [00193] and replace with the following:**


[00193]        ~~Figure 10 shows~~<u>Figures 10A through 10G show</u> some exemplary embodiments for various movements of at least one permanent magnet.

**Amendments to the Claims:**

This listing of claims will replace all prior versions, and listings of claims in this application. Applicant reserves the right to pursue any subject matter of any canceled claims in this or any other appropriate patent application.  Support for these claims is provided in the remarks following the listing of claims.

Claims

1-18. (Cancelled)

19.    (Currently Amended)  A method comprising: ~~adjusting~~ applying output of a magnetic field close to a head of a subject, ~~for influencing~~ and moving at least one of

an intrinsic frequency of a specified EEG band of ~~a~~ the subject toward a pre-selected intrinsic frequency of the specified EEG band and

a Q-factor of ~~an~~ the intrinsic frequency within ~~a~~ the specified EEG band of ~~a~~ the subject toward a pre-selected Q-factor ~~and applying said magnetic field close to a head of the subject~~; wherein movement of the ~~at least one of the pre-selected~~ intrinsic frequency ~~and~~ or the pre-selected Q-factor ~~is chosen in order to~~ improves at least one of

neuropathic pain in the subject,

a neurological disorder in the subject,

a symptom of brain damage, and

brain dysfunction in the subject.

20.   (Original)  The method of claim 19,

wherein the neuropathic pain comprises at least one of: occipital neuralgia, neuritis, trigeminal neuralgia, peripheral neuralgia, sciatic neuralgia, intercostal neuralgia, postherpetic neuralgia, diabetic neuropathy, and glossopharyngeal neuralgia;

wherein the neurological disorder comprises at least one of a brain neurological disorder, a spinal cord disorder, a peripheral nervous system disorder, a cranial nerve disorder, an autonomic nervous system disorder, a seizure disorder, a movement disorder, a sleep disorder, a headache, lower back pain, neck pain, other generalized neuropathic pain, delirium, dementia, dizziness, vertigo, stupor, coma, a head injury, a stroke, multiple sclerosis, a

demyelenating disease, an infection of the brain or spinal cord, a prion disease, and a complex regional pain syndrome;

wherein the brain damage comprises at least one of: cerebral lobe damage including lower brain areas such as the basal ganglia, the cerebellum, and the brainstem; frontal lobe damage, parietal lobe damage, temporal lobe damage, and occipital lobe damage; and

wherein the brain dysfunction comprises at least one of: aphasia, dysarthria, apraxia, agnosia, and amnesia.

21. (Currently Amended)  The method of claim 19, further comprising taking EEG measurements of the subject before the ~~adjusting~~ applying step or after the applying step, or both before the ~~adjusting~~ applying step and after the applying step.

22. (Currently Amended)  The method of claim 19, further comprising determining at least one of: the subject's intrinsic frequency of the specified EEG band and the subject's Q-factor of an intrinsic frequency within ~~a~~ the specified EEG band.

23. (Original)  The method of claim 19, wherein the applying of the magnetic field applies the magnetic field to a diffuse area in a brain of the subject.

24. (Original)  The method of claim 19, wherein the magnetic field is generated by movement of at least one permanent magnet.

25. (Original)  The method of claim  24, wherein the strength of the at least one permanent magnetic is from about 10 Gauss to about 4 Tesla.

26. (Currently Amended)  A device comprising: a means for adjusting output of a magnetic field ~~for~~ and ~~influencing~~ moving at least one of:

an intrinsic frequency of a specified EEG band of a subject toward a pre-selected intrinsic frequency of the specified EEG band; and

a Q-factor of an intrinsic frequency within a specified EEG band of a subject toward a pre-selected Q-factor,

wherein the means for adjusting the output of the magnetic field is adapted to apply said magnetic field close to a head of the subject,  and

wherein at least one of the pre-selected intrinsic frequency and the pre-selected Q-factor is chosen in order to improve at least one of:

neuropathic pain in the subject,

a neurological disorder in the subject,

Attorney Docket No. 35784-707.401

a symptom of brain damage, and

brain dysfunction in the subject.

27.    (Original)  The device of claim 26,

wherein the neuropathic pain comprises at least one of: occipital neuralgia, neuritis, trigeminal neuralgia, peripheral neuralgia, sciatic neuralgia, intercostal neuralgia, postherpetic neuralgia, diabetic neuropathy, and glossopharyngeal neuralgia;

wherein the neurological disorder comprises at least one of a brain neurological disorder, a spinal cord disorder, a peripheral nervous system disorder, a cranial nerve disorder, an autonomic nervous system disorder, a seizure disorder, a movement disorder, a sleep disorder, a headache, lower back pain, neck pain, other generalized neuropathic pain, delirium, dementia, dizziness, vertigo, stupor, coma, a head injury, a stroke, multiple sclerosis, a demylenating disease, an infection of the brain or spinal cord, a prion disease, and a complex regional pain syndrome;

wherein the brain damage comprises at least one of: cerebral lobe damage including lower brain areas such as the basal ganglia, the cerebellum, and the brainstem; frontal lobe damage, parietal lobe damage, temporal lobe damage, and occipital lobe damage; and

wherein the brain dysfunction comprises at least one of: aphasia, dysarthria, apraxia, agnosia, and amnesia.

28.    (Original)  The device of claim 26, comprising at least one permanent magnet, wherein the strength of the at least one permanent magnetic is from about 10 Gauss to about 4 Tesla.

29.    (Original)  The device of claim 28, wherein movement of the at least one said magnet generates an alternating magnetic field.

30.    (Original)  The device of claim 26, comprising an electromagnetic coil.

31.    (Original)   The device of claim 26, further comprising logic that controls a output of the magnetic field to be any frequency between about 0.5 Hz and about 100 Hz in increments of about 0.1 Hz.

32.-35  (Cancelled)

Attorney Docket No. 35784-707.401

## REMARKS

The specification has been amended to update the priority claim.

The specification has also been amended at paragraphs [00128] and [00152] in order to remove reference to certain claims which are not present in the Specification.

The specification has further been amended at paragraph [00193] in order to include description references for Figures 10A through 10G.

No new matter is added by any of these amendments.

Claims 1-35 are pending. Claims 1-18, 32-35 are canceled herein. Claims 19, 21-22, and 26 have been amended.   Following the amendments, claims 19-31 are pending.

Support for the amendments can be found in the original claims and in the specification. This amendment does not introduce new matter.  Applicants reserve the right to pursue any cancelled claims in this or any continuation or divisional application.

## CONCLUSION

Applicants respectfully solicit the Examiner to enter  the amendments and expedite prosecution of this patent application to issuance.  Should the Examiner have any questions, the Examiner is encouraged to contact the undersigned attorney at (858) 350-2215.


Respectfully submitted,

WILSON SONSINI GOODRICH & ROSATI


Date:     October 10, 2013                    By:     /Kristin Havranek/
                                                   Kristin Havranek
                                                   Reg. No. 58789


650 Page Mill Road
Palo Alto, CA  94304
Direct Dial:  (858) 350-2215
**Customer No. 021971**

UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
**United States Patent and Trademark Office**
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 14/051,378 | 10/10/2013 | James William PHILLIPS | 35784-707.401 | 9993 |

21971        7590        03/24/2016
WILSON, SONSINI, GOODRICH & ROSATI
650 PAGE MILL ROAD
PALO ALTO, CA 94304-1050

| EXAMINER |
|---|
| WEARE, MEREDITH H |

| ART UNIT | PAPER NUMBER |
|---|---|
| 3735 | |

| NOTIFICATION DATE | DELIVERY MODE |
|---|---|
| 03/24/2016 | ELECTRONIC |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

Notice of the Office communication was sent electronically on above-indicated "Notification Date" to the following e-mail address(es):

patentdocket@wsgr.com

PTOL-90A (Rev. 04/07)

WNI 004822

| **Office Action Summary** | **Application No.**<br>14/051,378 | **Applicant(s)**<br>PHILLIPS ET AL. | |
|---|---|---|---|
| | **Examiner**<br>Meredith Weare | **Art Unit**<br>3735 | **AIA (First Inventor to File) Status**<br>No |

-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address --

## Period for Reply

A SHORTENED STATUTORY PERIOD FOR REPLY IS SET TO EXPIRE <u>3</u> MONTHS FROM THE MAILING DATE OF THIS COMMUNICATION.

