**CHARLES A. BLAZER, II** (CSBN 282,495)
cblazer@blazerlegal.com
5282 Gaylord Place
San Diego, CA 92117
Telephone: (757) 560-7298

**ALLEN M. SOKAL** (pro hac vice)
asokal@dcpatent.com
Ditthavong, Steiner, & Mlotkowski
201 N. Union Street, Suite 110
Alexandria, VA 22314
Telephone (202) 297-2479

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| WAVE NEUROSCIENCE, INC., a Delaware corporation<br><br>*Plaintiff*,<br><br>v.<br><br>PEAKLOGIC, INC., and KEVIN T. MURPHY, M.D., a Professional Corporation, doing business as MINDSET<br><br>*Defendants*. | CASE NO.:  3:21-cv-01330-CAB-AGS<br><br>**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br><br>Judge:  Hon. Cathy Ann Bencivengo<br>Hearing: March 1, 2023<br><br>PER CHAMBERS RULES, NO ORAL ARGUMENT UNLESS SEPARATELY ORDERED BY THE COURT. |

1

[REDACTED – NON-CONFIDENTIAL VERSION]

# TABLE OF CONTENTS

I.    INTRODUCTION ....................................................................................4

II.   LEGAL STANDARD ............................................................................5

III.  ARGUMENT...........................................................................................5

    A.   Plaintiff is a Successor in Interest to NBRL ...................................5

    B.   In the 2019 Settlement Agreement, Plaintiff Released Its Patent
        Infringement Claims.........................................................................12

        1.   Legal Standard – *Augustine Med.* and *Press Machinery*....................14

        2.   The Technology at Issue in the 2018 Case Is Closely Related to the
               Technology Covered by the Patents in Suit.......................................18

IV.   CONCLUSION......................................................................................22

[REDACTED – NON-CONFIDENTIAL VERSION]

# TABLE OF AUTHORITIES

**Cases**

*Augustine Med., Inc. v. Progressive Dynamics, Inc.*,
194 F.3d 1367 (Fed. Cir. 1999)...................................................................*passim*

*Press Machinery Corp. v. Smith R.P.M. Corp.*,
727 F.2d 781 (8th Cir. 1984) ...........................................................14, 15, 16

*Stanford Hotel Co. v. M. Schwind Co.*,
180 Cal. 348 (1919) .......................................................................................6

*U.S. v. William Cramp & Sons Ship & Engine Bldg. Co.*,
206 U.S. 118 (1907).....................................................................................14

**Rules**

Fed. R. Civ. P. 56(c).......................................................................................5

3

[REDACTED – NON-CONFIDENTIAL VERSION]

# I.     INTRODUCTION

Defendants PeakLogic, Inc. and Kevin T. Murphy, M.D., move for summary judgment under Fed. R. Civ. P. 56(c) with respect to Plaintiff's claims on the ground that a 2019 Confidential Settlement Agreement and Mutual Release (hereinafter "2019 Settlement Agreement") bars the instant case.[1]  That Settlement was entered between Newport Brain Research Laboratory ("NBRL") and Defendant Dr. Kevin Murphy and is attached hereto as Exhibit A.  Plaintiff Wave Neuroscience, Inc. ("Wave") is a successor in interest and a related entity to NBRL, and ███████████████████████████████ ████████████████████████████████████████[2]  The Settlement ended a 2018 lawsuit between NBRL and Defendant Kevin Murphy, wherein NBRL alleged the same acts of misappropriation of NBRL's (now Wave's) intellectual property as alleged in this case – specifically, that Dr. Murphy misappropriated NBRL's (now Wave's) technology for transcranial magnetic stimulation (TMS).  ███████████████ ████████████████████████████████████████ ██████████████████████████████████  Therefore, the Settlement bars Plaintiff's claims in this case, and by bringing this case, Plaintiff is in breach of that agreement.

Defendants sought and received an Order Granting Unopposed Motion to File a Confidential Settlement Agreement and Related Motion for Summary Judgment Under Seal [Doc. No. 77] dated January 17, 2023, and hereby file the unredacted copy of this Motion under seal to protect the confidential terms of the 2019 Settlement Agreement.

The parties met and conferred regarding this motion.  Plaintiff stated that it will oppose this motion.

---

[1]     Exhibit A (Confidential Settlement Agreement and Mutual Release, December 24, 2019).

[2]     *Id.* at 2.

