Kenneth M. Fitzgerald, Esq. (SBN: 142505)
kfitzgerald@fitzgeraldknaier.com
Robert G. Knaier, Esq. (SBN: 234466)
rknaier@fitzgeraldknaier.com
Keith M. Cochran, Esq. (SBN: 254346)
kcochran@fitzgeraldknaier.com
FITZGERALD KNAIER LLP
402 West Broadway, Suite 1400
San Diego, California 92101
Tel: (619) 241-4810
Fax: (619) 955-5318

Allen M. Sokal (pro hac vice)
asokal@dcpatent.com
Ditthavong, Steiner, & Mlotkowski
201 N. Union Street, Suite 110
Alexandria, VA 22314
Telephone (202) 297-2479
Attorneys for Defendants and Counterclaimants
PeakLogic, Inc. and Kevin T. Murphy, M.D.

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| WAVE NEUROSCIENCE, INC., a Delaware corporation<br><br>*Plaintiff,*<br><br>v.<br><br>PEAKLOGIC, INC., and KEVIN T. MURPHY, M.D., a Professional Corporation, doing business as MINDSET<br><br>*Defendants.* | CASE NO.: 3:21-cv-01330-CAB-SBC<br><br>**MEMORANDUM OF POINTS & AUTHORITIES IN SUPPORT OF DEFENDANTS' RENEWED MOTION FOR SUMMARY JUDGMENT**<br><br>Date: August 15, 2023<br>Judge: Hon. Cathy Ann Bencivengo<br><br>PER CHAMBERS RULES, NO ORAL ARGUMENT UNLESS SEPARATELY ORDERED BY THE COURT. |

# TABLE OF CONTENTS

I.     INTRODUCTION ...................................................................................... 1

II.    UNDISPUTED FACTS .............................................................................. 3

    A.     The Prior Lawsuit over Dr. Murphy's Practice of TMS ................................. 3

    B.     Wave's Successor Relationship to NBRL ....................................................... 4

    C.     New Evidence of Wave's Successor and Related Entity Relationship ........... 5

    D.     New Evidence that Wave Knew of Its Patent Infringement Claims Before
        the Settlement Agreement Was Entered ......................................................... 7

III.   ARGUMENT .......................................................................................... 14

    A.     Plaintiff is the Successor-in-Interest and a Related Entity to NBRL ........... 14

    B.     Wave Released Its Infringement Claims in the Settlement Agreement ........ 16

    C.     Wave Is Equitably Estopped from Denying the Effect of the Release ......... 22

IV.    CONCLUSION ........................................................................................ 23

# TABLE OF AUTHORITIES

**Federal Cases**

*Augustine Med., Inc. v. Progressive Dynamics, Inc.,*
194 F.3d 1367 (Fed. Cir. 1999) ........................................................*passim*

*In re Bennett,*
298 F.3d 1059 (9th Cir. 2002) .........................................................16

*Mays v. United States Postal Serv.,*
995 F.2d 1056 (Fed.Cir.1993)..........................................................16

*Press Machinery Corp. v. Smith R.P.M. Corp.,*
727 F.2d 781 (8th Cir. 1984)....................................................18, 19, 20

*Torres-Chavez v. Holder,*
567 F.3d 1096 (9th Cir. 2009) .........................................................14

*U.S. v. Jamie Harmon,*
No. CR 08-00938 JW, 2010 WL 11519181 (N.D. Cal. July 1, 2010) .........14

*U.S. v. William Cramp & Sons Ship & Engine Bldg. Co.,*
206 U.S. 118 (1907)......................................................................18

**State Cases**

*Alameda County Deputy Sheriff's Assn v. ACERA,*
9 Cal. 5th 1032 (2020) ..................................................................22

*Ashou v. Liberty Mut. Fire Ins. Co.,*
138 Cal. App. 4th 748 (2006) ..........................................................23

*Brown v. Goldstein,*
34 Cal. App. 5th 418 (2019) ...........................................................16

*Olofsson v. Mission Linen Supply,*
211 Cal. App. 4th 1236 (2012) ........................................................23

*Stanford Hotel Co. v. M. Schwind Co.,*
180 Cal. 348 (1919) ......................................................................15

**State Rules**

Cal. Civ. Code § 2332 ...................................................................................22

Cal. Evid. Code § 623 ..................................................................................23

Memorandum of Points & Authorities ISO of Defendants' Renewed MSJ

# I.    INTRODUCTION

Defendants previously moved for summary judgment on the ground that a December 2019 Confidential Settlement Agreement and Mutual Release (the "Settlement Agreement") bars plaintiff's claims in this case.  The Settlement Agreement resolved a prior lawsuit against defendant Kevin Murphy, M.D. which had been brought by The National Brain Research Laboratory, Inc. ("NBRL").  NBRL had sued Dr. Murphy over his use of transcranial magnetic stimulation ("TMS") technology, which NBRL alleged it owned.  The Settlement Agreement released Dr. Murphy, ████████████████ ████████████████████████████████████████████ ███████████████████████████████████████████  Defendants argued that plaintiff Wave Neoroscience, Inc. ("Wave") was NBRL's successor and a related entity to NBRL.

Wave avoided summary judgment by misleading the Court.  Wave's attorneys argued that Wave could not have waived rights to sue for patent infringement, because Wave acquired the patents for its TMS technology two months after the Settlement Agreement was entered, and because Wave had "*no idea* [the patent infringement claim] *was even potentially going to exist* at the time" of the Settlement Agreement.  Exh. 1 (Reporter's Transcript of April 4, 2023 Summary Judgment Hearing) at 12:14-15 (emphasis added).  Accepting Wave's assertion as true, the Court denied defendants' motion without prejudice, holding that there was a triable issue of fact as to whether Wave was "releasing something they knew about at the time they signed this release or suspected or should have known or could have known."  *Id.* at 15:18-20; Doc. No. 105 at 1:17-18.