- Extensions of time may be available under the provisions of 37 CFR 1.136(a). In no event, however, may a reply be timely filed after SIX (6) MONTHS from the mailing date of this communication.
- If NO period for reply is specified above, the maximum statutory period will apply and will expire SIX (6) MONTHS from the mailing date of this communication.
- Failure to reply within the set or extended period for reply will, by statute, cause the application to become ABANDONED (35 U.S.C. § 133). Any reply received by the Office later than three months after the mailing date of this communication, even if timely filed, may reduce any earned patent term adjustment. See 37 CFR 1.704(b).

## Status

1)☒ Responsive to communication(s) filed on <u>03/02/2016</u>.
   ☐ A declaration(s)/affidavit(s) under **37 CFR 1.130(b)** was/were filed on _____.
2a)☒ This action is **FINAL**.    2b)☐ This action is non-final.
3)☐ An election was made by the applicant in response to a restriction requirement set forth during the interview on _____; the restriction requirement and election have been incorporated into this action.
4)☐ Since this application is in condition for allowance except for formal matters, prosecution as to the merits is closed in accordance with the practice under *Ex parte Quayle*, 1935 C.D. 11, 453 O.G. 213.

## Disposition of Claims*

5)☒ Claim(s) <u>19-29 and 31</u> is/are pending in the application.
   5a) Of the above claim(s) _____ is/are withdrawn from consideration.
6)☐ Claim(s) _____ is/are allowed.
7)☒ Claim(s) <u>19-29 and 31</u> is/are rejected.
8)☐ Claim(s) _____ is/are objected to.
9)☐ Claim(s) _____ are subject to restriction and/or election requirement.

* If any claims have been determined <u>allowable</u>, you may be eligible to benefit from the **Patent Prosecution Highway** program at a participating intellectual property office for the corresponding application. For more information, please see http://www.uspto.gov/patents/init_events/pph/index.jsp or send an inquiry to PPHfeedback@uspto.gov.

## Application Papers

10)☐ The specification is objected to by the Examiner.
11)☐ The drawing(s) filed on _____ is/are: a)☐ accepted or b)☐ objected to by the Examiner.
   Applicant may not request that any objection to the drawing(s) be held in abeyance. See 37 CFR 1.85(a).
   Replacement drawing sheet(s) including the correction is required if the drawing(s) is objected to. See 37 CFR 1.121(d).

## Priority under 35 U.S.C. § 119

12)☐ Acknowledgment is made of a claim for foreign priority under 35 U.S.C. § 119(a)-(d) or (f).
**Certified copies:**
  a)☐ All   b)☐ Some**  c)☐ None of the:
   1.☐ Certified copies of the priority documents have been received.
   2.☐ Certified copies of the priority documents have been received in Application No. _____.
   3.☐ Copies of the certified copies of the priority documents have been received in this National Stage application from the International Bureau (PCT Rule 17.2(a)).

** See the attached detailed Office action for a list of the certified copies not received.

**Attachment(s)**
1)☐ Notice of References Cited (PTO-892)
2)☐ Information Disclosure Statement(s) (PTO/SB/08a and/or PTO/SB/08b) Paper No(s)/Mail Date _____.
3)☐ Interview Summary (PTO-413) Paper No(s)/Mail Date. _____.
4)☐ Other: _____.

Application/Control Number: 14/051,378                                        Page 2
Art Unit: 3735

## DETAILED ACTION

### *Notice of Pre-AIA or AIA Status*

1.      The present application is being examined under the pre-AIA first to invent provisions.

### *Response to Amendment*

2.      The amendment to the claims filed 03/02/2016 has been entered. Claims 19, 23 and 26 are currently amended. Claims 1-18 and 30 have been canceled. Claims 19-29 and 31 remain pending.

### *Terminal Disclaimer*

3.      The terminal disclaimer filed on 03/02/2016 disclaiming the terminal portion of any patent granted on this application which would extend beyond the expiration date of US Patent No. 8,465,408 has been reviewed and is accepted. The terminal disclaimer has been recorded, and the obviousness-type double patenting rejection in view of US 8,465,408 withdrawn.

### *Claim Rejections - 35 USC § 112*

4.      The following is a quotation of 35 U.S.C. 112(b):

> (b) CONCLUSION.—The specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the inventor or a joint inventor regards as the invention.

The following is a quotation of 35 U.S.C. 112 (pre-AIA), second paragraph:

> The specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention.

5.      The following is a quotation of 35 U.S.C. 112(f):

> (f) Element in Claim for a Combination. – An element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital of structure, material, or acts

Application/Control Number: 14/051,378                                           Page 3
Art Unit: 3735

in support thereof, and such claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof.

The following is a quotation of pre-AIA 35 U.S.C. 112, sixth paragraph:

An element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof, and such claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof.

6.      **Claims 26-29 and 31 are rejected under 35 U.S.C. 112(b) or (pre-AIA 35 U.S.C. 112, second paragraph) as being indefinite for failing to particularly point out and distinctly claim the subject matter which the inventor or a joint inventor, or for pre-AIA the applicant regards as the invention.**

Regarding claim 26 and claims dependent thereon, the limitation "a subunit, wherein the subunit is configured to adjust output of the magnetic field and move [...], wherein the adjustment of output of the magnetic field is based on an intrinsic frequency of a specified EEG band of a subject, a Q-factor of the intrinsic frequency within the specified EEG band of the subject, or both" is indefinite. The above claim limitation has been interpreted under 35 U.S.C. 112(f) (pre-AIA 35 U.S.C. 112, sixth paragraph) because it uses the generic placeholder "subunit" coupled with functional language ("configured to adjust output of the magnetic field and move […]") without reciting sufficient structure to achieve the function. Since the claim limitation invokes 35 U.S.C. 112(f), claim 26 claims dependent thereon have been interpreted to cover the corresponding structure described in the specification that achieves the claimed function, and equivalents thereof. Upon review of the specification, the corresponding structure is unclear, as the specification does not appear to disclose a single "subunit" that achieves the above functions.

WNI 004825

Application/Control Number: 14/051,378                                   Page 4
Art Unit: 3735

Applicant discloses a "subunit" that "enables movement of said at least one permanent magnet at a frequency between about 0.5 Hz and about 100 Hz" (e.g., ¶ [0031]) including a rotating mechanism comprising a motor, a power source capable of powering the motor, and a rotating element coupled to the motor and coupled to the magnet (e.g., ¶¶ [0138]-[0141]). However, the disclosed subunit lacks any control or processing means for adjusting the magnetic field output based on an intrinsic frequency of a specified EEG band of a subject, a Q-factor of the intrinsic frequency within the specified EEG band of the subject, or both. Rather, Applicant discloses these functions are performed by logic (hardware, software or a combination of both, as described in ¶ [0624]) that controls the subunit and subsequently, adjusts the output of a magnetic field produced by a magnet (e.g., ¶ [0034]). Therefore, the scope of the claim is indefinite, as it is unclear in what manner the disclosed "subunit" structure, absent any associated control or processing means, adjusts the magnetic field output based on an intrinsic frequency of a specified EEG band of a subject, a Q-factor of the intrinsic frequency within the specified EEG band of the subject, or both.