4

## II.     LEGAL STANDARD

The familiar standard for summary judgment applies.   Summary judgment is authorized if there are no genuine issues as to any material fact and the moving party is entitled to judgment as a matter of law.[3]

This Motion involves interpreting the 2019 Settlement Agreement.   Because a settlement agreement is a contract, any issue regarding its scope "is a question of law" appropriate for resolution on summary judgment.[4]

## III.    ARGUMENT

### A.     Plaintiff is a Successor in Interest to NBRL

██████████████████████████████████████████████████

████████████████[5]   Plaintiff is NBRL's successor in interest because, in April 2019, Plaintiff acquired "substantially all of the assets from the many different onshore and offshore holding companies under NBRL"[6] and "key NBRL personnel – all U.S. persons – were hired into new roles at Wave Neuroscience."[7]   Plaintiff then continued commercializing NBRL's transcranial magnetic stimulation ("TMS") technology, including NBRL's Magnetic EEG/ECG-guided Resonance Therapy ("MeRT").[8]   Simply put, Plaintiff and NBRL are the same entity.   Having acquired "substantially all" of NBRL's assets and NBRL's key personnel ("**all** U.S. persons") and then continued the

---

[3]     Fed. R. Civ. P. 56(c).

[4]     *Augustine Med., Inc. v. Progressive Dynamics, Inc.*, 194 F.3d 1367, 1370 (Fed. Cir. 1999).

[5]     *Id.*

[6]     Exhibit G ("Wave Neuroscience Completes Major Brain Treatment Technology Asset Purchase," Press Release, December 5, 2019, available at https://www.businesswire.com/news/home/20191205005915/en/Wave-Neuroscience-Completes-Major-Brain-Treatment-Technology-Asset-Purchase, retrieved on January 22, 2023).

[7]     *Id.*

[8]     *Id.*

[REDACTED – NON-CONFIDENTIAL VERSION]

commercialization of NBRL's technology, Plaintiff is merely the direct continuation of NBRL under a new name.[9]

Indeed, when it served Plaintiff's interests to do so, Plaintiff admitted that it is NBRL's successor in interest.  In an August 26, 2022, letter from Plaintiff's counsel to Defendants' counsel attached hereto as Exhibit B, Plaintiff acknowledged that "Newport Brain Research Laboratory ('NBRL') [is] the predecessor-in-interest to Wave," the Plaintiff in this case.[10]  Plaintiff did so even though it knew that Defendants had alleged in January 2022 that because NBRL was Plaintiff's predecessor, Plaintiff's filing this suit constituted a breach of the Settlement Agreement.[11]  Plaintiff made this acknowledgement to support an objection to Defendants' designated expert, who was NBRL's former employee and thus also Plaintiff's *de facto* former employee.  Plaintiff's counsel used the predecessor in interest relationship to argue that "Federal courts frequently enter protective orders precluding former employees from participating as experts in analogous

---

[9]     *See, e.g., Stanford Hotel Co. v. M. Schwind Co.*, 180 Cal. 348, 354 (1919) ("[I]t is well established in this state that under circumstances such as these, where a corporation reorganizes under a new name, but with practically the same stockholders and directors, and continues to carry on the same business, a court of equity will regard the new corporation as a continuation of the former corporation.").

[10]     Exhibit B (Letter from J. R. Taché to C. Blazer and A. Sokal, August 19, 2022) at 1.

[11]     *See* Defendants' Answer, Affirmative Defenses, and Counterclaims I-XII to Plaintiff's Second Amended Complaint, filed May 9, 2022 (Doc. 36) at 10 ("Plaintiff's claims and requested relief under Title 35 of the United States Code are barred by a settlement agreement, as set forth in paragraphs 1-22 and 70-75 of Defendants' counterclaims."); Memorandum in Support of Defendants' Motion to Dismiss and Strike, filed January 18, 2022 (Doc. 26-1) at 1 ("Indeed, this is not the first suit against Defendants for the acts alleged in the SAC. On September 11, 2018, the Newport Brain Research Laboratory, Inc., and its related entities, which are predecessors of Plaintiff, sued Dr. Murphy for those same acts … In February, however, immediately after the dismissal, Plaintiff acquired the patents in suit and later brought the complaint in this case, in breach of the settlement agreement.").

[REDACTED – NON-CONFIDENTIAL VERSION]

circumstances such as patent infringement cases."[12]   Plaintiff thus acknowledged that NBRL is Plaintiff's predecessor in interest.

Plaintiff then doubled down on that position.  In a subsequent September 16, 2022 letter from Plaintiff's counsel to Defendant's counsel attached hereto as Exhibit C, Plaintiff's counsel again argued that "we provided you with ample authority in our letter of August 19, 2022 explaining that there is essentially a bright-line rule that former employees are disqualified from testifying as an expert against their former employer concerning matters which [*sic*] they have received confidential information in the course of their employment."[13]   In response, Defendants did not dispute that their expert was a former employee of Plaintiff's predecessor in interest, but rather agreed to restrictions on their expert to protect any of Plaintiff's confidential information he might have.[14]

The evidence supports Plaintiff's argument that Plaintiff is NBRL's successor in interest.  The following timeline, spanning the next three pages, summarizes the NBRL lawsuit, settlement, and acquisition by Plaintiff:

---

[12]   *Id.*

[13]   Exhibit C (Letter from J. R. Taché to C. Blazer and A. Sokal, September 19, 2002) at 1.