Documents produced by Wave after the Court's ruling make clear that Wave did "suspect or should have known or could have known" about the patent infringement claims it failed to preserve in the Settlement Agreement.  Those documents show Wave knew, or at least believed when the Settlement Agreement was entered, that it was acquiring the patents.  An internal Wave memo created before the Settlement Agreement

1 │ was executed even describes ███████████████████████████████████

2 │ ████████████████████████    Those documents prove the falsity of Wave's assertions

3 │ that it had "no idea" its patent infringement claims were "potentially going to exist" when

4 │ the Settlement Agreement was signed. ████████████████████████████████

5 │ ████████████████████████████████████████████████████

6 │ ████████████████████████████████████████████

7 │ ████████████████████████████████████████████████████

8 │ when NBRL settled the prior lawsuit with a release that encompassed the same activities

9 │ Wave is (again) suing over now.  Wave (in the name of NBRL) waived its patent

10 │ infringement claims, because Wave knew or suspected it would have such claims when

11 │ Dr. Murphy received the broad, unreserved, forward-looking release of all known and

12 │ unknown claims arising from his practice of TMS.

13 │       Newly obtained documents also conclusively prove that Wave is, and was at the

14 │ time of the Settlement Agreement, NBRL's successor-in-interest and a "related entity" to

15 │ NBRL.  Those documents include sworn declarations filed in a federal court case in

16 │ Oregon, which were prepared and filed by the same attorneys representing Wave in this

17 │ case.  Those declarations have sworn testimony that Wave was—before the Settlement

18 │ Agreement—NBRL's successor-in-interest, and sworn testimony that NBRL was Wave's

19 │ predecessor.  A Wave founder's email states that ████████████████████████

20 │ According to that email (which Wave did not produce until after the prior MSJ ruling),

21 │ Wave was ████████████████████████████████████████

22 │ ████████████████████████████████████████████████

23 │ Exh. 2 (emphases added).  And as the Court is aware from the prior motion, six months

24 │ before the Settlement Agreement, Wave acquired all of NBRL's assets and agreed to

25 │ "cause NBRL" to litigate the prior lawsuit to conclusion.  For all practical purposes, at

26 │ the time of the Settlement Agreement, Wave and NBRL were more than "related

27 │ entities"; they were one and the same.  The forward-looking release in the Settlement

28 │ Agreement therefore binds Wave, and bars the claims in this case.

The Court left open the opportunity for defendants to renew their summary judgment motion upon discovery of evidence reflecting Wave's belief or suspicion of a potential patent infringement claim at the time the Settlement Agreement was entered. Exh. 1 at 15:21-16:2. Defendants now have that evidence. Lots of it. They also have new evidence proving that Wave is NBRL's successor-in-interest and a related entity to NBRL. The Court should therefore grant summary judgment, and dismiss this case.

## II.   UNDISPUTED FACTS

### A.   The Prior Lawsuit over Dr. Murphy's Practice of TMS

On September 11, 2018, in the Central District of California, NBRL and NBRL V, Inc. ("NBRL V") sued Dr. Kevin Murphy, alleging theft of trade secrets and eight other claims. Murphy Dec. ¶ 2, Exh. 3. According to the Complaint in that case ("the prior lawsuit"), NBRL possessed "revolutionary, proprietary, trade secret Magnetic EEG/ECG-guided Resonance therapy technology that it calls MeRT to treat a variety of brain maladies . . . and that MeRT involves applying Transcranial Magnetic Stimulation ('TMS'), which is magnetic energy, to the brain non-invasively through the skull." Exh. 3 ¶ 8. NBRL alleged that Dr. Murphy only learned of NBRL's TMS methods from NBRL, and specifically from "Yi Jin, the primary inventor of NBRL's proprietary MeRT technology . . . ." *Id.* ¶¶ 10-11. *See also id.* ¶ 12 (alleging that Dr. Murphy presented NBRL's materials with "Yi Jin, one of the founders of NBRL and the primary scientist behind NBRL's technology"). According to NBRL, Dr. Murphy was "unfairly competing with NBRL by treating patients . . . using the stolen trade secret information about which he learned from NBRL . . . ." More specifically, NBRL alleged Dr. Murphy had "taken the critical core elements of NBRL's MeRT/[TMS] technology and is using them in his own treatment protocols . . . ." *Id.* ¶ 16. NBRL further alleged its TMS technology (developed by Yi Jin) "is unique in that it involves taking and reading the biometric data of a patient and developing a treatment protocol based on the results using proprietary technology. The treatment protocol involves applying [TMS] energy non invasively through the skull to one or more locations on a patient's brain at a particular

frequency, at a particular strength, for a particular length of time in a particular pulse train pattern." *Id.* ¶ 38.

### B.     Wave's Successor Relationship to NBRL

According to Wave's CEO Fred Walke, Wave acquired all the assets of NBRL (and a host of other entities involved in TMS) in June 2019, through an "Asset Contribution Agreement" (or "ACA") signed on June 17, 2019.  Fitzgerald Dec. ¶ 2, Exh. 4.  The transaction by which Wave acquired NBRL's assets *closed* the same day the ACA was signed, *i.e.,* on June 17, 2019.  Exh. 4, ACA § 2.1.  At that time, the prior lawsuit against Dr. Murphy was still pending.  Exh. 5 (prior lawsuit docket).  In the ACA, Wave and NBRL essentially agreed to Wave taking control of the litigation, with Wave agreeing to use commercially reasonable efforts "to cause NBRL to litigate the Murphy Case to conclusion."  Exh. 4, ACA §5.6.