If Applicant wishes to provide further explanation or dispute the examiner's interpretation of the corresponding structure, Applicant must identify the corresponding structure with reference to the specification by page and line number, and to the drawing, if any, by reference characters in response to this Office action.

If Applicant does not intend to have the claim limitation(s) treated under 35 U.S.C. 112(f), Applicant may amend the claim(s) so that it/they will clearly not invoke 35 U.S.C. 112(f), or present a sufficient showing that the claim recites/recite sufficient structure, material, or acts

Application/Control Number: 14/051,378                                          Page 5
Art Unit: 3735

for performing the claimed function to preclude application of 35 U.S.C. 112(f) or pre-AIA 35

U.S.C. 112, sixth paragraph.

For more information, see MPEP § 2173 *et seq.* and *Supplementary Examination*

*Guidelines for Determining Compliance With 35 U.S.C. 112 and for Treatment of Related Issues*

*in Patent Applications*, 76 FR 7162, 7167 (Feb. 9, 2011).


## Double Patenting

7.      The nonstatutory double patenting rejection is based on a judicially created doctrine

grounded in public policy (a policy reflected in the statute) so as to prevent the unjustified or

improper timewise extension of the "right to exclude" granted by a patent and to prevent possible

harassment by multiple assignees. A nonstatutory double patenting rejection is appropriate where

the claims at issue are not identical, but at least one examined application claim is not patentably

distinct from the reference claim(s) because the examined application claim is either anticipated

by, or would have been obvious over, the reference claim(s). See, e.g., *In re Berg*, 140 F.3d

1428, 46 USPQ2d 1226 (Fed. Cir. 1998); *In re Goodman*, 11 F.3d 1046, 29 USPQ2d 2010 (Fed.

Cir. 1993); *In re Longi*, 759 F.2d 887, 225 USPQ 645 (Fed. Cir. 1985); *In re Van Ornum*, 686

F.2d 937, 214 USPQ 761 (CCPA 1982); *In re Vogel*, 422 F.2d 438, 164 USPQ 619 (CCPA

1970); and *In re Thorington*, 418 F.2d 528, 163 USPQ 644 (CCPA 1969).

A timely filed terminal disclaimer in compliance with 37 CFR 1.321(c) or 1.321(d) may

be used to overcome an actual or provisional rejection based on a nonstatutory double patenting

ground provided the reference application or patent either is shown to be commonly owned with

this application, or claims an invention made as a result of activities undertaken within the scope

Application/Control Number: 14/051,378                                      Page 6
Art Unit: 3735

of a joint research agreement. A terminal disclaimer must be signed in compliance with 37 CFR

1.321(b).

The USPTO internet Web site contains terminal disclaimer forms which may be used.

Please visit http://www.uspto.gov/forms/. The filing date of the application will determine what

form should be used. A web-based eTerminal Disclaimer may be filled out completely online

using web-screens. An eTerminal Disclaimer that meets all requirements is auto-processed and

approved immediately upon submission. For more information about eTerminal Disclaimers,

refer to http://www.uspto.gov/patents/process/file/efs/guidance/eTD-info-I.jsp.


8.      **Claims 19, 26 and 27 are rejected on the ground of nonstatutory double patenting as**

**being unpatentable over claims 2, 4 and 23 of U.S. Patent No. 8,475,354 in view of US**

**2005/0182287 (Becker).**

Although the claims at issue are not identical, they are not patentably distinct from each

other because the claims of the present application overlap in scope with the identified claims of

US 8,475,354, wherein the differences in scope between both sets of claims would have been

obvious to one of ordinary skill in the art. One of ordinary skill in the art would consider the

difference obvious because the additional feature of applying magnetic fields to the head to

improve at least one of neuropathic pain, a neurological disorder in the subject, a symptom of

brain damage, and brain dysfunction in the subject is disclosed and/or suggested by Becker in

order to effectively reduce symptoms associated with such states (¶ [0055]).

Application/Control Number: 14/051,378                                         Page 7
Art Unit: 3735

9.      **Claims 26-29 and 31 are rejected on the ground of nonstatutory double patenting as being unpatentable over claim 17 of U.S. Patent No. 8,480,554 in view of Becker.**

Although the claims at issue are not identical, they are not patentably distinct from each other because the claims of the present application overlap in scope with the identified claims of US 8,480,554, wherein the differences in scope between both sets of claims would have been obvious to one of ordinary skill in the art. One of ordinary skill in the art would consider the difference obvious because the additional feature of applying magnetic fields to the head to improve at least one of neuropathic pain, a neurological disorder in the subject, a symptom of brain damage, and brain dysfunction in the subject is disclosed and/or suggested by Becker in order to effectively reduce symptoms associated with such states (¶ [0055]).


10.     **Claims 19-25 are rejected on the ground of nonstatutory double patenting as being unpatentable over claims 1-7 of U.S. Patent No. 8,870,737 in view of Becker.**

Although the claims at issue are not identical, they are not patentably distinct from each other because the claims of the present application overlap in scope with the identified claims of US 8,870,737, wherein the differences in scope between both sets of claims would have been obvious to one of ordinary skill in the art. One of ordinary skill in the art would consider the difference obvious because the additional feature of applying magnetic fields to the head to improve at least one of neuropathic pain, a neurological disorder in the subject, a symptom of brain damage, and brain dysfunction in the subject is disclosed and/or suggested by Becker in order to effectively reduce symptoms associated with such states (¶ [0055]).

Application/Control Number: 14/051,378                                    Page 8
Art Unit: 3735

11.     **Claims 26-28 are rejected on the ground of nonstatutory double patenting as being unpatentable over claims 1 and 6 of U.S. Patent No. 8,888,672 in view of Becker.**

Although the claims at issue are not identical, they are not patentably distinct from each other because the claims of the present application overlap in scope with the identified claims of US 8,888,672, wherein the differences in scope between both sets of claims would have been obvious to one of ordinary skill in the art. One of ordinary skill in the art would consider the difference obvious because the additional feature of applying magnetic fields to the head to improve at least one of neuropathic pain, a neurological disorder in the subject, a symptom of brain damage, and brain dysfunction in the subject is disclosed and/or suggested by Becker in order to effectively reduce symptoms associated with such states (¶ [0055]).


12.     **Claim 26 is rejected on the ground of nonstatutory double patenting as being unpatentable over claims 1, 4 and 14 of U.S. Patent No. 9,015,057 (cited on PTO-892 mailed 07/30/2015) in view of Becker.**

Although the claims at issue are not identical, they are not patentably distinct from each other because the claims of the present application overlap in scope with the identified claims of US 9,015,057, wherein the differences in scope between both sets of claims would have been obvious to one of ordinary skill in the art. One of ordinary skill in the art would consider the difference obvious because the additional feature of applying magnetic fields to the head to improve at least one of neuropathic pain, a neurological disorder in the subject, a symptom of brain damage, and brain dysfunction in the subject is disclosed and/or suggested by Becker in order to effectively reduce symptoms associated with such states (¶ [0055]).

Application/Control Number: 14/051,378                                                                Page 9
Art Unit: 3735

### *Allowable Subject Matter*

13.     Claims 19-29 and 31 would be allowable if rewritten or amended to overcome the double

patenting rejection(s) and the rejection(s) under 35 U.S.C. 112(b) (pre-AIA 35 U.S.C. 112,

second paragraph) set forth in this Office action.