[14]   Exhibit D (Email from C. Blazer Email to J. R. Taché *et al.*, September 27, 2022) ("[I]n his capacity as an expert witness, we can provide written assurance that we will not solicit from Dr. Silvetz any confidential information he may have obtained from NBRL…. We will also admonish him not to volunteer any such information to us, should he have any…. With that clarification, we can agree to your proposal, and I hope that your fundamental concerns are addressed.").

[REDACTED – NON-CONFIDENTIAL VERSION]

| Date | Event |
|------|-------|
| July 7, 2013 | Asserted patent 8,475,354 issued with Dr. Yi Jin as the first named co-inventor and assigned to NeoSync, Inc., a company co-founded by Dr. Jin. Dr. Jin is also a co-founder of NBRL.[15] |
| July 9, 2013 | Asserted patent 8,480,554 issued with Dr. Jin as the first named co-inventor and assigned to NeoSync, Inc. |
| September 20, 2016 | Asserted patent 9,446,259 issued with Dr. Jin as the first named co-inventor and assigned to NeoSync, Inc. |
| September 11, 2018 | NBRL sued Defendant Kevin Murphy, alleging misappropriation of NBRL's technology for "Transcranial Magnetic Stimulation ('TMS')" including NBRL's "Magnetic EEG/ECG-guided Resonance Therapy technology that it calls MeRT."[16] |
| June 2019 | While the lawsuit was still pending, Plaintiff acquired "substantially all of the assets from the many different onshore and offshore holding companies under NBRL" and "key NBRL personnel – all U.S. persons – were hired into new roles at Wave Neuroscience."[17] |
| December 5, 2019 | While the lawsuit was still pending, Plaintiff issued a press release titled "Wave Neuroscience Completes Major Brain Treatment Technology Asset Purchase," announcing the acquisition of NBRL. The release |

---

[15]   *See, e.g.,* Exhibit L (Dr. Yi Jin Biography, available at https://www.bhlfoundation.org/team retrieved on January 25, 2023).

[16]   Exhibit K (Complaint for: 1) Federal Unfair Competition (Lanham Act); 2) Copyright Infringement; 3) Breach of Contract; 4) Theft of Trade Secrets; 5) Tortious Interference with Prospective Economic Advantage; 6) State Law Unfair Competition; 7) Fraud and Deceit; 8) Slander; and 9) Breach of Fiduciary Duty, The Newport Brain Research Laboratory, Inc. v. Kevin Murphy *et al.*, Case No. 8:18-CV-1625, C.D. Cal. Sept. 10, 2018).

[17]   Exhibit G at 1.

8

[REDACTED – NON-CONFIDENTIAL VERSION]

| Date | Event |
|------|-------|
| | proudly announced that Plaintiff owned the TMS technology that was at the center of the 2018 lawsuit.[18]  The release also announced that the Plaintiff's work was now "fueled by ten wholly owned and U.S.-held patents with 6 applications pending."[19]  The release concluded with a quote from Plaintiff's President, Dr. Erik Won.[20] |
| December 21, 2019 | ███████████████████████████████████████████████ ███████[21]███████████████████████████████████ he was apparently employed by Plaintiff, which by that time had acquired NBRL's U.S. personnel.  Under these circumstances, it appears that ███ ████████████████████████████.  Dr. Jin is also the first named inventor of the patents asserted in this case and thus obviously was aware of those patents when ██████████████████████. |
| December 24, 2019 | ████████████████████████████████████████████████ ████████████[22]  At this point, the lawsuit between NBRL and Dr. Murphy was fully settled.  Note that nineteen days earlier, Dr. Won was quoted in Plaintiff's press release as *Plaintiff's* President.[23]  Under these circumstances, it appears that ██████████████████████████ |

───────────────

[18] *Id.*
[19] *Id.* at 2.
[20] *Id.*
[21] Exhibit A at 5.
[22] *Id.* at 7.
[23] Exhibit G at 2.