████████████████████████████████████████████████████

████████████  Murphy Dec. ¶ 4, Exh. 6.  As NBRL previously admitted in briefing on the prior MSJ, Yi Jin signed it on behalf of NBRL.  Doc. No. 84 at 5:12-13; *id.* at 8:14-16.  Yi Jin is a co-inventor of the patents being asserted in this case.  Exhs. 33-35.  Under the ACA, Yi Jin became Wave's employee and stockholder, eligible to earn bonuses of up to $3.5 million if he obtained financing or a buyer for Wave.  Exh. 39 at 566 ("Bonus Agreement").  It is obvious from that agreement that Yi Jin was not only an employee of Wave; he was *the key employee* of Wave—tasked with obtaining financing for, and selling, the company in exchange for rich rewards upon his success.  Wave previously represented to the Court that Yi Jin was never an officer or employee of Wave.  Doc. No. 84 at 5:12-14; Doc. No. 84-1 ¶ 12.  However, documents produced by Wave in discovery confirm that ████████████████████████  Exh. 2 (████████████ ████████████████████████████████████████) (emphasis added).  Indeed, Wave entered an Indemnification Agreement with Yi Jin on June 17, 2019, based on his "Corporate Status" with Wave, defined to mean his status as "a person

who is or was a director, officer, employee, agent, or fiduciary of the Company [Wave] . . . .” Exh. 9 §11(f).

### C.    New Evidence of Wave's Successor and Related Entity Relationship

On January 25, 2023, defendants filed a motion for summary judgment, arguing that the Settlement Agreement bars this action because 1) Wave is a related entity and successor to NBRL; and 2) Wave is pursuing claims over the same acts for which Dr. Murphy and his entities were released in the Settlement Agreement. *See* Docs. 82, 83, 91. Wave did not contest point 2. *See* Doc. No. 84. Instead, Wave's attorneys stated in Wave's MSJ opposition that "Wave cannot be a successor to The Newport Brain Research Laboratory . . . ." Doc. No. 84 at 5:24-6:1.

However, those same attorneys unequivocally represented to the federal court in Portland, Oregon—in sworn witness declarations—that Wave *is* NBRL's successor-in-interest. Fitzgerald Dec. ¶ 2, Exh. 10 (*Wave Neuroscience, Inc. v. Bradley et al.,* Case No. 3:19-cv-01413-SB (D. Ore.) Doc. 28-7 at 2 ¶ 3 (Declaration of Julie H. Kim, M.D. describing a contract "in effect with NBRL, Inc.'s successor in interest, Wave Neurosciences, Inc.")); Exh. 11 (Doc. 15-21 at 2 ¶ 4 (Declaration of Julie H. Kim, M.D. describing a contract "in effect with NBRL, Inc.'s successor in interest, Wave Neurosciences, Inc.")); Exh. 12 (Doc. 15-22 at 2 ¶ 2 (Declaration of Wave Military Care Coordinator Jon Warren describing activities at "Wave's predecessor, Newport Brain Research Laboratory ('NBRL')" and employment by NBRL ("Wave's predecessor"))); Exh. 13 (Doc. 35-5 ¶ 2  (Declaration of Alexander Ring describing his work "with the founders of the Newport Brain Research Laboratory ('NBRL')," employment as "the Senior Scientist at NBRL" from 2012 through June 2019, followed by: "Subsequent to the Asset Contribution Agreement transaction between Wave and various entities affiliated with NBRL, I became Wave's Senior Scientist" and "my more than 10 years' experience working for Wave and its predecessors in interest")). Those declarations were filed in September and October 2019. Fitzgerald Dec. ¶ 2, Exhs. 10-13. That was months before the Settlement Agreement was signed (in December 2019). Those

declarations are all on pleading paper with Buchalter attorneys J. Rick Taché and Roger L. Scott on the caption pages, undoubtedly reflecting that those attorneys drafted those carefully worded sworn statements.

Wave's attorneys at Buchalter also described Wave as NBRL's successor when seeking to prevent NBRL's former Chief Science Officer Dr. Robert Silvetz from serving as an expert witness for defendants.  Exhs. 14, 15.

***A Wave document produced after the MSJ hearing describes Wave and NBRL*** ■

■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

■■■■■■■■■■■■■■■■■■■■■■■  Exh. 2 (emphasis added); Fitzgerald Dec. ¶ 6, Exh. 16 (Bill Phillips LinkedIn profile describing him as "Founder/VP" of Wave).  Wave co-founder Bill Phillips is, along with Yi Jin, a named inventor on the patents-in-suit. Exhs. 33-35; Fitzgerald Dec. ¶ 7, Exh. 17.  Phillips is also a co-founder of NeoSync, the assignee of the Jin/Phillips patents.  Exh. 16.

Nevertheless, at the MSJ hearing (before the Phillips email was produced), Mr. Scott argued against a finding that Wave is a related entity or successor to NBRL, saying, "If the Court's position is that by paying legal bills for someone else, you become related, I think that's a very dangerous argument to make. I don't think by simply paying someone else's bills, they become a related entity, nor do I think that simply by buying an asset from someone else you become related to them.  That would create a successor in interest problem for every single asset transaction that occurs ever."  Exh. 1 at 10:1-8. The new evidence supporting this motion shows Wave did far more than just pay NBRL's legal bills.  According to Wave's attorneys, Wave is NBRL's successor-in-interest, and according to Wave's co-founder, Wave is the same company as NBRL but with a different name.  These newly obtained documents show there is also no possible

dispute that Wave is a "related entity" to NBRL; indeed, based on that new evidence, it is difficult to imagine how two entities could be any more related.