As noted by Applicant in the Remarks submitted 09/30/2015, the prior art of record fails

to teach or suggest, in combination with the remaining steps and/or elements, generating and

applying a magnetic field and/or adjusting output of a magnetic field based on an intrinsic

frequency of a specified EEG band of a subject, a Q-factor of the intrinsic frequency within the

specified EEG band of the subject, or both as recited in Applicant's independent claims 19 and

26.

### *Response to Arguments*

14.     Applicant's arguments regarding the double patenting rejections in view of US 8,475,354,

US 8,480,554, US 8,870,737, US 8,888,672, and US 9,015,057 have been fully considered but

they are not persuasive.

With respect to each of the patents identified above, Applicant submits, "Applicants are

filing concurrently with this response a Terminal Disclaimer in compliance with 37 C.F.R. 1.321.

Thus, the rejection is moot" (Remarks, pgs. 8-9). However, only the terminal part of the statutory

term of any patent granted on the instant application which would extend beyond the expiration

date of the full statutory term of prior patent US 8,465,408 was disclaimed. As noted above, this

terminal disclaimer has been reviewed and accepted, and the obviousness-type double patenting

(ODP) rejection in view of US 8,465,408 withdrawn. No terminal disclaimer(s) has/have been

WNI 004831

Application/Control Number: 14/051,378                                        Page 10
Art Unit: 3735

filed for the above-identified patents. See MPEP 804.02(IV).  Therefore, the ODP rejections in

view of US 8,475,354, US 8,480,554, US 8,870,737, US 8,888,672, and US 9,015,057 have been

maintained.


## Conclusion

15.    Applicant's amendment necessitated the new ground(s) of rejection presented in this

Office action. Accordingly, **THIS ACTION IS MADE FINAL**. See MPEP § 706.07(a).

Applicant is reminded of the extension of time policy as set forth in 37 CFR 1.136(a).

A shortened statutory period for reply to this final action is set to expire THREE

MONTHS from the mailing date of this action. In the event a first reply is filed within TWO

MONTHS of the mailing date of this final action and the advisory action is not mailed until after

the end of the THREE-MONTH shortened statutory period, then the shortened statutory period

will expire on the date the advisory action is mailed, and any extension fee pursuant to 37

CFR 1.136(a) will be calculated from the mailing date of the advisory action. In no event,

however, will the statutory period for reply expire later than SIX MONTHS from the date of this

final action.


16.    Any inquiry concerning this communication or earlier communications from the

examiner should be directed to Meredith Weare whose telephone number is (571) 270-3957. The

examiner can normally be reached on Monday-Friday, 9:00-5:00.

Application/Control Number: 14/051,378                                    Page 11
Art Unit: 3735

    If attempts to reach the examiner by telephone are unsuccessful, the examiner's supervisor, Patricia Mallari, can be reached on (571) 272-4729. The fax phone number for the organization where this application or proceeding is assigned is 571-273-8300.

    Information regarding the status of an application may be obtained from the Patent Application Information Retrieval (PAIR) system. Status information for published applications may be obtained from either Private PAIR or Public PAIR. Status information for unpublished applications is available through Private PAIR only. For more information about the PAIR system, see http://pair-direct.uspto.gov. Should you have questions on access to the Private PAIR system, contact the Electronic Business Center (EBC) at 866-217-9197 (toll-free). If you would like assistance from a USPTO Customer Service Representative or access to the automated information system, call 800-786-9199 (IN USA OR CANADA) or 571-272-1000.

/NAVIN NATNITHITHADHA/
Primary Examiner, Art Unit 3735

/Meredith Weare/
Examiner, Art Unit 3735

WNI 004833

PTO/AIA/26 (04-14)
Approved for use through 07/31/2016. OMB 0651-0031
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

| TERMINAL DISCLAIMER TO OBVIATE A DOUBLE PATENTING REJECTION OVER A "PRIOR" PATENT | Docket Number (Optional) 35784-707.401 |

In re Application of:  James William PHILLIPS

Application No.: 14/051,378

Filed: October 10, 2013

For: SYSTEMS AND METHODS FOR NEURO-EEG SYNCHRONIZATION THERAPY

The applicant, _Neosync, Inc._____, owner of _____100_____ percent interest in the instant application hereby disclaims, except as provided below, the terminal part of the statutory term of any patent granted on the instant application which would extend beyond the expiration date of the full statutory term of **prior patent** No. _8,475,354_____ as the term of said **prior patent** is presently shortened by any terminal disclaimer. The applicant hereby agrees that any patent so granted on the instant application shall be enforceable only for and during such period that it and the **prior patent** are commonly owned. This agreement runs with any patent granted on the instant application and is binding upon the grantee, its successors or assigns.

In making the above disclaimer, the applicant does not disclaim the terminal part of the term of any patent granted on the instant application that would extend to the expiration date of the full statutory term of the **prior patent**, "as the term of said **prior patent** is presently shortened by any terminal disclaimer," in the event that said **prior patent** later:
          expires for failure to pay a maintenance fee;
          is held unenforceable;
          is found invalid by a court of competent jurisdiction;
          is statutorily disclaimed in whole or terminally disclaimed under 37 CFR 1.321;
          has all claims canceled by a reexamination certificate;
          is reissued; or
          is in any manner terminated prior to the expiration of its full statutory term as presently shortened by any terminal disclaimer.

Check either box 1 or 2 below, if appropriate.

1. ☐   The undersigned is the applicant.  If the applicant is an assignee, the undersigned is authorized to act on behalf of the assignee.

I hereby acknowledge that any willful false statements made are punishable under 18 U.S.C. 1001 by fine or imprisonment of not more than five (5) years, or both.

2. ☑   The undersigned is an attorney or agent of record.  Reg. No. _58789_____

| /Kristin Havranek/ | April 21, 2016 |
| Signature | Date |
| Kristin Havranek | |
| Typed or printed name | |
| Attorney of Record | (858)350-2215 |
| Title | Telephone Number |

☑   Terminal disclaimer fee under 37 CFR 1.20(d) included.

        **WARNING: Information on this form may become public. Credit card information should not be included on this form. Provide credit card information and authorization on PTO-2038.**

This collection of information is required by 37 CFR 1.321. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.11 and 1.14. This collection is estimated to take 12 minutes to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. **SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.**

If you need assistance in completing the form, call 1-800-PTO-9199 and select option 2.

WNI 004850

PTO/AIA/26 (04-14)
Approved for use through 07/31/2016. OMB 0651-0031
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

| TERMINAL DISCLAIMER TO OBVIATE A DOUBLE PATENTING REJECTION OVER A "PRIOR" PATENT | Docket Number (Optional) 35784-707.401 |
|---|---|

In re Application of:  James William PHILLIPS

Application No.: 14/051,378

Filed: October 10, 2013

For:  SYSTEMS AND METHODS FOR NEURO-EEG SYNCHRONIZATION THERAPY

The applicant, _Neosync, Inc._____, owner of ____100____ percent interest in the instant application hereby disclaims, except as provided below, the terminal part of the statutory term of any patent granted on the instant application which would extend beyond the expiration date of the full statutory term of **prior patent** No. _8,480,554_____ as the term of said **prior patent** is presently shortened by any terminal disclaimer. The applicant hereby agrees that any patent so granted on the instant application shall be enforceable only for and during such period that it and the **prior patent** are commonly owned. This agreement runs with any patent granted on the instant application and is binding upon the grantee, its successors or assigns.