9

[REDACTED – NON-CONFIDENTIAL VERSION]

| Date | Event |
|------|-------|
|  | ███████████, and to this day he remains Plaintiff's President and Chief Medical Officer.[24] |
| February 13, 2020 | Plaintiff acquired the Asserted Patents (e.g., U.S. Patent Nos. 8,475,354[25], 8,480,554[26], and 9,446,259[27]) from NeoSync, Inc.  Dr. Jin, ███████████████████████, is a co-inventor of the Asserted Patents and co-founder of NeoSync, Inc. and NBRL.[28] |
| September 9, 2021 | Plaintiff served the First Amended Complaint in the instant case on Defendants, alleging infringement of Dr. Jin's patents. |

Plaintiff and NBRL also share the same business address at 1601 Dove Street, Newport Beach, CA 92660.[29]  In other words, NBRL's personnel and assets never moved; the company merely changed its name and continued its business.  More pointedly, Plaintiff tried to play a bad faith shell game, by transferring its assets and U.S. personnel to a new company, "settling" its ill-fated lawsuit with Dr. Murphy, then bringing a new lawsuit, alleging the same nexus of facts, under the new company.

---

[24]    *See, e.g.,* Exhibit H (Dr. Won's profile at https://www.linkedin.com/in/erik-won-86941614 retrieved on January 23, 2023).

[25]    *See* USPTO Assignment Records at Reel/Frame 052107/0189 executed on February 13, 2020, and recorded on March 13, 2020.

[26]    *Id.*

[27]    *See* USPTO Assignment Records at Reel/Frame 052108/0187 executed on February 13, 2020 and recorded on March 13, 2020.

[28]    *See, e.g.,* Exhibit L.

[29]    Exhibit I (https://opencorporates.com/companies/us_ca/3583295 retrieved on January 22, 2023) (listing NBRL's registered address as 1601 Dove Street #299, Newport Beach, CA 92660); Exhibit J (https://opencorporates.com/companies/us_ca/3583295 retrieved on January 22, 2023) (listing Wave Neuroscience, Inc.'s registered address as 1601 Dove Street #205, Newport Beach, CA 92660).

[REDACTED – NON-CONFIDENTIAL VERSION]

In view of these facts, it is unsurprising that, in this case, Plaintiff insisted so fervently that Plaintiff is NBRL's successor in interest.  Defendants agree, and there is no genuine issue of disputed fact with respect to that conclusion.

However, on November 17, 2022, Defendants served Defendants' First Set of Requests for Admission to Plaintiff Wave Neuroscience, Inc. (No. 1), requesting that Plaintiff "[a]dmit that Wave Neuroscience is a successor-in-interest of The Newport Brain Research Laboratory, Inc. a California corporation ('NBRL') and NBRL V, LLC, a Nevada limited liability corporation)."[30]  On December 15, 2022, Plaintiff provided Plaintiff's Responses to Defendants' First Set of Requests for Admission to Defendants PeakLogic, Inc. and Kevin Murphy, M.D. D/B/A Mindset, stating *inter alia* that:

> Subject to and without waiving the foregoing objections and within Wave's understanding of the intent of this otherwise impermissible Request, Wave responds as follows: based on the claims and defenses raised by Defendants in this litigation, it is Wave's understanding that this request is intended as a request to admit that Wave Neuroscience is a successor in interest to The Newport Brain Research Laboratory, Inc. of [*sic*] NBRL V, LLC with respect to the December 24, 2019 Confidential Settlement Agreement and Mutual Release between Kevin Murphy and The Newport Brain Research Laboratory, Inc., a California corporation ("NBRL") and NBRL V, LLC, a Nevada limited liability corporation. Based on Wave's understanding, this Request is denied.[31]

Plaintiff thus tries to cast itself as a successor in interest to NBRL with respect to the appointment of expert witnesses – as evidenced by the exchange between Plaintiff and Defendants over Defendants' expert, described above – but not for the purpose of the 2019 Settlement Agreement.  But this cannot be.  A company is either a successor in interest or it is not.  Plaintiff cannot have it both ways.

---

[30]   Exhibit E (Defendants' First Set of Requests for Admission to Plaintiff Wave Neuroscience, Inc. (No. 1)).

[31]   Exhibit F (Plaintiff's Responses to Defendants' First set of Requests for Admission to Defendants PeakLogic, Inc. and Kevin Murphy, M.D. D/B/A Mindset) at 14.

[REDACTED – NON-CONFIDENTIAL VERSION]

But even if there were a basis to argue that a company can be a successor for one purpose, but not another – which there is not – ██████████████████████████ ████████████████[32]   Thus, it is not even strictly necessary for the Court to find that Plaintiff is NBRL's successor in interest.  Given the facts set forth above, Plaintiff and NBRL are indisputably related entities, thereby ████████████████████████████████ ████████.