### D. New Evidence that Wave Knew of Its Patent Infringement Claims Before the Settlement Agreement Was Entered

At oral argument on defendants' MSJ, Wave's attorney Roger Scott asserted that Wave did not waive its patent infringement claims through the Settlement Agreement, by stating as follows: "You can't waive a claim that you had *no idea was even potentially going to exist* at the time." Exh. 1 at 12:14-15. *See also* Doc. No. 84 at 15:20-22 (Wave's MSJ opposition, stating "a party cannot be faulted for not carving out a claim from a general release *where it had no reason to know of the claim at the time of the release*") (emphasis added). Disclaiming any link between NBRL and the patents, attorney Scott stated those patents "were not acquired by Wave until February of 2020, two months after the Settlement Agreement was – occurred. . . . Neither of those NBRL entities ever owned the NeoSync patents." *Id.* at 12:17-18, 12:20-21. Distinguishing the caselaw cited by defendants on the ground that plaintiffs in those cases knew about patents when they gave releases, Mr. Scott represented that Wave did not know about or *even suspect* it would own the patents it is now suing to enforce. He did so by asserting that Wave did not own the patents at the time, "nor could anyone have contemplated carving out these NeoSync patents from the settlement . . . ." *Id.* at 13:23-24. Buchalter attorney J. Rick Taché appeared along with Mr. Scott at the hearing, and he sat silently by while Mr. Scott made those representations.

The Court relied on them, by holding that there was a triable issue of fact on the issue of Wave's awareness of a potential patent infringement claim at the time of the settlement. As the Court framed the question, there was an issue as to "what expectations Wave had in Dr. Jin about these patents and obtaining these patents and *did they suspect that they were going to get them. Did it just happen that the next day, they got up and two months later, they bought these patents, or *had there been any kind of ongoing negotiations prior to the settlement* where you could argue that *it was suspected they

*would have this claim in the near future,* or did it really just fall in their lap out of the sky and not be subject to the release. Those I think are the factual issues." *Id.* at 14:24-15:8 (emphases added). And, "were they releasing something they knew about at the time they signed this release or suspected or should have known or could have known"?  *Id.* at 15:18-20.  The answer to that question is yes.

Documents produced by Wave after the summary judgment hearing show that instead of "hav[ing] no idea" the patent infringement claim "*was even potentially* going to exist at the time" of the Settlement Agreement, Wave and its attorneys had *every* idea that claim was going to exist.  The documents show that ████████████████████ ████████████████████████████████ such that they did know (or at least suspect) that Wave would have "this claim in the near future." *Id.* at 15:5-6.  Indeed, the documents show that ██████████████████████████████████ ███████████████████████████████████████ such that "it was suspected they would have this claim in the near future." *Id.* at 15:3-6.

Wave's CEO Fred Walke ████████████████████████████ Exh. 21.  He followed up ████████████ ████████████████████████████████████████████████ Exh. 22 at 247. ███████████████████████████████ Exhs. 23, 24.  In November 2019, Wave ████████ ███████████████████████████████████ Exh. 19. ████ ██████████████████████████████████ *Id.* at 234. ██████████████████ ████████████████████████████████████████ Exh. 20 at 241. ███████████████████████ ████████████████████████████████████████ (*id.* at 239), ██████████████████████████████████

1   ████████████████████[1]   ████████████████████████

2   ██████████████   Exh. 25 at 256.  On December 11, 2019, before the Settlement

3   Agreement was signed, █████████████████████████████

4   ███████████████   Exh. 26.  ████████████████████████

5   ██████████████████████████████████████████████████

6   ████████████████████████████████   Exh. 27.

7   ██████████████████████████████████████████

8   ████   *Id.*   ███████████████████████████████

9   ███████████████████████████████████████████████

10  ██████████   Exh. 28.  In sum, Mr. Taché and the Buchalter firm were fully aware of

11  Wave's effort to acquire those patents before and during NBRL's negotiation of the

12  Settlement Agreement—a settlement entered under the authority of Wave and for the

13  benefit of Wave.

14      A Wave document created on December 20, 2019, entitled ████████████

15  █████████████   states that:

16  

22  Exh. 29 at 265 (emphasis added).  Tellingly, ████████████████████████

23  ██████████████████████████████   This reflects

24  the reality that NBRL and Wave were effectively one and the same.  That document ████

25

26  _____

27  [1] ██████████████████████████████████████████████

28  ██████████████████████████████████████████████

    ███████████████████████████   That Confidentiality Agreement was not
produced in discovery by Wave, however.  Fitzgerald Dec. ¶ 5.

1 ████████████████████████████████████████████████

2 ████████████████████████████████████████████

3 ███████████████████████ Fitzgerald Dec. ¶ 9, Exh. 30.  By its terms, the

4 Settlement Agreement was █████████████████████████████████

5 █████ Exh. 6 at 135████████████████████████████████████

6 ████████████████████████████████████).  Thus, before the

7 Settlement Agreement was effective, █████████████████████████

8 ████████████████████████████████████

9 █████████████████  In sum, NBRL's successor and related entity Wave—directly and

10 through its attorneys at Buchalter—knew full well that Wave had potential patent

11 infringement claims at the time Dr. Murphy received a ████████████████████

12 ███████ release from NBRL ███████████████████████████████████

13 ███████████████████████████████████████████

14 █████████████

15      The following timeline summarizes the evidence demonstrating that Wave is

16 NBRL's successor and a related entity, and showing that Wave knew about its potential

17 patent infringement claims before the Settlement Agreement became effective:

| Date | Event |
|---|---|
| July 7, 2013 | Asserted Patent No. 8,475,354 issued with Dr. Yi Jin and Bill Phillips as co-inventors, and assigned to NeoSync, a company co-founded by Dr. Jin and Bill Phillips.  Dr. Jin and Bill Phillips are also co-founders of NBRL.  Exhs. 31, 2. |
| July 9, 2013 | Asserted Patent No. 8,480,554 issued with Dr. Yi Jin and Bill Phillips as co-inventors, and assigned to NeoSync. |
| September 20, 2016 | Asserted Patent No. 9,446,259 issued with Dr. Yi Jin and Bill Phillips as co-inventors, and assigned to NeoSync. |