In making the above disclaimer, the applicant does not disclaim the terminal part of the term of any patent granted on the instant application that would extend to the expiration date of the full statutory term of the **prior patent**, "as the term of said **prior patent** is presently shortened by any terminal disclaimer," in the event that said **prior patent** later:

> expires for failure to pay a maintenance fee;
> is held unenforceable;
> is found invalid by a court of competent jurisdiction;
> is statutorily disclaimed in whole or terminally disclaimed under 37 CFR 1.321;
> has all claims canceled by a reexamination certificate;
> is reissued; or
> is in any manner terminated prior to the expiration of its full statutory term as presently shortened by any terminal disclaimer.

Check either box 1 or 2 below, if appropriate.

1. [ ]   The undersigned is the applicant.  If the applicant is an assignee, the undersigned is authorized to act on behalf of the assignee.

I hereby acknowledge that any willful false statements made are punishable under 18 U.S.C. 1001 by fine or imprisonment of not more than five (5) years, or both.

2. [✔]   The undersigned is an attorney or agent of record.  Reg. No. _58789_____

| /Kristin Havranek/ | April 21, 2016 |
|---|---|
| Signature | Date |
| Kristin Havranek | |
| Typed or printed name | |
| Attorney of Record | (858)350-2215 |
| Title | Telephone Number |

[✔]   Terminal disclaimer fee under 37 CFR 1.20(d) included.

**WARNING: Information on this form may become public. Credit card information should not be included on this form. Provide credit card information and authorization on PTO-2038.**

This collection of information is required by 37 CFR 1.321. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.11 and 1.14. This collection is estimated to take 12 minutes to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. **SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.**

If you need assistance in completing the form, call 1-800-PTO-9199 and select option 2.

**FILED ELECTRONICALLY ON Sep. 30, 2015**

**ATTORNEY DOCKET NO. 35784-707.401**
**PATENT**

| | |
|---|---|
| In re the Patent Application of: | Confirmation No.: 9993 |
| Applicants:   James William Phillips *et al.* | Group Art Unit:  3735 |
| Serial No.:   14/051,378 | Examiner:  Meredith H. WEARE |
| Filed:   October 10, 2013 | |
| Title: **SYSTEMS AND METHODS FOR NEURO-EEG SYNCHRONIZATION THERAPY** | |

## AMENDMENT IN RESPONSE TO FINAL OFFICE ACTION WITH REQUEST FOR CONTINUED EXAMINATION

MAIL STOP RCE

Commissioner for Patents

P.O. Box 1450

Alexandria VA 22313-1450

Commissioner:

This communication is in response to the Final Office Action dated July 30, 2015, with a Request for Continued Examination. This response is being filed within three-months of the Final Office Action date.  Applicants believe that this response is being timely filed. The shortened statutory period for response expires on October 30, 2015.  Applicant believes that the fees submitted herewith are sufficient.  However, in the event that Applicants are incorrect, please charge any necessary fees to Deposit Account No. 23-2415, referencing Docket No. 35784-707.401.

*Amendments to the Claims* begin on page **2** of this paper.

*Remarks* begin on page **6** of this paper.

*Conclusion* is on page **13** of this paper.

WNI 004771

Attorney Docket No. 35784-707.401

**AMENDMENTS TO THE CLAIMS**

This listing of claims will replace all prior versions, and listings of claims in this application. Applicant reserves the right to pursue any subject matter of any canceled claims in this or any other appropriate patent application.  Support for these claims is provided in the remarks following the listing of claims.

1. – 18.   Cancelled.

19.  (Currently Amended)  A method comprising:

<u>generating output of a magnetic field based on an intrinsic frequency of a specified EEG band of a subject, a Q-factor of the intrinsic frequency within the specified EEG band of the subject, or both comprising:</u>

<u>generating the magnetic field having a first frequency that is higher than the intrinsic frequency in the specified EEG band of the subject in order to move the intrinsic frequency of the subject up within the specified EEG band toward a preselected intrinsic frequency;</u>

<u>generating the magnetic field having a second frequency that is lower than the intrinsic frequency in the specified EEG band of the subject in order to move the intrinsic frequency of the subject down within the specified EEG band toward the preselected intrinsic frequency;</u>

<u>generating the magnetic field having a first pre-selected frequency in order to move the Q-factor of the intrinsic frequency within the specified EEG band up toward a preselected Q-factor;</u>

<u>generating the magnetic field having a second pre-selected frequency in order to move the Q-factor of the intrinsic frequency within the specified EEG band down toward the preselected Q-factor;</u>

<u>generating the magnetic field having a plurality of frequencies within the specified EEG band in order to move the Q-factor of the intrinsic frequency within the specified EEG band down toward the preselected Q-factor;</u>

<u>or a combination thereof ;</u>

~~applying  output of a magnetic field close to a head of a subject in a manner that moves at least one of~~

Attorney Docket No. 35784-707.401

~~an intrinsic frequency of a specified EEG band of the subject toward a pre-selected~~
~~intrinsic frequency of the specified EEG band and~~

~~a Q-factor of the intrinsic frequency within the specified EEG band of the subject~~
~~toward a pre-selected Q-factor;~~

applying the output of the magnetic field to a head of the subject, wherein application of the output of the magnetic field improves at least one of

neuropathic pain in the subject,

a neurological disorder in the subject,

a symptom of brain damage, and

brain dysfunction in the subject,

~~wherein applying output of a magnetic field comprises:~~

~~generating a first frequency that is higher than the intrinsic frequency in the specified~~
~~EEG band of the subject in order to move the intrinsic frequency of the subject up~~
~~within the specified EEG band;~~

~~generating a second frequency that is lower than the intrinsic frequency in the~~
~~specified EEG band of the subject in order to move the intrinsic frequency of the~~
~~subject down within the specified EEG band;~~

~~generating a first pre-selected frequency in order to move the Q-factor of the intrinsic~~
~~frequency within the specified EEG band up;~~

~~generating a second pre-selected frequency in order to move the Q-factor of the~~
~~intrinsic frequency within the specified EEG band down;~~

~~generating a plurality of frequencies within the specified EEG band in order to move~~
~~the Q-factor of the intrinsic frequency within the specified EEG band down;~~
~~or a combination thereof .~~

20. (Original)  The method of claim 19,

wherein the neuropathic pain comprises at least one of: occipital neuralgia, neuritis, trigeminal neuralgia, peripheral neuralgia, sciatic neuralgia, intercostal neuralgia, postherpetic neuralgia, diabetic neuropathy, and glossopharyngeal neuralgia;

wherein the neurological disorder comprises at least one of a brain neurological disorder, a spinal cord disorder, a peripheral nervous system disorder, a cranial nerve disorder, an autonomic nervous system disorder, a seizure disorder, a movement disorder, a sleep disorder, a headache, lower back pain, neck pain, other generalized neuropathic pain, delirium,

Attorney Docket No. 35784-707.401

dementia, dizziness, vertigo, stupor, coma, a head injury, a stroke, multiple sclerosis, a demylenating disease, an infection of the brain or spinal cord, a prion disease, and a complex regional pain syndrome;

wherein the brain damage comprises at least one of: cerebral lobe damage including lower brain areas such as the basal ganglia, the cerebellum, and the brainstem; frontal lobe damage, parietal lobe damage, temporal lobe damage, and occipital lobe damage; and

wherein the brain dysfunction comprises at least one of: aphasia, dysarthria, apraxia, agnosia, and amnesia.

21.    (Previously Presented)  The method of claim 19, further comprising taking EEG measurements of the subject before the applying step or after the applying step, or both before the applying step and after the applying step.

22.    (Previously Presented)  The method of claim 19, further comprising determining at least one of: the subject's intrinsic frequency of the specified EEG band and the subject's Q-factor of an intrinsic frequency within  the specified EEG band.