## B. In the 2019 Settlement Agreement, Plaintiff Released Its Patent Infringement Claims

In the 2018 lawsuit, NBRL sued Defendant Kevin Murphy alleging *inter alia* misappropriation of trade secrets relating to the parties' TMS research and medical practice.[33]  NBRL's complaint specifically mentioned Murphy's competing, allegedly unfairly, through his companies PeakLogic and Mindset by using "the trade secret information he learned about NBRL's MeRT technology."[34]  On August 1, 2019, Murphy counterclaimed alleging *inter alia* slander and intentional interference with prospective economic advantage.[35]

The 2019 Settlement Agreement settled the litigation ██████████████████ █████████████████[36] ████████████████████████████. ██████████ ████████████████████████████████████████████,[37] █████████ ████████████████████████[38].

The ██████████████████ Settlement was not limited to the unfair competition causes of action alleged in the 2018 lawsuit.  Instead, it covered ████████████████ ████████

---

[32]   Exhibit A at 2.
[33]   Exhibit K at ¶ 4.
[34]   *Id.* at ¶¶ 13, 14.
[35]   Exhibit A at 1.
[36]   *Id.*
[37]   *Id.* at 3.
[38]   *Id.* at 4.

12

[REDACTED – NON-CONFIDENTIAL VERSION]

1 ████████████████████████████████████████████████████

2 ████████████████████████████████████████████████████

3 ████████████████████████████████████████████████████

4 ████████████████████████████████████████████████████

5 ████████████████████████████████████████████[39]

6 Consistent with that language, ████████████████████████

7 ████████████████████████████████████████████████████

8 ████████. To confirm the release's intended wide breadth, the parties acknowledged their

9 awareness ████████████████████████████████████████████

10 ████████████████████████████████████████████████████

11 ████████████████████████████████████████████████████

12 ████████████████████████████████████████████[40]

13 Also, as discussed above, ████████████████████████████

14 ████████████[41]

15      Indeed, Plaintiff did not bring a cause of action for patent infringement in the 2018

16 lawsuit.  However, by its own plain terms, ██████████████████████

17 ████████████████████████████████████████████████████

18 ████████. ██████████████████████████████████████████████

19 ████████████████████████████████████████████████████

20 ████████████████████████████████████████████████████

21 ████████████████████████.

_____

[39] *Id.* at 2 (emphasis added).
[40] *Id.*
[41] *Id.*

13

[REDACTED – NON-CONFIDENTIAL VERSION]

### 1. Legal Standard – *Augustine Med.* and *Press Machinery*

Because a settlement agreement is a contract, any issue regarding its scope "is a question of law" appropriate for resolution on summary judgment.[42]  And the United States Supreme Court made clear more than a century ago that "stipulations of this kind are not to be shorn of their efficiency by any narrow, technical, and close construction.  The general language … indicates an intent to make an ending of every matter arising under or by virtue of the contract.  If parties intend to leave some things open and unsettled, their intent so to do should be made manifest."[43]

The Federal Circuit has applied this principle to settlements involving intellectual property disputes.[44]  Releasing all claims arising from a dispute over competitive information, including trade secrets, the Federal Circuit has explained, prohibits a party to the settlement from filing a new case asserting related patent infringement claims, even if the initial case did not allege patent infringement.[45]

In reaching that conclusion, the Federal Circuit relied on the Eighth Circuit's *Press Machinery* decision, barring a party to the settlement of a trade secret claim from enforcing a related later-issued patent.[46]  There, in the initial case, the plaintiff sought "an injunction barring [the defendant] from disclosing or using trade secrets or confidential information regarding" the plaintiff's business.[47]  The parties then settled that case, releasing "all claims … which the parties hereto now have or under any circumstances could or might have,

---

[42]  *Augustine Med.*, 194 F.3d at 1370.
[43]  *U.S. v. William Cramp & Sons Ship & Engine Bldg. Co.*, 206 U.S. 118, 128 (1907).
[44]  *Augustine Med.*, 194 F.3d at 1373.
[45]  *Id*.
[46]  *Press Machinery Corp. v. Smith R.P.M. Corp.*, 727 F.2d 781 (8th Cir. 1984).
[47]  *Id*. at 783.