| Date | Event |
|------|-------|
| September 11, 2018 | NBRL sues Dr. Murphy, alleging misappropriation of NBRL's technology shared with him by Yi Jin, for "Transcranial Magnetic Stimulation ('TMS')" including NBRL's "Magnetic EEG/ECG-guided Resonance Therapy technology that it calls MeRT." Exh. 3 ¶¶ 8, 11. |
| June 17, 2019 | While the prior lawsuit is still pending, Wave acquires "substantially all of the assets from the many different onshore and offshore holding companies under NBRL" and "key NBRL personnel – all U.S. persons – were hired into new roles at Wave Neuroscience." Exh. 32 at 278. The Asset Contribution Agreement ("ACA") is signed on June 17, 2019. Exh. 4. The transaction closes upon that date of execution according to the ACA. Exh. 4, ACA § 2.1. In the ACA, Wave agrees to use "commercially reasonable efforts to cause NBRLI to litigate the Murphy Case to conclusion." Exh. 4, ACA § 5.6. |
| June 17, 2019 | Wave enters indemnification agreement with Yi Jin, agreeing to indemnify Jin based on his "Corporate Status" with Wave, defined to mean his status as "a person who is or was a director, officer, employee, agent, or fiduciary of the Company [Wave] . . . ." Exh. 9 §11(f) |
| August 2, 2019 | Wave's CEO Fred Walke emails with ███████████ ██████████████████████████████████████████ █████████████████ Exhs. 21, 22. Walke says, ███████ ██████████████ Exh. 22. |
| September–October 2019 | Wave's attorneys J. Rick Taché and Roger Scott file numerous declarations in U.S. District Court for the District of Oregon (Portland Division) containing sworn statements of Wave personnel describing |

| Date | Event |
|------|-------|
| | Wave as "NBRL, Inc.'s successor in interest," and describing NBRL as "Wave's predecessor" and "predecessor[] in interest."  Exhs. 10-13. |
| September-December 2019 | Wave and NeoSync ▮▮▮▮▮▮▮▮▮▮▮▮▮▮  ▮▮▮▮  Exhs. 19, 20, 22-28. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮  ▮▮▮▮▮▮▮▮▮▮▮  Exh 19 at 234; Exh. 20 at 241. ▮▮  ▮▮▮▮▮▮  Exh. 8 ▮▮▮▮▮▮▮▮▮▮▮  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮  ▮▮▮▮▮▮  Exh. 20 at 239. ▮▮▮▮▮▮▮▮  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮  ▮▮▮▮▮▮▮▮▮  Exh. 27. ▮▮▮▮  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮  ▮▮▮▮▮▮▮▮▮▮▮▮▮  ▮▮▮▮▮▮▮  Exh. 28. |
| December 5, 2019 | While the prior lawsuit is still pending, Wave issues a press release announcing the acquisition of NBRL, and stating that Wave owns the TMS technology that was at the center of the prior lawsuit.  Exh. 32. |
| December 20, 2019 | Wave ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮  ▮▮▮▮▮▮▮▮▮▮▮▮ |



| Date | Event |
|---|---|
| | ████████████████████████████████████ ████████████████████████████████ █████████████████████████████ ██████████████████████████ Fitzgerald Dec. ¶ 9, Exhs. 29, 30. |
| December 21, 2019 | Wave co-founder Bill Phillips emails ███████████████ ████████████████████████████████████ *Ibid.* |
| December 21, 2019 | Dr. Yi Jin ████████████████████████████ Exh. 6 at 139. |
| December 24, 2019 | Co-plaintiff NBRL V ████████████████████ ██████████████████ Exh. 6 at 141████████████ ████████████████████████████████████ ██████████████; *id.* at 135██████████████████) |
| February 13, 2020 | Plaintiff formally acquires the NeoSync patents (U.S. Patent Nos. 8,475,354, 8,480,554, and 9,446,259) from NeoSync, Inc.  Doc. No. 84-1 ¶ 13.  Dr. Jin, ████████████████████████, is a co-inventor of the Asserted Patents and co-founder of NeoSync, Inc. and NBRL.  Exh. 31.  Wave co-founder Bill Phillips is also a co-inventor of the patents and a co-founder of NeoSync.  Exh. 16. |
| June 28, 2020 | Wave co-founder Bill Phillips email stating ██████████████ ████████████████████████████████████ ████████████████████████████████████ ████████████████████████████████ Exh. 2 (emphases added). |



| Date | Event |
|------|-------|
| September 9, 2021 | Wave files this lawsuit.  Doc. No. 1. |

At no time did NBRL or Wave disclose to Dr. Murphy the possibility of a second lawsuit over the same conduct at issue in the prior lawsuit.  Murphy Dec. ¶ 5.  Instead, he was induced to waive his valuable counterclaims against NBRL in exchange for the promise of permanent peace.  *Id.*  Wave, however, had other undisclosed plans, which it would soon carry out by filing this lawsuit.

## III.   ARGUMENT

### A.   Plaintiff is the Successor-in-Interest and a Related Entity to NBRL

The 2019 Settlement Agreement expressly ███████████████████████ ███████████████████  Exh. 6 § 3.2.  Wave previously minimized its connection to NBRL, saying that it merely purchased certain assets of NBRL and only paid its legal fees in pursuing the prior lawsuit.  But sworn declarations filed in the federal court in Oregon squarely admit what Wave previously refused to acknowledge: Wave is NBRL's successor-in-interest, and NBRL is Wave's predecessor in interest.  Exhs. 10-13.  Wave's lawyers prepared and submitted those sworn declarations, thereby admitting to what is in them.  Wave is bound by those admissions.  *See Torres-Chavez v. Holder*, 567 F.3d 1096, 1101 (9th Cir. 2009) (parties are bound by the tactical admissions and concessions made by their lawyers); *U.S. v. Jamie Harmon*, No. CR 08-00938 JW, 2010 WL 11519181, at *2 (N.D. Cal. July 1, 2010) (lawyer's statements are authorized admissions by client).