23.    (Original)  The method of claim 19, wherein the applying of the magnetic field applies the magnetic field to a diffuse area in a brain of the subject.

24.    (Original)  The method of claim 19, wherein the magnetic field is generated by movement of at least one permanent magnet.

25.    (Original)  The method of claim  24, wherein the strength of the at least one permanent magnetic is from about 10 Gauss to about 4 Tesla.

26. (Currently Amended) A device comprising:

at least one permanent magnet, wherein the movement of the at least one permanent magnet generates a magnetic field; and

a means for adjusting output of the magnetic field and moving at least one of:

an intrinsic frequency of a specified EEG band of a subject toward a pre-selected intrinsic frequency of the specified EEG band; and

a Q-factor of an intrinsic frequency within a specified EEG band of a subject toward a pre-selected Q-factor,

wherein the adjustment of output of the magnetic field is based on an intrinsic frequency of a specified EEG band of a subject, a Q-factor of the intrinsic frequency within the specified EEG band of the subject, or both,

Attorney Docket No. 35784-707.401

wherein the means for adjusting the output of the magnetic field is adapted to apply said magnetic field close to a head of the subject, and

wherein at least one of the pre-selected intrinsic frequency and the pre-selected Q-factor is chosen in order to improve at least one of:

> neuropathic pain in the subject,
>
> a neurological disorder in the subject,
>
> a symptom of brain damage, and
>
> brain dysfunction in the subject.

27.    (Original)  The device of claim 26,

> wherein the neuropathic pain comprises at least one of: occipital neuralgia, neuritis, trigeminal neuralgia, peripheral neuralgia, sciatic neuralgia, intercostal neuralgia, postherpetic neuralgia, diabetic neuropathy, and glossopharyngeal neuralgia;
>
> wherein the neurological disorder comprises at least one of a brain neurological disorder, a spinal cord disorder, a peripheral nervous system disorder, a cranial nerve disorder, an autonomic nervous system disorder, a seizure disorder, a movement disorder, a sleep disorder, a headache, lower back pain, neck pain, other generalized neuropathic pain, delirium, dementia, dizziness, vertigo, stupor, coma, a head injury, a stroke, multiple sclerosis, a demylenating disease, an infection of the brain or spinal cord, a prion disease, and a complex regional pain syndrome;
>
> wherein the brain damage comprises at least one of: cerebral lobe damage including lower brain areas such as the basal ganglia, the cerebellum, and the brainstem; frontal lobe damage, parietal lobe damage, temporal lobe damage, and occipital lobe damage; and
>
> wherein the brain dysfunction comprises at least one of: aphasia, dysarthria, apraxia, agnosia, and amnesia.

28.    (Previously Presented)  The device of claim 26, wherein the strength of the at least one permanent magnetic is from about 10 Gauss to about 4 Tesla.

29.    (Original)  The device of claim 28, wherein movement of the at least one said magnet generates an alternating magnetic field.

30.    Canceled.

31.    (Original)   The device of claim 26, further comprising logic that controls a output of the magnetic field to be any frequency between about 0.5 Hz and about 100 Hz in increments of about 0.1 Hz.

Attorney Docket No. 35784-707.401

## REMARKS

The following remarks are in response to the Examiner's Office Action mailed on July. 30, 2015.  Claims 19 and 26 are amended. Claim 30 is canceled. Support for claim amendments can be found in the application as filed, e.g. at paragraphs [0006], [0105],[0107], [0119], [0122], [0202], [0208],[0275], [0299], [0415], and [0416]. Claims 19-29, and 31 are pending.  Reconsideration is respectfully requested in light of the following remarks.

### *Claim Rejections - 35 USC § 112*

Claim 30 was rejected under 35 U.S.C. 112(b) or 35 U.S.C. 112 (pre-AIA), first paragraph, as allegedly failing to comply with the written description requirement. The claim(s) contains subject matter which was not described in the specification in such a way as to reasonably convey to one skilled in the relevant art that the inventor or a joint inventor, or for pre-AIA the inventor(s), at the time the application was filed, had possession of the claimed invention.

Without conceding the appropriateness of the rejection, claim 30 has been canceled. Thus, the rejection is moot. As such, Applicant respectfully requests that the rejection be withdrawn.

### *Claim Rejections - 35 USC § 103*

Claims 19-23 are rejected under pre-AIA 35 U.S.C. 103(a) as allegedly being unpatentable over US 6,488,617 (Katz) in view of US 2005/0182287(Becker).

The Office alleges that Katz teaches "mov[ing] at least one of an intrinsic frequency of a specified EEG band of the subject toward a pre-selected intrinsic frequency of the specified EEG band a Q-factor of the intrinsic frequency within the specified EEG band of the subject toward a pre-selected Q-factor. " Applicant respectfully disagrees.

Katz teaches moving a subject *from a current brain state into a desired brain state* via magnetic stimulation. Brain states targeted in Katz are categorized based on the level of alertness of the subject. *See* Katz at Col. 1, line 14 to 34. These states include sleep states associated with brain wave frequencies in the delta and theta ranges of 1.5 to 3.5 Hz and 3.5 to 7 Hz, respectively, a relaxed state associated with brain wave frequencies in the alpha range of 7.5 to 12.5 Hz, and an excited state associated with brain wave frequencies in the beta range of 12.5 to 20 Hz. *Id., See also*, Col. 6, lines 16-35). Thus, *each state of Katz is within a different*

Attorney Docket No. 35784-707.401

***EEG band***, and Katz tries to move the subject from one state (in one band) to another state (in another band).

Katz fails to teach or suggest "generating output of a magnetic field based on an intrinsic frequency of a specified EEG band of a subject, a Q-factor of the intrinsic frequency within the specified EEG band of the subject, or both" as required in currently amended and present pending claim 19. Instead, Katz merely teaches that "the computational system 7 sends the determined parameters (2)-(4) to the pulse train generator 8, which in turn directs the magnets, i.e., means for applying a magnetic field, to produce the field as required by these parameter settings." *See* Katz at Col. 6, lines 62-66. The "parameters (2)-(4)" of Katz's teaching are not related or based on "an intrinsic frequency of a specified EEG band of a subject, a Q-factor of the intrinsic frequency within the specified EEG band of the subject, or both" as required in currently pending claim 19. *See* Katz at Col. 6, lines 36-61.

Further, Katz fails to teach "generating the magnetic field having a first frequency that is higher than the intrinsic frequency in the specified EEG band of the subject in order to move the intrinsic frequency of the subject up within the specified EEG band toward a preselected intrinsic frequency;" or "generating the magnetic field having a second frequency that is lower than the intrinsic frequency in the specified EEG band of the subject in order to move the intrinsic frequency of the subject down within the specified EEG band toward the preselected intrinsic frequency" as optionally required in claim 19. Clearly, the magnetic field of pending claim 19 is moving the intrinsic frequency "***within the  specified EEG band***" of the subject "***toward the pre-selected intrinsic frequency***". In stark contrast, Katz' methods and devices move the subject's brain waves from one band to another, by teaching moving the subject from one brain state to a desired brain state.  Brain states in Katz correlate to separate EEG bands in Katz (e.g. from relaxed in the alpha band to sleep in the delta or theta band) which encompasses ***a range*** of frequenc***ies***: "the therapeutic goal determines the gap between the measured and desired brain state . . . reduce[s] gap between the actual and desired state, and what constitutes an acceptable brain state. For example, an acceptable brain state may be achieved by obtaining lower frequency states, between 1.5 and 7.5 Hz, to induce and/or maintain sleep." *See* Katz at Col. 6, lines 26-32.