14

[REDACTED – NON-CONFIDENTIAL VERSION]

1   against the other arising out of, resulting from or in any way pertaining to the agreements
2   and matters referred to in [the pleadings]."[48]

3          One and a half months later, the plaintiff's pending patent application issued
4   encompassing the same proprietary technology the plaintiff had accused the defendant of
5   misappropriating in the first case.[49]   The original plaintiff then instituted a letter writing
6   campaign essentially accusing the defendant of patent infringement, and as a result, the
7   defendant lost a contract.[50]

8          The defendant responded by filing a declaratory judgement action accusing the
9   plaintiff in the first suit of breaching the settlement agreement, and the Eighth Circuit
10  agreed.[51]   The court explained that the essence of the first case was the contention that the
11  defendant there used "trade secrets, confidential information and plans and designs owned
12  solely and exclusively by" the plaintiff.[52]   The later-issued patent covered related
13  technology, and therefore the settlement prohibited the original plaintiff from asserting that
14  patent against the defendant, even though the first case did not include, and could not have
15  included, a patent infringement claim.[53]

16         In *Press Machinery*, the plaintiff argued that it should be able to enforce its newly
17  acquired intellectual property right because "a patent infringement claim is distinct from
18  an action premised on allegations of trade secret violations."[54]   Rejecting that argument,
19  the court stressed that the settlement was "not limited to a release of the trade secrets
20  claim."[55]   And "at the time [the first] suit was filed, and when it was settled," the defendant

---

48   *Id.*
49   *Id.* at 784.
50   *Id.*
51   *Id.* at 785.
52   *Id.*
53   *Id.*
54   *Id.*
55   *Id.*

15

was using the plaintiff's subsequently patented technology.[56] "The release in the settlement agreement," the court explained, was "not limited to the cause of action then at issue; nor [wa]s it limited to resolving past disputes."[57]  On the contrary, "[t]he agreement was an attempt to resolve finally those disputes then at issue and those that might arise in the future."[58]  As a result, the Eighth Circuit concluded the release thus barred the plaintiff's patent infringement claims relating to the same technology as the trade secret claims.[59]

In *Augustine Med*, the Federal Circuit adopted the reasoning in *Press Machinery*.[60] The plaintiff there initially alleged *inter alia* that the defendant engaged in unfair competition.[61]  The parties settled the case, including a release ████████████ ████████████████████████████████████████████.[62]

After settling the initial case, the *Augustine Med* plaintiff filed a new one, alleging patent infringement.[63]  The defendant sought summary judgment on the ground that the

_____

[56]    *Id*.
[57]    *Id*.
[58]    *Id*. at 785-86.
[59]    *Id*.
[60]    *Augustine Med.*, 194 F.3d at 1373.
[61]    *Id*. at 1369.
[62]    The Federal Circuit quoted the following language from the settlement: "AMI does hereby ... release and forever discharge PDI from any and all manner of action or actions ... that AMI and/or its owners ... have, have had, or may have against PDI upon or by reason of or relating to any acts, omissions or statements made by PDI on or before the date of this Settlement Agreement, including, but not limited to, any and all claims that were or could have been asserted by AMI in the [present lawsuit].... AMI covenants and agrees not to commence any action or proceeding against PDI arising out of or related to, statements not otherwise precluded by this Settlement Agreement made after the date hereof that are in substance repetitions of statements made by PDI prior to the date of this Settlement Agreement that were at issue in the above-referenced litigation." *Id*. at 1370.
[63]    *Id*. at 1370-71.

[REDACTED – NON-CONFIDENTIAL VERSION]

settlement of the unfair competition claim barred the subsequent patent litigation.[64]   In upholding the District of Minnesota's grant of summary judgment, Judge Gajarsa explained for the Federal Circuit that "[w]hile issues of patent infringement do give rise to individual causes of action, those individual causes of action cannot override the unambiguous language of a Settlement Agreement that releases all possible future claims related to the matters settled by the agreement."[65]   And, the court held, following *Press Machinery*, that a settlement "is not limited to the cause of action then at issue [in the first case]; nor is it limited to resolving past disputes."[66]   There, as here, the agreement unequivocally "was an attempt to resolve finally those disputes then at issue and those that might arise in the future."[67]

In *Augustine Med*, the court noted that the plaintiff had "clear knowledge at the time of the Settlement Agreement" of the technology the defendant used in its business, "and it was likely obvious that the [use of that technology] would not cease the instant the Settlement Agreement was signed."[68]

While the conduct at issue in *Press Machinery* clearly infringed the subsequently obtained patent, Defendants maintain that their conduct in this case does *not* infringe.[69] But even if it does, the 2019 Settlement Agreement would bar Plaintiff from filing patent infringement claims.

---

[64]   *Id*. at 1370.
[65]   *Id*. at 1372.
[66]   *Id*.
[67]   *Id*.
[68]   *Id*. at 1373.
[69]   Defendants Answer and Counterclaims (Doc. 36) at ¶¶ 34, 37, 51, 52, 53, 60, 61, 62, 69, 70, and 71.