A Wave email admits ████████████████████████████████████ ████████████████████████████  Exh. 2 at 22.  And the ACA shows that NBRL effectively became Wave, because NBRL contributed all of its assets (except for some cash and one unrelated license agreement) to Wave, in exchange for Wave stock.  Exh. 4, ACA at 111 (Schedule 1.2 "Excluded Assets").  Wave's public statements are in accord.  Exh. 32 (Wave December 5, 2019 press release stating Wave acquired

"substantially all of the assets from the many different onshore and offshore holding companies under NBRL" and "key NBRL personnel—all U.S. persons—were hired into new roles at Wave Neuroscience"). Wave then continued commercializing NBRL's TMS technology, including NBRL's Magnetic EEG/ECG-guided Resonance Therapy ("MeRT"). *Id.* Plaintiff and NBRL also share the same business address at 1601 Dove Street, Newport Beach, CA 92660.[2] Simply put, Wave and NBRL are the same entity, as Wave's founder described when saying Wave ████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████ Exh. 2 at 22. Having acquired "substantially all" of NBRL's assets and NBRL's key personnel ("**all** U.S. persons") and then continued the commercialization of NBRL's technology, Wave is merely the direct continuation of NBRL under a new name. Equity prohibits Wave from denying this conclusion. *See, e.g., Stanford Hotel Co. v. M. Schwind Co.*, 180 Cal. 348, 354 (1919) ("[I]t is well established in this state that under circumstances such as these, where a corporation reorganizes under a new name, but with practically the same stockholders and directors, and continues to carry on the same business, a court of equity will regard the new corporation as a continuation of the former corporation.").

The broad, forward-looking release in the Settlement Agreement was ████████ ██████████ ███████████████ The undisputed facts show that Wave is, and was at the time of the Settlement Agreement, a related entity to NBRL. The Court previously expressed the view that Wave would have trouble persuading a jury that it is not a related entity to NBRL. Exh. 1 at 10:23-11:4 ("These all involve the same people. The assets were moved from one company to another. There was a wholesale, as I understand it, transfer of assets. . . . If you put this on in front of a jury and say oh, we're not related, don't you think that's going to look a little awkward?"). But no jury trial is

---

[2] Exhibits 37 and 38 (corporate listings identifying the registered address for NBRL and Wave both as 1601 Dove Street, Newport Beach, CA 92660).

necessary on this question, because interpretation of the phrase "related entities" is a question of law for the Court.  *See Brown v. Goldstein*, 34 Cal. App. 5th 418, 432 (2019) ("The rules governing the role of the court in interpreting a written instrument are well established.  The interpretation of a contract is a judicial function.")  In the context of an unambiguous, fully executed contract, the Court must interpret the document based solely on the language itself, without resort to extrinsic evidence. *Id*. ("The court generally may not consider extrinsic evidence of any prior agreement or contemporaneous oral agreement to vary or contradict the clear and unambiguous terms of a written, integrated contract.").  Even where a contract term is ambiguous, there is no right to a jury trial if there is no conflict in the extrinsic evidence bearing on its interpretation.  *See id.*  There is no such conflict in any admissible extrinsic evidence bearing on the interpretation question here.  There is therefore nothing that necessitates a jury trial (or, for that matter, a bench trial).  The Court can and should find on the undisputed facts that Wave is a related entity to NBRL.

**B.    Wave Released Its Infringement Claims in the Settlement Agreement**

Because a settlement agreement is a contract, any issue regarding its scope "is a question of law" appropriate for resolution on summary judgment.  *Augustine Med., Inc. v. Progressive Dynamics, Inc.*, 194 F.3d 1367, 1370 (Fed. Cir. 1999); *Mays v. United States Postal Serv.*, 995 F.2d 1056, 1059 (Fed. Cir. 1993) ("The settlement agreement is a contract, of course, and its interpretation is a matter of law."); *In re Bennett*, 298 F.3d 1059, 1064 (9th Cir. 2002) ("Under California law, the interpretation of a [settlement agreement] is a question of law.").  The release here encompasses ███████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
███████████████████████  Exh. 6 § 3.2 (emphases added).  The "acts alleged in the Action" are the same acts alleged in the current lawsuit, namely, defendants' practice of TMS using protocols and methods allegedly shared with Dr. Murphy by

NBRL and, specifically, by Yi Jin (the purported inventor of Wave's patents). The release encompasses ██████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
██████████████████████████ Exh. 6 § 4 (emphases added).

Wave failed to reserve any right to sue on the patents over the same conduct at issue in the first case. That failure bars the claims it is now asserting. Wave's claim that it did not own the patents at the time of the Settlement Agreement is of no consequence, because Wave ████████████████████████████████████
██████████████ Exh. 6 § 3.2 (████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████████
██████████████████████████). "The phrase 'may have' is necessarily future-oriented." *Augustine Med.*, 194 F.3d at 1371. This is even more true of claims a party "*hereafter* may have.*" ██████████████████████████████████████
████████████████████████████████████████████████████
██████████████████████████ The release includes ████████████████████

████████████████████████████████████████████ It therefore
released the claims in this case.