Yet further, Katz fails to teach "generating the magnetic field having a first pre-selected frequency in order to move the Q-factor of the intrinsic frequency within the specified EEG band up

Attorney Docket No. 35784-707.401

toward a preselected Q-factor;" "generating the magnetic field having a second pre-selected frequency in order to move the Q-factor of the intrinsic frequency within the specified EEG band down toward the preselected Q-factor;" or "generating the magnetic field having a plurality of frequencies within the specified EEG band in order to move the Q-factor of the intrinsic frequency within the specified EEG band down toward the preselected Q-factor;" as optionally required in currently pending claim 19.  As provided in the present application Fig. 12, at least, and descriptions thereof, Q-factor is a measure of distribution around the intrinsic frequency within a single EEG band. Katz has no measurement or recognition of Q-factor around an intrinsic frequency within a specified EEG band, as it seeks to move brain states, without regard for any intrinsic frequency in a particular EEG band.

The Office states that "Katz does not teach movement of the intrinsic frequency or the pre-selected Q-factor improves at least one of neuropathic pain in the subject, a neurological disorder in the subject, a symptom of brain damage, and brain dysfunction in the subject," but relied entirely on Becker for these elements as required in currently pending claim 19.

However, Becker does not cure the defects of Katz. Becker teaches "a method and apparatus for generating electromagnetic fields for healing. A device preferably includes a microcontroller and associated memory, a wire coil in electrical communication with a driving circuit that is controlled by the microcontroller in accordance with a program stored in the associated memory, wherein the driving circuit is effective to produce a pulsed DC output having a frequency in the range of about 0-45 Hz, more preferably in the range of 0.5-14.1 Hz and most preferably around 9.6 Hz." *See* Becker at Abstract.

Contrary to the Office's allegation, Becker fails to teach "applying the output of the magnetic field to a head of the subject, wherein application of the output of the magnetic field improves at least one of neuropathic pain in the subject, a neurological disorder in the subject, a symptom of brain damage, and brain dysfunction in the subject" as the magnetic field required in the currently amended claim 19 is "based on an intrinsic frequency of a specified EEG band of a subject, a Q-factor of the intrinsic frequency within the specified EEG band of the subject or both."  Indeed, intrinsic frequency, Q-factor, movement of intrinsic frequency, or movement of a Q-factor of an intrinsic frequency is completely absent in Becker's teaching.

Attorney Docket No. 35784-707.401

Additionally, Becker fails to teach "generating output of a magnetic field based on an intrinsic frequency of a specified EEG band of a subject, a Q-factor of the intrinsic frequency within the specified EEG band of the subject, or both," as required in currently pending claim 19. In contrast, Becker teaches that "a microprocessor may be set to the automatic mode of operation in which case the microprocessor 30 functions to sequentially shift between the delta, theta, alpha and beta frequency segments at timed intervals." Becker further teaches that "frequencies of about 7.83, 14.1, 20.3, 26.4, 31.32, 39 and 45 Hz, [are] known as the Schumann wave frequencies. A principle objective of this invention is to provide a therapeutic magnetic field at a flux density and frequencies substantially the same as those occurring in nature. Accordingly, the microprocessor 30 may also be programmed to cause the circuit 20 to produce an output signal which varies in frequency corresponding to the Schumann wave frequencies. The magnetic field produced . . . at such frequencies is believed to be beneficial for the treatment of pain and other conditions." *See* Becker at paragraphs [0052] and [0054]. Thus, a magnetic field generated "based on an intrinsic frequency of a specified EEG band of a subject, a Q-factor of the intrinsic frequency within the specified EEG band of the subject, or both" is completely absent in Becker.

Further, Becker fails to teach "generating the magnetic field having a first frequency that is higher than the intrinsic frequency in the specified EEG band of the subject in order to move the intrinsic frequency of the subject up within the specified EEG band toward a preselected intrinsic frequency;" or "generating the magnetic field having a second frequency that is lower than the intrinsic frequency in the specified EEG band of the subject in order to move the intrinsic frequency of the subject down within the specified EEG band toward the preselected intrinsic frequency;" as optionally required in currently pending claim 19. Indeed, Becker is completely silent to an intrinsic frequency and movement of an intrinsic frequency.

Yet further, Becker has no teach of "generating the magnetic field having a first pre-selected frequency in order to move the Q-factor of the intrinsic frequency within the specified EEG band up toward a preselected Q-factor;" "generating the magnetic field having a second pre-selected frequency in order to move the Q-factor of the intrinsic frequency within the specified EEG band down toward the preselected Q-factor;" or "generating the magnetic field having a plurality of frequencies within the specified EEG band in order to move the Q-factor of the intrinsic frequency within the specified EEG band down toward the preselected Q-factor." On the contrary to the Office's allegation, Beck merely teaches "permit[ing] variation of the output frequency of the

circuit 20, and, hence the frequency of the magnetic field produced by the coil 18." *See* Becker at paragraph [0038]. Indeed, Q-factor, and movement of a Q-factor of an intrinsic frequency is completely absent in Becker's teaching.

In summary, both Katz and Becker fail to teach or suggest each and every element in claim 19 as amended, whether considered individually or in combination with each other or with any other reference. Withdrawal of this rejection and advancement of claim 19 and all claims dependent thereon to allowance is respectfully requested.

Claims 26-31 are rejected under pre-AIA 35 U.S.C. 103(a) as allegedly being unpatentable over Becker in view of US 2005/0256539(George).

The Office alleges that "Becker teaches a means for adjust output of a magnetic field and moving at least one of: an intrinsic frequency of a specified EEG band of a subject toward a pre-selected intrinsic frequency of the specified EEG band; and a Q-factor of an intrinsic frequency within a specified EEG band of a subject toward a preselected Q-factor ([0038])." Applicant respectfully disagrees.

In particular, Becker fails to teach "a means for adjusting output of the magnetic field and moving at least one of: an intrinsic frequency of a specified EEG band of a subject toward a pre-selected intrinsic frequency of the specified EEG band; and a Q-factor of an intrinsic frequency within a specified EEG band of a subject toward a pre-selected Q-factor, wherein the adjustment of output of the magnetic field is based on an intrinsic frequency of a specified EEG band of a subject, a Q-factor of the intrinsic frequency within the specified EEG band of the subject, or both," as required in currently amended and presently pending claim 26.

Becker teaches "a method and apparatus for generating electromagnetic fields for healing. A device preferably includes a microcontroller and associated memory, a wire coil in electrical communication with a driving circuit that is controlled by the microcontroller in accordance with a program stored in the associated memory, wherein the driving circuit is effective to produce a pulsed DC output having a frequency in the range of about 0-45 Hz, more preferably in the range of 0.5-14.1 Hz and most preferably around 9.6 Hz." *See* Becker at Abstract.

More specifically, Becker teaches that "a microprocessor may be set to the automatic mode of operation in which case the microprocessor 30 functions to sequentially shift between the delta,

theta, alpha and beta frequency segments at timed intervals." *See* Becker at paragraph [0052]. Becker further teaches that "frequencies of about 7.83, 14.1, 20.3, 26.4, 31.32, 39 and 45 Hz, [are] known as the Schumann wave frequencies. A principle objective of this invention is to provide a therapeutic magnetic field at a flux density and frequencies substantially the same as those occurring in nature. Accordingly, the microprocessor 30 may also be programmed to cause the circuit 20 to produce an output signal which varies in frequency corresponding to the Schumann wave frequencies. The magnetic field produced . . . at such frequencies is believed to be beneficial for the treatment of pain and other conditions." *See* Becker at paragraph [0054]. Thus, frequency of the magnet field in Becker's teaching is based on the Schumann wave frequencies, or most preferably around 9.6 Hz. Clearly, Becker has no teaching to a magnetic field generated "based on an intrinsic frequency of a specified EEG band of a subject, a Q-factor of the intrinsic frequency within the specified EEG band of the subject, or both" as required in currently amended claim 26. In fact, Becker is completely silent to an intrinsic frequency within an EEG band or a Q-factor of an intrinsic frequency.