17

[REDACTED – NON-CONFIDENTIAL VERSION]

### 2. The Technology at Issue in the 2018 Case Is Closely Related to the Technology Covered by the Patents in Suit

Similarly, here, Plaintiff's predecessor in interest, NBRL, filed a trade secret claim against Defendant Dr. Murphy and settled it, ██████████████. ████████████████████████████████████████████████████████████████████████████████████████████████[70] The ███████████████████████████ were Dr. Murphy's alleged use of NBRL's allegedly proprietary technology for Transcranial Magnetic Stimulation (TMS).[71] In NBRL's 2018 complaint, NBRL described its TMS technology as follows:

> NBRL is a company that possesses revolutionary, proprietary, trade secret Magnetic EEG/ECG-guided Resonance Therapy technology that it calls MeRT to treat a variety of brain maladies including depression, which is an FDA approved indication, as well as other indications off-label such as Autism Spectrum Disorder (ASD), Post Traumatic Stress Disorder, (PTSD), Traumatic Brain Injury (TBI), and chemo brain. MeRT involves applying Transcranial Magnetic Stimulation ("TMS"), which is magnetic energy, to the brain noninvasively through the skull. Biometric data is first acquired and analyzed using NBRL's proprietary technology. Using the results of that analysis, TMS is then applied to the patient's brain using a proprietary, trade secret treatment protocol that is specifically tailored to each patient (the frequency and strength of the magnetic energy, the location on the patient's skull and the duration and pattern of the magnetic energy).[72]

The patents asserted in this case are closely analogous to the technology at issue in the 2018 case. Plaintiff has already admitted that the technologies are closely analogous in a letter to Defendants' counsel:

> While some of this technology was the subject of patents contained within Wave's patent portfolio, other portions of this technology was maintained by NBRL as a trade secret. The subject trade secrets were instrumental to the

---

[70] Exhibit A at 2.
[71] Exhibit K at ¶8.
[72] *Id.*

[REDACTED – NON-CONFIDENTIAL VERSION]

success of NBRL and continue to be critical to the ongoing success of Wave. In addition, ***these trade secrets directly relate to the subject matter of the patents at issue in this case***.[73]

Apart from the statement from Plaintiff above, a review of the underlying technologies shows that they are closely analogous. For example, NBRL alleged in the 2018 case that its technology used a "treatment protocol that is specifically tailored to each patient (the frequency … of the magnetic energy…)"[74] based on "[b]iometric data [that] is first acquired and analyzed using NBRL's proprietary technology."[75] The asserted patents disclose and claim nearly the same technology. Specifically, the asserted patents claim determining an individual patient's intrinsic frequency using an electroencephalogram (EEG), which is a form of biometric data, and then applying transcranial magnetic stimulation (TMS) to the patient's brain at a frequency based on the patient's individual intrinsic frequency to treat the patient.[76] In other words, the patents claim a "treatment protocol that is specifically tailored to each patient" wherein the frequency of the magnetic energy is adjusted based on biometric data that is first acquired and analyzed – precisely the technology at issue in the NBRL case.

NBRL alleged, in 2018, that its TMS technology can be used "to treat a variety of brain maladies including depression, which is an FDA approved indication, as well as other indications off-label such as Autism Spectrum Disorder (ASD), Post Traumatic Stress Disorder, (PTSD), Traumatic Brain Injury (TBI), and chemo brain."[77] Plaintiff's patents,

---

[73]    Exhibit B at 1 (emphasis added).
[74]    Exhibit K at ¶ 8.
[75]    *Id*.
[76]    U.S. Patent No. 8,475,354, cl. 1.
[77]    Exhibit K at ¶ 8.

19

in the present case, likewise claim using TMS to treat "depression," "autism," "head injury," "brain damage," and many other related brain conditions.[78]

This substantial overlap in technology between the NBRL case and the present case makes sense, as a practical matter. As discussed above, the co-founder of NBRL was the co-inventor of the Asserted Patents in this case. And, as also discussed, the Plaintiff in this case acquired substantially all of NBRL's assets, including the "MeRT" TMS technology at issue in the 2018 case, which is called "pMERT" in the patents.[79] The patents further explain that "pMERT" may be "alternatively called a Neuro-EEG Synchronization Therapy (NEST) device,"[80] an acronym that also appears in Plaintiff's complaint here.[81]

Furthermore, Plaintiff's December 5, 2019, press release, published before the December 24, 2019, settlement, boasted about Plaintiff's "***patented***, non-invasive, drug-free *MeRT[SM] process*" – the same allegedly misappropriated MeRT process at the heart of the 2018 lawsuit.[82] Plaintiff's press release boasted that its patented process involved, *inter alia*, "1) recording a patient's EEG/EKG; 2) processing this biometric data with computational neuroanalytics; [and] 3) generation of an individualized treatment protocol" – just like the process of recording and processing "biometric data" to generate a "treatment protocol that is specifically tailored to each patient" allegedly misappropriated according to the 2018 lawsuit.[83] Again, all of this overlap between NBRL's technology, the asserted

---

[78]    *E.g.*, U.S. Patent No. 9,446,259 at col. 47, ll. 14-32; col. 90, ll. 3-16; col. 93, ll. 21-39; col. 96, ll. 5-34 (disclosing and claiming treatment of dozens of brain conditions).