The Supreme Court made clear more than a century ago that "stipulations of this kind are not to be shorn of their efficiency by any narrow, technical, and close construction.  The general language … indicates an intent to make an ending of every matter arising under or by virtue of the contract.  If parties intend to leave some things open and unsettled, their intent so to do should be made manifest." *U.S. v. William Cramp & Sons Ship & Engine Bldg. Co.*, 206 U.S. 118, 128 (1907).  The Federal Circuit applied this principle to settlements involving intellectual property disputes in *Augustine Med.*, 194 F.3d at 1373.  The court there held that releasing all claims arising from a dispute over competitive information, including trade secrets, prohibits a party from filing a new case asserting related patent infringement claims, even if the initial case did not allege patent infringement.  *Id.*  In reaching that conclusion, the Federal Circuit relied on the Eighth Circuit's *Press Machinery* decision, barring a party to the settlement of a trade secret claim from enforcing a related later-issued patent.  *Press Machinery Corp. v. Smith R.P.M. Corp.*, 727 F.2d 781 (8th Cir. 1984).  There, in the initial case, the plaintiff sought "an injunction barring [the defendant] from disclosing or using trade secrets or confidential information regarding" the plaintiff's business.  *Id.* at 783.  The parties then settled that case, releasing "all claims … which the parties hereto now have or under any circumstances could or might have, against the other arising out of, resulting from or in any way pertaining to the agreements and matters referred to in [the pleadings]."  *Id.* at 784.  A month and a half later, the plaintiff's pending patent application issued, encompassing the same proprietary technology the plaintiff had accused the defendant of misappropriating in the first case.  The original plaintiff then instituted a letter writing campaign essentially accusing the defendant of patent infringement, and as a result, the defendant lost a contract.  The defendant responded by filing a declaratory judgment action accusing the plaintiff in the first suit of breaching the settlement agreement, and the Eighth Circuit agreed.  *Id.* at 785.  The court explained that the essence of the first

case was the contention that the defendant there used "trade secrets, confidential information and plans and designs owned solely and exclusively by" the plaintiff.  *Id.* The later-issued patent covered related technology, and therefore the settlement prohibited the original plaintiff from asserting that patent against the defendant, even though the first case did not include, and could not have included, a patent infringement claim.  *Id.*  The court stressed that the settlement was "not limited to a release of the trade secrets claim," and "at the time [the first] suit was filed, and when it was settled," the defendant was using the plaintiff's subsequently patented technology.  *Id.*  "The release in the settlement agreement," the court explained, was "not limited to the cause of action then at issue; nor [wa]s it limited to resolving past disputes."  *Id.*  On the contrary, "[t]he agreement was an attempt to resolve finally those disputes then at issue and those that might arise in the future."  *Id.* at 785-786.  As a result, the Eighth Circuit concluded the release barred the plaintiff's patent infringement claims relating to the same technology as the trade secret claims.  *Id.*

In *Augustine Med.*, the Federal Circuit adopted the reasoning in *Press Machinery*. 194 F.3d at 1373.  The plaintiff there initially alleged that the defendant engaged in unfair competition.  The parties settled the case, including a release that was no broader than the release entered by Wave's predecessor in the prior lawsuit against Dr. Murphy.  After settling the initial case, the *Augustine Med.* plaintiff filed a new one, alleging patent infringement. The defendant sought summary judgment on the ground that the settlement of the unfair competition claim barred the subsequent patent litigation.  The trial court agreed.  In affirming the trial court's grant of summary judgment, the Federal Circuit explained that "[w]hile issues of patent infringement do give rise to individual causes of action, those individual causes of action cannot override the unambiguous language of a Settlement Agreement that releases all possible future claims related to the matters settled by the agreement."  *Id.* at 1372.  Following *Press Machinery*, the court held that a settlement "is not limited to the cause of action then at issue [in the first case]; nor is it limited to resolving past disputes."  *Id.*  There, as here, the agreement unequivocally "was

an attempt to resolve finally those disputes then at issue and those that might arise in the future." *Id.*  And as in *Augustine Med.*, plaintiff had "clear knowledge at the time of the Settlement Agreement" of the technology defendant used in its business, "and it was likely obvious that the [use of that technology] would not cease the instant the Settlement Agreement was signed." *Id.* at 1373.

As in *Press Machinery*, plaintiff's predecessor-in-interest NBRL filed a trade secret claim against Dr. Murphy and settled it, issuing a broad release. ████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████  Exh. 6 § 3.2.  The "acts alleged in the Action" were Dr. Murphy's use of NBRL's allegedly proprietary technology for TMS.  Exh. 3 ¶ 8.  The patents asserted in this case relate directly to the TMS technology at issue in the 2018 case.  Plaintiff has admitted as much, in a letter from its Buchalter lawyers asserting:

> While some of this technology was the subject of patents contained within Wave's patent portfolio, other portions of this technology was maintained by NBRL as a trade secret.  The subject trade secrets were instrumental to the success of NBRL and continue to be critical to the ongoing success of Wave. In addition, ***these trade secrets directly relate to the subject matter of the patents at issue in this case***.

Exh. 14 at 193 (emphasis added).  This substantial overlap in technology between the NBRL case and the present case makes sense.  After all, NBRL's co-founder Yi Jin was the co-inventor of the patents in this case.  NBRL alleged in the prior lawsuit that Dr. Jin shared his TMS technology with Dr. Murphy.  Exh. 3 ¶ 8.  And Wave acquired substantially all of NBRL's assets, including the "MeRT" TMS technology at issue in the 2018 case, which is called "pMERT" in the patents.[3]  The patents further explain that "pMERT" may be "alternatively called a Neuro-EEG Synchronization Therapy (NEST)

---

[3] *Compare* Exhibit 3 ¶ 8 (referring to "Magnetic EEG/ECG-guided Resonance Therapy" ("MeRT")) *with* U.S. Patent No. 8,475,354 (Exh. 33 at 310) at col. 6, l. 16 (referring to " Permanent Magneto-EEG Resonant Therapy (pMERT)").

device,"[4] an acronym that also appears in Plaintiff's Complaint here.  Doc. No. 18 ¶ 14 (referring to "NeoSync's EEG Synchronized TMS ('N.E.S.T.') device").

Despite Wave's prior knowledge of patents on its TMS process, it failed to reserve any right in the Settlement Agreement to file patent infringement claims on the TMS technology at issue in the 2018 case and at issue here.  If a plaintiff wants to preserve a right to bring a future patent infringement case, it has the "responsibility to 'ma[k]e manifest' its intent to leave the issue of possible future patent infringement claims open for future resolution."  *Augustine Med.*, 194 F.3d at 1373.  Wave did not do so here. Because Wave fully anticipated acquiring the patents it is now suing on, before and at the time of the Settlement Agreement, that failure defeats its claims.