George's teaching does not cure the deficiency of Becker. George teaches "rTMS at frequencies of around 1 Hz has been shown to produce inhibition of the motor cortex. rTMS at higher frequencies of several minutes has been shown to excite the underlying cortex for several minutes. Manipulations of frequency and intensity may produce distinct patterns of facilitation (fast rTMS) and inhibition (slow rTMS) of motor responses with distinct time courses." See George at paragraph [0008]. In George' teaching, subjects are "stimulated over the prefrontal or occipital regions, each at high frequency (5 Hz) or low frequency (1 Hz)." See George at paragraph [0081]. Thus, George fails to teach or disclose "a means for adjusting output of the magnetic field and moving at least one of: an intrinsic frequency of a specified EEG band of a subject toward a pre-selected intrinsic frequency of the specified EEG band; and a Q-factor of an intrinsic frequency within a specified EEG band of a subject toward a pre-selected Q-factor, wherein the adjustment of output of the magnetic field is based on an intrinsic frequency of a specified EEG band of a subject, a Q-factor of the intrinsic frequency within the specified EEG band of the subject, or both," as required in currently amended and presently pending claim 26.

The Office stated that "Beck does not teach the system comprises at least one permanent magnet, herein the strength of the at least one permanent magnet[] is from about 10 Gauss to about 4 Tesla," but relied entirely on George for the teaching of the above element as required

Attorney Docket No. 35784-707.401

in currently pending claim 26. Specifically, the Office alleges that "George teaches methods and systems for using trans-cranial magnetic stimulation to enhance cognitive performance comprising applying a magnetic field close to a head of subject(e.g. Fig. 3), wherein the magnetic field is generated by movement of at least one permanent magnet ([0134] where electric field induction is caused by the movement by the vibrating permanent magnets), wherein the strength of the at least one permanent magnet is from about 10 Guass to about 4 Tesla([0004] where the magnetic field typically has a strength of about 2 Tesla), wherein movement of the at least one said magnetic generates an alternating magnetic field (TMS pulse)." Applicant respectfully disagrees.

George does not cure the defects of Becker. George teaches "magnetic field, electric field and induced current simulations for different coil designs." *See* George at paragraph [0132]. In particular, "Field Simulations are performed ... The simulations will be similar, except that the electric field induction is caused by the movement by the vibrating permanent magnets, rather than by current pulses as in the figure-8 and lattice coil. Alternatively, field simulations can be conducted on computer models." *See* George at paragraph [0134]. Further, George teaches that "the "moving" magnets . . . will require some sort of electromechanical device, which itself will consume power, to overcome the coil's inertia, move it a short distance and then return, which could be cumbersome and fragile. A magnet spinning at high speed, would require neither a large current, nor the generation of the forward and backward impulses of a pulsed system, but would require power to bring the spinning magnet up to speed and keep it there and would generate current continuously not pulses. There would also be a problem with the gyroscopic effect of any magnet, large enough to stimulate the brain, spinning at high speed. In addition, there is no data on the stimulation pattern of such a TMS "coil", so extensive simulations would be necessary. However, these concepts should not be rejected out of hand, and the information gained through the associated simulations would increase our understanding of the magnetic fields and induced currents of any design." See George at paragraph [0149].

Contrary to the Office's allegation, it is clear that the permanent magnets in George's teaching are for simulating the current pulses and lattice coils of the TMS coils for different coil designs and for gaining understanding of the magnetic fields and induced current of different designs. Such permanent magnet of George is not used to generate a magnetic field to be applied close to a head of the subject. Such permanent magnet of George is not used to generate

Attorney Docket No. 35784-707.401

a magnetic field based on an intrinsic frequency or A-factor of the subject. Indeed, George fails to teach "a device comprising at least one permanent magnet . . . generat[ing] a magnetic field," and said magnetic field can be applied "close to a head of the subject," as required in currently amended claim 26.

Regarding claim 28, the Office states that "Becker does not teach the system comprises at least one permanent magnet, wherein the strength of the at least one permanent magnet[] is from about 10 Gauss to about 4 Tesla," and relied entirely on George for the above-mentioned element in currently pending claim 28. Applicant respectfully disagrees.

In fact, George fails to teach "the strength of the at least one permanent magnet is from about 10 Gauss to about 4 Tesla" as required in currently pending claim 28.  In specific, George teaches that "**high intensity current is rapidly turned on and off** in the coil through the discharge of capacitors. This produces a time-varying magnetic field . . . The magnetic field typically has  a strength of about 2 Tesla (or 40,000 times the earth's magnetic field, or about the same intensity as the static magnetic field used in clinical MRI.)" *See* George at paragraph [0004]. Clearly, George merely teaches that a magnetic field strength of about 2 Tesla is generated **by alternating high-intensity current**. The element that "the strength of the at least one permanent magnet is from about 10 Gauss to about 4 Tesla" as required in currently pending claim 28 is completely absent in George's teaching.

### *Double Patenting*

Claims 19, 26 and 27 were provisionally rejected on the ground of nonstatutory double patenting as allegedly being unpatentable over claims 2, 4 and 23 of U.S. Patent No. 8,475,354 in view of Becker.

Without conceding the appropriateness of such rejection, Applicants request that such provisional rejection be held in abeyance and Applicants will consider submitting a terminal disclaimer or additional arguments at the appropriate time.

Claims 26-31 were provisionally rejected on the ground of nonstatutory double patenting as allegedly being unpatentable over claims 17 of U.S. Patent No. 8,480,554 in view of Katz.

Without conceding the appropriateness of such rejection, Applicants request that such provisional rejection be held in abeyance and Applicants will consider submitting a terminal disclaimer or additional arguments at the appropriate time.

Attorney Docket No. 35784-707.401

Claims 19-25 were provisionally rejected on the ground of nonstatutory double patenting as allegedly being unpatentable over claims 1-7 of U.S. Patent No. 8,870,737 in view of Katz.

Without conceding the appropriateness of such rejection, Applicants request that such provisional rejection be held in abeyance and Applicants will consider submitting a terminal disclaimer or additional arguments at the appropriate time.

Claims 19-26 were provisionally rejected on the ground of nonstatutory double patenting as allegedly being unpatentable over claims 2-7 and 13 of U.S. Patent No. 8,465,408 in view of Katz.

Without conceding the appropriateness of such rejection, Applicants request that such provisional rejection be held in abeyance and Applicants will consider submitting a terminal disclaimer or additional arguments at the appropriate time.

## REMARKS AND CONCLUSION

In light of the remarks set forth above, Applicants believe that the pending claims are under condition for allowance. Applicants respectfully solicit the Examiner to expedite the prosecution of this patent application to issuance. Should the Examiner have any questions, the Examiner is encouraged to telephone the undersigned attorney at (858) 350-2215. The Commissioner is authorized to charge any underpayment or credit any overpayment to Deposit account No. 23-2415 (Attorney Docket No. 35784-707.401).

Respectfully submitted,

WILSON SONSINI GOODRICH & ROSATI

Date:   September 30, 2015            By:   /Kristin Havranek/
                                             Kristin J. Havranek
                                             Reg. No. 58,789

650 Page Mill Road
Palo Alto, CA  94304
Direct Dial:  (512) 338-5458
**USPTO Customer No. 021971**