[79]    *Compare* Exhibit K at ¶ 8 (referring to "Magnetic EEG/ECG-guided Resonance Therapy" ("MeRT")) *with* U.S. Patent No. 8,475,354 at col. 6, l. 16 (referring to "Permanent Magneto-EEG Resonant Therapy (pMERT)").

[80]    U.S. Patent No. 8,475,354 at col. 6, ll. 16-18; col. 43, l. 43 – col. 44, l. 29 (repeatedly referring to "NEST (pMERT)" and "pMERT (NEST)" interchangeably).

[81]    Doc. 18 at ¶ 14 (referring to "NeoSync's EEG Synchronized TMS ('N.E.S.T.') device").

[82]    Exhibit G (press release) (emphasis added); Exhibit K (NBRL complaint) at ¶ 8.

[83]    Exhibit G (press release); Exhibit K (NBRL complaint) at ¶ 8.

20

[REDACTED – NON-CONFIDENTIAL VERSION]

patents, Plaintiff's technology, and the two lawsuits makes sense because, fundamentally, they are all the same technology, being patented and commercialized by the same people in the same building, who simply changed the name of their company and who are trying to sue the same competitor twice on the same facts.

Despite Plaintiff's prior knowledge of patents on its TMS process, ███████████████ ████████████████████████████████████████████████████████████████ ███████████████████████████████████. If a plaintiff wants to preserve a right to bring a future patent infringement case, the Federal Circuit explained in *Augustine Med*, it has the "responsibility to 'ma[k]e manifest' its intent to leave the issue of possible future patent infringement claims open for future resolution."[84]

Here, the parties settled the earlier trade secret case involving related TMS technology, and Plaintiff's predecessor in interest did not "make manifest" any intent to preserve the right to subsequently file patent infringement claims. The Federal Circuit made clear that for a potential cause of action to be excluded from an otherwise blanket settlement agreement and therefore preserved for a later lawsuit, the parties must affirmatively exclude it. Where, as here, a party is fully aware of potential patent infringement claims when it signs the settlement – especially where one of the signatories to the settlement was an inventor on the patent – the case for barring infringement claims is at its strongest. As a result, pursuant to the holdings in *Augustine Med.* and *Press Machinery*, the 2019 Settlement Agreement in this case demonstrated the parties' intent █ ██████████████████████████████████████████████ and therefore bars Plaintiff's patent infringement claims.

---

[84]    194 F.3d at 1373.

[REDACTED – NON-CONFIDENTIAL VERSION]

## IV.   CONCLUSION

The Court should grant summary judgment in favor of the Defendants with respect to Plaintiff's causes of action because: 1) there is no genuine issue of material fact that the Plaintiff is a successor in interest to NBRL; and 2) as a matter of law, the 2019 Settlement Agreement bars future lawsuits relating to acts alleged in the 2018 lawsuit, which include the acts allegedly giving rise to patent infringement in this case.  By bringing the present action, it follows that 3) Plaintiff has breached 2019 Settlement Agreement.

Therefore, Defendants respectfully seek summary judgment in favor of Defendants with respect to Plaintiff's Counts I-III (*see* Doc. 18), Defendants' Ninth Affirmative Defense (Settlement Agreement), and Defendants' Counterclaim VIII (Breach of Settlement Agreement) (*see* Doc. 36).

Respectfully submitted,

Dated: January 25, 2023        By:   */s/ Charles A. Blazer, II*
Charles A. Blazer, II
Allen M. Sokal
*Attorneys for Defendants*,
PeakLogic, Inc., and Kevin T. Murphy, M.D.

22

[REDACTED – NON-CONFIDENTIAL VERSION]

## CERTIFICATE OF SERVICE

I hereby certify that on January 25, 2023, I caused a copy of the foregoing

**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

and any attachments thereto to be served *via* electronic mail to counsel for all parties and their counsel of record, who are deemed to have consented to electronic service using the Court's CM/ECF system.

I declare under penalty of perjury that the foregoing is true and correct.

Respectfully submitted,

Dated: January 25, 2023              By:  */s/ Charles A. Blazer, II*
                                        Charles A. Blazer, II
                                        Allen M. Sokal
                                        *Attorneys for Defendants*,
                                        PeakLogic, Inc., and Kevin T. Murphy,
                                        M.D.

23

[REDACTED – NON-CONFIDENTIAL VERSION]