The Court was obviously skeptical about Wave's attorney's assertions that Wave had no idea it had a potential patent infringement claim at the time of the Settlement Agreement.  *See* Exh. 1 at 15:1-7 (". . . did they suspect that they were going to get them. Did it just happen that the next day, they got up and two months later, they bought these patents, or had there been any kind of ongoing negotiations prior to the settlement where you could argue that it was suspected they would have this claim in the near future, or did it really just fall in their lap out of the sky and not be subject to the release."). Unfortunately, Mr. Scott and Mr. Taché were not candid with the Court about the existence of their own law firm's documents proving Wave "suspected it would have this claim in the near future."  The documents produced after the MSJ hearing prove conclusively ███████████████████████████████████████████████
Indeed, Wave ████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████████
██████ Exh. 29 at 265.  That document and the documents evidencing ████████████
████████████████████████████████████ put to rest the factual issue identified by the Court as the reason for denying the motion: "were they releasing

---

[4] U.S. Patent No. 8,475,354 (Exh. 33 at 310, 329) at col. 6, ll. 16-18; col. 43, l. 43 – col. 44, l. 29 (repeatedly referring to "NEST (pMERT)" and "pMERT (NEST)" interchangeably).

something they knew about at the time they signed this release or suspected or should have known or could have known."  Exh. 1 at 15:18-20.  Yes, they were.

Companies are deemed to know what their employees and attorneys know, because principals are charged with the knowledge of their agents. Cal. Civ. Code § 2332. Wave, through its Buchalter attorneys, clearly knew that it was acquiring the NeoSync patents when Dr. Murphy and his affiliated companies were being released from all claims arising from their practice of TMS.  Yi Jin, an officer of both NBRL and Wave, undoubtedly knew about the plan to acquire the NeoSync patents when he signed the Settlement Agreement on behalf of NBRL, which was for the benefit of Wave under its express agreement with Wave.  And Wave knew what its co-founder Bill Phillips and Fred Walke knew, which was ███████████████████████████████████████████
███████████████████████████████████████████

### C.    Wave Is Equitably Estopped from Denying the Effect of the Release

Dr. Murphy was led to believe that he would never again be sued over his practice of TMS.  Murphy Dec. ¶ 5. ████████████████████████████████████████
██████████████████████████████████████████████████████████ At no time did NBRL or its lawyer (whom Wave was paying) disclose Wave's pending purchase of the NeoSync patents.  At no time was Dr. Murphy apprised that Wave—which actually owned all of NBRL's assets—was acquiring patents it planned to sue him over, based on the same acts at issue in the prior lawsuit.  *Id.*  Dr. Murphy was misled by the concealment of material facts in connection with the Settlement Agreement. Equitable estoppel therefore prevents Wave from avoiding the release given to Dr. Murphy in the name of Wave's predecessor NBRL.

"The doctrine of equitable estoppel is founded on concepts of equity and fair dealing. It provides that a person may not deny the existence of a state of facts if he intentionally led another to believe a particular circumstance to be true and to rely upon such belief to his detriment." *Alameda County Deputy Sheriff's Assn v. ACERA*, 9 Cal. 5th 1032, 1072 (2020).  The elements of equitable estoppel are (1) the party to be estopped (here, Wave)

must know the facts; (2) the party must intend that the party's conduct will be acted on, or must act in such a way that the party asserting the estoppel (PeakLogic/Dr. Murphy) had the right to believe that the conduct was so intended; (3) the party asserting the estoppel must be ignorant of the true state of facts; and (4) that party must rely upon the conduct to the party's detriment.  *Ashou v. Liberty Mutual Fire Ins. Co.*, 138 Cal. App. 4th 748, 766-67 (2006); *see also Olofsson v. Mission Linen Supply*, 211 Cal. App. 4th 1236, 1246 (2012); Cal. Evid. Code § 623 ("Whenever a party has, by his own statement or conduct, intentionally and deliberately led another to believe a particular thing true and to act upon such belief, he is not, in any litigation arising out of such statement or conduct, permitted to contradict it.").

Those elements are all met here.  Wave was in charge of the prior litigation, and Wave paid the lawyer prosecuting it.  Wave knew ███████████████████████ ████████████████████████████, but Wave intended for Dr. Murphy to release his counterclaims in exchange for the broad, unqualified release of all claims arising from Dr. Murphy's practice of TMS.  Neither Wave nor NBRL ever apprised Dr. Murphy that he would be sued again over the same conduct, and he relied on language in the Settlement Agreement saying █████████████████████████████████ ███████████████████████████  It would be highly inequitable to allow Wave to avoid the consequence of its conduct in inducing Dr. Murphy to enter the Settlement Agreement through concealment of secret plan to sue him for patent infringement.  The Court can and should apply equitable estoppel to prevent this result.

## IV.    CONCLUSION

For the foregoing reasons, defendants respectfully request the Court to enter summary judgment, and dismiss plaintiff's claims with prejudice.

Dated: July 11, 2023

*/s/ Kenneth M. Fitzgerald*
Kenneth M. Fitzgerald
Fitzgerald Knaier LLP
Attorneys for Defendants and
Counterclaimants PeakLogic, Inc. and
Kevin T. Murphy, M.D.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 11, 2023, I caused a copy of the foregoing

**MEMORANDUM OF POINTS & AUTHORITIES IN SUPPORT OF DEFENDANTS' RENEWED MOTION FOR SUMMARY JUDGMENT**

and any attachments thereto to be served *via* electronic mail to counsel for all parties and their counsel of record, who are deemed to have consented to electronic service using the Court's CM/ECF system.

I declare under penalty of perjury that the foregoing is true and correct.


Respectfully submitted,


Dated: July 11, 2023          By:   */s/ Kenneth M. Fitzgerald*
                                    Kenneth M. Fitzgerald